COOLEY LLP
TOWER C. SNOW, JR. (58342)
(tsnow@cooley.com)
101 California Street
San Francisco, CA  94111-5800
Telephone:      (415) 693-2000
Facsimile:      (415) 693-2222

JOHN C. DWYER (136533)
(dwyerjc@cooley.com)
JESSICA VALENZUELA SANTAMARIA (220934)
(jsantamaria@cooley.com)
ADAM C. TRIGG (261498)
(atrigg@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Telephone:      (650) 843-5000
Facsimile:      (650) 849-7400

JOSEPH B. WOODRING (272940)
(jwoodring@cooley.com)
1333 2nd Street, Suite 400
Santa Monica, CA 90401
Telephone:      (310) 883-6400
Facsimile:      (310) 849-6500

Attorneys for Defendants
H. RAVI BRAR, SUSIE HERRMANN, ENRIQUE
SANTACANA, KEVIN CAMERON, and ANDREW
TANG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| In re ECOtality, Inc. Securities Litigation. | Case No.  3:13-CV-03791-SC<br>(Consolidated with 3:13-cv-03840 and 3:13-cv-04569)<br><br>**CLASS ACTION**<br><br>**MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>Judge:    Hon. Samuel Conti<br>Date:     August 22, 2014<br>Time:     10:00 a.m.<br>Ctrm:     1, 17th Floor |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 2

I.      INTRODUCTION ......................................................................................................... 2

II.     FACTS AND PROCEDURAL HISTORY................................................................... 4

        A.      The Parties.......................................................................................................... 4

        B.      ECOtality's Business ......................................................................................... 5

        C.      ECOtality Was Awarded the DOE Project in September 2009 and, as of
                Early July 2013, Had Completed Over 90 Percent of Planned Charger
                Installations ........................................................................................................ 6

        D.      ECOtality Repeatedly Cautioned Investors About the Many Risks Facing
                the Company, Including the Company's History of Losses, Volatile Stock
                Price, and Razor-Thin Capitalization................................................................. 7

        E.      ECOtality Was Unable to Obtain Additional Financing and Promptly
                Notified the Market ............................................................................................ 8

III.    LEGAL STANDARDS................................................................................................. 9

        A.      General Standards Governing Motions to Dismiss............................................ 9

        B.      Exchange Act Claims ...................................................................................... 10

        C.      Securities Act Claim ....................................................................................... 11

IV.     ARGUMENT ............................................................................................................. 11

        A.      Plaintiffs' Exchange Act Claims Should Be Dismissed ................................. 11

                1.      Plaintiffs fail to plead falsity ............................................................... 12

                        a.      Most of the statements that are allegedly false are
                                immunized under the PSLRA's express safe harbor ............... 12

                        b.      Defendants' statements of opinion and corporate optimism
                                are not actionable .................................................................... 15

                        c.      Plaintiffs plead no facts to suggest that any challenged
                                statement was false when made ............................................... 16

                2.      The Complaint Does Not Plead Facts Giving Rise to a Strong
                        Inference That Any Defendant Acted with Scienter............................... 19

                        a.      The confidential witness allegations do not give rise to a
                                strong inference of scienter ..................................................... 20

                        b.      The absence of stock sales refutes an inference of scienter .......... 23

                3.      Plaintiffs Fail to Plead Loss Causation ................................................ 24

        B.      Plaintiffs' Securities Act Claims Should Be Dismissed ................................. 28

V.      CONCLUSION .......................................................................................................... 29

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. McGrath,*
   2013 U.S. Dist. LEXIS 42575 (D. Ariz. Mar. 26, 2013) ...................................................... 27

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................................ 10

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ........................................................................................................ 29

*Brown v. Ambow Educ. Holding Ltd.,*
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014) .................................................................. 24, 25

*Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.,*
   2012 WL 685344 (N.D. Cal. Mar. 2, 2012) ...................................................................... 13

*In re Century Aluminum Sec. Litig.,*
   729 F. 3d 1104 (9th Cir. 2013) ............................................................................ 4, 11, 28, 29

*City of Livonia Employees' Ret. Sys. & Local 295/Local 851, IBT v. Boeing Co.,*
   711 F.3d 754 (7th Cir. 2013) ............................................................................................ 21

*In re Copper Mountain Sec. Litig.,*
   311 F. Supp. 2d 857 (N.D. Cal. 2004) .............................................................................. 14

*In re Cutera Sec. Litig.,*
   610 F.3d 1103 (9th Cir. 2010) ................................................................................ 3, 12, 15

*Delshah Grp. LLC v. Javeri,*
    2013 WL 2322488 (S.D.N.Y. May 28, 2013) ...................................................................... 4

*In re Downey Sec. Litig. ("Downey I"),*
   2009 WL 736802 (C.D. Cal. Mar. 18, 2009) .......................................................... 16, 26, 27

*In re Downey Sec. Litig. ("Downey II"),*
   2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........................................................ 19, 22, 24

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005) ................................................................................................ *passim*

*Higginbotham v. Baxter Int'l, Inc.,*
   495 F.3d 753 (7th Cir. 2007) ............................................................................................ 20

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.,*
   537 F.3d 527 (5th Cir. 2008) ............................................................................................ 20

CooLEY LLP
ATTORNEYS AT LAW
PALO ALTO

ii.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Janus Capital Grp., Inc. v. First Derivative Traders*,
4
    131 S. Ct. 2296 (2011) ........................................................................................ 12

5

*Karpov v. Insight Enters., Inc.*,
    No. CV09-856-PHX-SRB, 2010 WL 4867634 (D. Ariz. Nov. 16, 2010) ............................ 21

6

*Kearns v. Ford Motor Co.*,
7
    567 F.3d 1120 (9th Cir. 2009) ............................................................................ 10

8

*Krim v. pcOrder.com*,
    402 F.3d 489 (5th Cir. 2005) .............................................................................. 29
9

10

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ............................................................................ 24

11

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
12
    540 F.3d 1049 (9th Cir. 2008) ................................................................... 3, 24, 26

13

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..................................................................... 24, 29
14

15

*In re Netflix, Inc., Sec. Litig. ("Netflix I")*,
    923 F. Supp. 2d 1214 (N.D. Cal. 2013) ............................................................... 18

16

*In re Netflix, Inc. Sec. Litig. ("Netflix II")*,
17
    964 F. Supp. 2d 1188 (N.D. Cal. 2013) ............................................. 16, 21, 22, 23

18

*Pound v. Stereotaxis, Inc.*,
    2014 WL 1048590 (E.D. Mo. Mar. 18, 2014) .................................... 14, 21, 22, 23
19

20

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ..................................................... 26, 27

21

*Red River Res., Inc. v. Mariner Sys.*,
22
    2012 WL 2507517 (D. Ariz. June 29, 2012) ........................................................ 27

23

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .............................................................................. 29

24

*Ronconi v. Larkin*,
25
    253 F.3d 423 (9th Cir. 2001) ......................................................................... 17, 20

26

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ............................................................................ 28
27

28

Cooley LLP
Attorneys At Law
Palo Alto

iii.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)........................................................................ 3, 10, 16

4

*South Ferry LP #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)............................................................................... 3, 10

5

6

*In re Splash Tech. Holdings Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................. 16

7

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727377, (N.D. Cal. Sept. 29, 2000) ........................................ 12, 14, 27

8

9

*Sprewell v. Golden State Warriors*,
    266 F. 3d 979 (9th Cir. 2001).................................................................................. 9

10

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996).................................................................... 9, 11, 28

11

12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ 11, 20

13

14

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ............................................................................... 10

15

*In re VeriFone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993)................ 9

16

17

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003)............................................................................... 10

18

19

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................................... 16

20

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994)........................................................................... 20, 24

21

22

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)........................................................................*passim*

23

24

*In re Zumiez Inc. Sec. Litig.*,
    2009 WL 901934 (W.D. Wash. Mar. 30, 2009) .................................................... 21

25

26

*In re Zynga, Inc. Secs. Litig.*,
    2014 U.S. Dist. LEXIS 24673 (N.D. Cal., Feb. 25, 2014).................................... 11

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iv.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

**Statutes**

4

15 U.S.C.,

5
§ 77k(a) ........................................................................................................ 11
§ 77o(a) ........................................................................................................ 29
6
§ 78u-4(b)(1) ................................................................................................ 10
§ 78u-4(b)(2) ................................................................................................ 10
7
§ 78u-4(b)(4) ................................................................................................ 25
§ 78u-5(i)(1)(A)-(D) ..................................................................................... 12
8
§ 78u-5(c)(1)(A)(i) ....................................................................................... 12
§ 78u-5(c)(1)(B)(i) ....................................................................................... 12
9

10

**Other Authorities**

11

Fed. R. Civ. P.,

8(a)(2) .......................................................................................................... 10
12
9(b) ................................................................................................... 2, 10, 11, 28
12(b)(6) .......................................................................................................... 1
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

v.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3         PLEASE TAKE NOTICE that on August 22, 2014 at 10:00 a.m., or as soon thereafter as

4    this motion may be heard in the above-entitled court, located at 450 Golden Gate Ave, San

5    Francisco, California 94102, in Courtroom 1, 17th Floor, Defendants H. Ravi Brar, Susie

6    Herrmann, Enrique Santacana, Kevin Cameron, and Andrew Tang (collectively, "Defendants")

7    will move to dismiss the Consolidated Amended Complaint ("Complaint") filed by plaintiffs

8    Joseph W. Vale, Hua-Chen Jenny Lin, Jonathan W. Diamond, Eric M. Cohen, and Francis X.

9    Fleming ("Plaintiffs").  Defendants' motion is made pursuant to Federal Rule of Civil Procedure

10   12(b)(6) and is based on this Notice of Motion and Motion, the accompanying Memorandum of

11   Points and Authorities and attached Appendix of Risk Factor Disclosures, Request for Judicial

12   Notice, the Declaration of Joseph B. Woodring ("Dec.") and exhibits ("Ex.") thereto, all

13   pleadings and papers on file in this matter, and upon such other matters as may be presented to

14   the Court at the time of hearing or otherwise.

15

**STATEMENT OF RELIEF REQUESTED**

16        Defendants seek an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing

17   with prejudice Plaintiffs' Complaint and each of the four Counts for Relief asserted therein

18   against Defendants for failure to state a claim upon which relief can be granted.

19

**STATEMENT OF ISSUES TO BE DECIDED**

20        Do Plaintiffs' conclusory allegations fail to state a claim against Defendants upon which

21   relief can be granted, where the Complaint relies on PSLRA protected forward looking

22   statements, fails to allege any facts showing that a material statement was false when made, does

23   not plead a cogent or compelling inference of scienter, and fails to sufficiently plead loss

24   causation and Section 11 standing?

25

26

27

28

1.

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         This is a classic case of pleading "fraud by hindsight" that should not survive scrutiny

4    under Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act

5    ("PSLRA").   Plaintiffs' Consolidated Amended Complaint ("Complaint") relies on *ex post*

6    allegations in an attempt to contort normal operational issues, and unforeseeable developments,

7    into securities fraud.  Plaintiffs' Complaint fails on all counts.

8         ECOtality, as a leader in the electric vehicle ("EV") charging and energy storage systems

9    industry, was awarded a Department of Energy ("DOE") grant to deploy EV chargers and analyze

10   EV charger usage data throughout twelve regions of the country (the "EV Project").  ECOtality

11   made steady progress in completing its obligations under the award until a confluence of

12   unforeseen events in late July and early August 2013 – including the Company's inability to

13   obtain additional financing and the concomitant loss of funding from the DOE – plunged the

14   Company into a cash crisis.

15        The Complaint hinges on the Company's August 12, 2013 announcement of these and

16   other unknown (and unknowable) developments.  Starting there, Plaintiffs then speculate that

17   earlier statements throughout the preceding four months must have been false.   Plaintiffs'

18   allegations can be grouped into three categories of supposedly false statements: (1) ECOtality was

19   successfully completing its obligations under the EV Project; (2) ECOtality was well-positioned

20   to continue its growth and be viable after completion of the EV Project; and (3) ECOtality

21   planned to release a new product, the Minit-Charger 12, in Q3 2013.   (*See* ¶ 160.)[1]   The

22   Complaint does not, however, allege any facts, much less particularized ones, to support claims

23   based on these purportedly misleading statements as required by Rule 9(b) and the PSLRA.

24        First, Defendants' statements about the status of the EV Project were not false when

25   made.  Although Plaintiffs claim that ECOtality was severely lagging and "drastically" behind

26   schedule in installations of EV chargers, in reality, as of Q2 2013, ECOtality had installed over

27   
28   _____

[1]   Citations to (¶ __) are to the Consolidated Amended Complaint filed January 31, 2014
(Dkt. 52).

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

90% of the planned chargers and over 81 million miles had been recorded by participating vehicles.  (Ex. 1 at 19.)[2]  Although making significant progress towards meeting its objectives under the EV Project, ECOtality expressly cautioned investors that "**ECOtality North America may not continue to receive DOE funding or any other government funding**."  (Ex. 3 at 9.)  ECOtality repeatedly alerted investors about the soft EV market, warning that the Company had "focused on controlling operating costs" because of "lower-than-anticipated rate of adoption of EVs and PHEVs by consumers to date."  (Ex. 2 at 4.)  The DOE suspended funding due to ECOtality's financing challenges, not because of its rate of progress.

Second, Defendants' statements about ECOtality's (i) *expectations* for completion of the EV Project, (ii) *potential future sales* of EV chargers after completion of the EV Project and (iii) *prospects* for the yet-to-be-launched-Minit-Charger 12 were self-evidently forward looking and accompanied by PSLRA safe harbor language.  As such, they are expressly immunized from liability under binding Ninth Circuit precedent.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-12 (9th Cir. 2010).

Third, Defendants' generalized proclamations of corporate optimism on each of these topics – including that ECOtality had "successfully executed upon the objectives of the EV Project" (¶ 69), "demonstrated some solid progress" in post-EV Project sales initiatives (¶ 126), and generated "a healthy pipeline of interest" for the Minit-Charger 12 (¶ 70) – are inactionable as corporate puffery under long established Ninth Circuit authority.  *See, e.g.*, *Cutera*, 610 F. 3d at 1111.

Fourth, the Complaint does not plead particularized facts sufficient to support a conclusion that any defendant acted with deliberate recklessness or engaged in conscious

---

[2]  Citations to "Ex." refer to exhibits attached to the Declaration of Joseph B. Woodring and the page numbers in the lower right corner of each document.  The underlying documents are the subject of Defendants' Request for Judicial Notice ("RJN").  As set forth in the RJN, the exhibits, which are documents explicitly referenced in Plaintiffs' Complaint and/or public filings with the SEC, are properly subject to judicial notice and also may be considered under the incorporation by reference doctrine.  *See, e.g.*, *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *abrogated on other grounds as recognized by South Ferry LP #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

Cooley LLP
Attorneys At Law
Palo Alto

3.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

1    misconduct.  Rather, the Complaint relies exclusively on the statements of confidential witnesses

2    ("CWs") in pleading scienter, but does not allege facts to establish the CWs' reliability and

3    personal knowledge, much less facts that show what any individual defendant knew or believed at

4    any time during the Class Period.

5        Fifth, Plaintiffs' fail to plead loss causation, as they have not and cannot identify a

6    "corrective disclosure" that revealed any alleged fraud.

7        Finally, Plaintiffs' claim for violation of Sections 11 and 15 of the Securities Act should

8    be dismissed under controlling Ninth Circuit authority because Plaintiffs have not (and cannot)

9    plead any facts tracing their shares to the operative Registration Statement.  *In re Century*

10   *Aluminum Sec. Litig.*, 729 F. 3d 1104, 1106 (9th Cir. 2013).

11       Plaintiffs' gerrymandered, hindsight pleading is nothing more than an attempt to use the

12   federal securities laws as insurance to recover their failed investment.  But, as made clear by the

13   Supreme Court, investing involves risk, and the federal securities laws are "not [intended] to

14   provide investors with broad insurance against market losses."  *Dura Pharm., Inc. v. Broudo*, 544

15   U.S. 336, 345 (2005); *see also Delshah Grp. LLC v. Javeri*, 09-CIV-6909 KBF, 2013 WL

16   2322488, at *1 (S.D.N.Y. May 28, 2013) ("The securities laws are not an insurance policy for

17   investments gone wrong, inexperience, bad luck, poor choices, or unexpected market events.").

18   **II.    FACTS AND PROCEDURAL HISTORY**

19       **A.    The Parties.**

20       **Plaintiffs.**  Hua-Chen Jenny Lin, Jonathan Diamond, Eric Cohen, and Francis Fleming, Jr.

21   filed the instant action.[3]  (¶¶ 27-30.)  On October 15, 2013, six competing movants, including

22   Joseph W. Vale ("Vale"), filed motions to consolidate the actions, to appoint the movants as lead

23   plaintiffs and to approve the movants' selection of lead counsel.[4]  On December 13, 2013, the

24

25   [3]  On August 15, 2013, Hua-Chen Lin and Jonathan W. Diamond filed a complaint captioned *Lin v. ECOtality, Inc.*, Case No. 13-cv-3791 SC (the "*Lin*" action).  On August 19, 2013, Eric Cohen

26   filed a complaint captioned *Cohen v. ECOtality, Inc.*, 13-cv-3840 SC (the "*Cohen*" action).  On October 3, 2013, Francis X. Fleming, Jr. filed a complaint captioned *Fleming v. Brar*, 13-cv-4579

27   SC (the "*Fleming*" action).

28   [4]  (*See* Dkt. Nos. 17, 18, 22, 24, 27, & 29.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

4.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1    Court issued an order consolidating the actions, appointing Vale as Lead Plaintiff and approving

2    Vale's selection of lead counsel.  (Dkt. No. 47.)   On January 31, 2014, Plaintiffs filed the

3    operative complaint.  (Dkt. No. 52.)   The Complaint alleges that Plaintiffs purchased ECOtality

4    stock during the class period (*i.e.*, between April 16, 2013 and August 9, 2013) (¶¶ 1, 26-30), and

5    further alleges that Plaintiffs Vale and Diamond "acquired ECOtality shares in July 2013 that

6    were traceable to the [Company's S-3] Registration Statement," filed on July 1, 2013 and

7    effective on July 9, 2013 (¶ 186).

8        **Defendants**.  H. Ravi Brar was ECOtality's Chief Executive Officer, President, and a

9    director.  (¶ 31.)   Susie Herrmann was, and is, ECOtality's Chief Financial Officer.  (¶ 32.)

10   Plaintiffs also name the following outside directors as Defendants *solely* with respect to their

11   Section 11 and 15 claims: Enrique Santacana, Kevin Cameron, and Andrew Tang.  (¶¶ 33-35.)[5]

12       **B.      ECOtality's Business.**

13       ECOtality was a leader in designing, manufacturing, testing, and commercializing

14   advanced EV charging and energy storage systems.  (Ex. 3 at 3.)   ECOtality operated three

15   complementary business lines in the highly competitive electric vehicle supply equipment

16   ("EVSE") industry: Blink (EV charging stations for commercial and residential use), Minit-

17   Charger (fast-charging systems for industrial applications, including material handling and airport

18   ground support vehicles), and eTec Labs (a research and testing resource for governments,

19   automotive OEMs, and utilities).  (*Id.*)

20       ECOtality's passenger vehicle product line was comprised of Blink charging stations,

21   including the (1) Blink Residential Charger, (2) Blink Level 2 Pedestal Charger, and (3) Blink DC

22   Fast Charger.  (¶ 54.)   Commercial customers hosting the Company's Blink chargers included

23   Ikea, Fred Meyer/Kroger, Macy's, Sears, Cracker Barrel, Kimpton Hotels, Kohl's, McDonald's,

24   Regency Centers and WalMart.  (Ex. 3 at 3.)   In its Form 10-K filed in April 2013, the Company

25   anticipated that "a majority of [its] revenue [would] be derived from the sale of Blink chargers to

26   residential and commercial customers."   (*Id.* at 5.)   Although the Company's Minit-Charger

27

28   [5]  On September 16, 2013, ECOtality filed a voluntary petition for bankruptcy.  (¶ 22.)

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1   industrial line was in use by Southwest Airlines, PepsiCo, and Home Depot, among others (*id.*), it

2   constituted a minimal percentage of the Company's earnings, generating only 7 percent of total

3   revenue in FY2012.  (*Id.* at 19 (*Compare* FY2012 revenue of $54.7M *with* FY2012 revenue from

4   "[s]ales of industrial material handling products, ground support equipment and related products"

5   of $4.3 million).)

6   **C.    ECOtality Was Awarded the DOE Project in September 2009 and, as of Early**

7   **July 2013, Had Completed Over 90 Percent of Planned Charger Installations.**

8       In September 2009, the DOE awarded ECOtality the EV Project, a reimbursable cost

9   contract totaling $100.2 million to lead, support, and manage the largest deployment of EV

10  charging infrastructure in U.S. history.  (¶ 56.)  Under the EV Project, ECOtality deployed Blink

11  residential and commercial charging stations, along with DC Fast charging stations, throughout

12  the country.[6]  (¶ 57.)  The EV Project's installation target of 13,200 chargers was divided in three

13  discrete groups: residential (8,000 chargers), commercial (5,000 chargers), and DC Fast charging

14  stations (200 chargers).  (¶ 61; *see also* Ex. 4 at 4-5; Ex. 5 at 1.)  As of July 9, 2013, the DOE –

15  the entity funding the EV Project – concluded that "[t]he project ha[d] successfully deployed

16  more than 8,400 vehicles (101 percent of planned deployments) and 12,000 chargers (over 90

17  percent of planned deployments) . . . ."  (Ex. 1 at 19.)

18      ECOtality was only reimbursed under the EV Project for work completed.  (Ex. 1 at 12;

19  *see also* ¶ 60.)  As of August 2013, ECOtality had been reimbursed for approximately $97.5

20  million of its $100 million award.  (Ex. 4 at 7.)  Reimbursements under the EV Project comprised

21  the vast majority of the Company's revenue.  Revenue attributable to the EV Project during

22  FY2012 constituted over 72 percent of the Company's total revenue (Ex. 3 at 26 (*compare*

23

---

24  [6]  The EV Project originally contemplated that ECOtality would install 11,210 charging stations
    across five geographic regions.  (Ex. 1 at 7.)  When the DOE increased the EV Project award by

25  $13.8 million, the number of installation targets increased to a total of seven geographic regions
    and 14,960 charging units.  (Ex. 1 at 7-8; Ex. 3 at 4.)  Later, however, because "the demand for

26  electric vehicles was much less than originally anticipated," the DOE added five additional
    geographic regions so that it would be able to collect sufficient data, bringing the total to twelve

27  regions.  (Ex. 1 at 8.)  As regions were added, the number of charging station targets was *lowered*
    from 14,960 to 13,200, again because of slow EV sales.  (*Id.*)

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

6.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

FY2012 revenue of $54.7 *with* FY2012 revenue recognized under EV Project of $39.6 million)), and, during Q1 2013, the EV Project generated approximately 77 percent of the Company's revenue (Ex. 13 at 2).

**D.     ECOtality Repeatedly Cautioned Investors About the Many Risks Facing the Company, Including the Company's History of Losses, Volatile Stock Price, and Razor-Thin Capitalization.**

ECOtality repeatedly warned investors that investing in the Company was highly speculative and risky. For example, the Company incurred *and disclosed* net losses of $(13.7) million in 2007, $(8.1) million in 2008, $(29.5) million in 2009, $(16.4) million in 2010, $(22.5) million in 2011, and $(9.6) million in 2012. (Exs. 6 at 3; 7 at 3; 8 at 3; 9 at 3; 10 at 3; 3 at 19.) In other words, ECOtality had never made a penny in five years.

In 2012, the Company's thinly-traded stock, which ECOtality cautioned "could be volatile and could decline at a time when you want to sell your holdings" (Ex. 3 at 16), dipped *below* $1.00 per share for a period of thirty consecutive trading days, prompting the Company to specifically warn investors that it was subject to de-listing from NASDAQ.[7]  (*Id.* at 18.) Moreover, the Company's razor-thin capitalization, including net working capital *deficits* of $(3.4) million as of December 31, 2012 (*id.* at 21) and $(5.2) million as of March 31, 2013 (Ex. 18 at 6) made it clear that the Company was *highly* dependent on continued financing.

ECOtality cautioned investors about these and numerous other risks:

- "To execute our overall business strategy, we may require additional working capital, which may not be available on terms favorable to us or at all. …**There can be no assurance that if we were to need additional funds to meet obligations we have incurred, or may incur in the future, that additional financing arrangements would be available in amounts or on terms acceptable to us, if at all.  Furthermore, if adequate additional funds are not available, we may be required to delay, reduce the scope of, or eliminate material parts of the implementation of our business strategy."**

- **"A large percentage of our revenues depend on the progress of our activities under grants from the DOE.  The government has a unilateral ability to make changes in the terms of grants.  To the extent the DOE imposes changes which result in** significant reduction

---

[7]  Between January 1, 2012 and December 31, 2012, ECOtality's stock traded as low as $0.26 and did not go above $1.32 per share. (Ex. 3 at 16.)  The day before the class period commenced, the Company's stock was trading at $0.96.  (Ex. 20 at 10.)

of future activities under the grants, **changes in the nature or extent of reimbursable costs**, or changes for which we are unable to negotiate equitable adjustments, **our business, results of operations, and/or financial condition may be materially adversely affected."**

- "Our future growth is dependent upon consumers' willingness to purchase and use electric vehicles. **Our growth is highly dependent upon the purchase and use by consumers of, and we are subject to an elevated risk of any reduced demand for,** alternative fuel vehicles in general and EVs in particular. If the market for EVs does not gain broad market acceptance or develops more slowly than we expect, our business, prospects, financial condition and operating results will be harmed."

- "Problems with product quality or performance may cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share. …**Because of the limited operating history of our products, we have been required to make assumptions regarding the durability and reliability of our products …. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective products, which could have a material adverse effect on our financial condition and results of operations."**

- "Product development and commercialization milestones may not be met. … **If we do not meet the required development milestones, our commercialization schedules could be delayed**, which could result in alternative product offerings being purchased from competitors. **Delayed commercialization schedules may also impact our cash flow, which could require increased funding."**

(Ex. 3 at 8-13)[8] (emphasis added).

**E.    ECOtality Was Unable to Obtain Additional Financing and Promptly Notified the Market.**

On June 12, 2013, ECOtality entered into a Securities Purchase Agreement ("SPA") with a group of private investors (which *did not* include any of the Plaintiffs) who purchased 5.1 million shares for $8.2 million.  (Ex. 11 at 2.)

Approximately two months thereafter, ECOtality encountered, and immediately disclosed, a confluence of unanticipated events that significantly impacted the Company's ability to fund its operating losses.  In late July and early August, 2013, five things happened that unexpectedly changed the Company's financial position.  All were promptly disclosed to the market in a Form

---

[8]    Attached as Exhibit A is an Appendix of ECOtality's relevant Risk Factor Disclosures. ECOtality's filings with the SEC contained extensive and robust risk factor disclosures.  So as not to burden the Court with paper, Defendants only submit those risk factor disclosures relevant to Plaintiffs' claims.

Cooley LLP
Attorneys At Law
Palo Alto

8.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

8-K on August 12, 2013.  (Ex. 12.)  First, and most importantly, the Company learned on August 8 that it would not secure expected third party financing from an existing investor.  (*Id.* at 2.)  Second, on August 8, upon learning from the Company of its financing challenges, the DOE suspended reimbursements under the EV Project.  (*Id.*)  Third, the Company learned that the planned Q3 release of a new product, the Minit-Charger 12, would be delayed until 2014 because of unanticipated development issues.  (*Id.*)  Fourth, the Company realized that its non-EV Project sales would be significantly below forecasts.  (*Id.*)  Finally, the Department of Labor imposed a fine of $855,000 for previously disclosed labor law violations involving a third party provider, whereas the Company had expected a fine of, and set aside a reserve for, $597,000.  (*Id.*)

These developments impacted the Company in rapid succession, and the Company was not aware of them until just days before the 8-K was filed.  Plaintiffs' Complaint fails to allege a single particularized fact – in contrast to bald conclusions – which suggests the contrary.  Any of these events, in isolation, would have presented a challenge that could be overcome, but their simultaneous impact created more financial strain than ECOtality could withstand.  Accordingly, the Company retained a firm to advise on a potential restructuring or bankruptcy.  (Ex. 12 at 4.)  Following the Company's announcement that it could be facing bankruptcy in the near-term, its stock price fell by $1.15 per share.  (¶ 156.)

## III.   LEGAL STANDARDS

### A.   General Standards Governing Motions to Dismiss.

In considering a motion to dismiss, the Ninth Circuit has made clear that the Court need not accept conclusions asserted as "facts" or any other unsupported, conclusory allegation.  *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1476 n.5 (N.D. Cal. 1992) (citation omitted), *aff'd*, 11 F.3d 865 (9th Cir. 1993)); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996).  Nor should the Court accept allegations based on unwarranted deductions or unreasonable inferences, or allegations that contradict matters properly subject to judicial notice.  *See Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001).  The Court may, however, consider materials incorporated by reference in the Complaint and other matters subject to judicial notice.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

### B.    Exchange Act Claims.

To state a claim under Section 10(b), a plaintiff must allege: (1) a material; (2) misrepresentation or omission (falsity); (3) made with scienter; (4) in connection with the purchase or sale of a security; (5) upon which Plaintiffs relied; (6) which proximately caused (loss causation); (7) plaintiff's damages.  *Dura*, 544 U.S. at 341-42.

A plaintiff must clear three hurdles to plead an Exchange Act claim.  First, a plaintiff must meet the general pleading standard under Rule 8, which requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In making its determination, the Court should not accept "mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

Second, because fraud allegations harm livelihoods and reputations, *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009), a Section 10(b) claim must also satisfy Rule 9(b)'s heightened pleading obligations, which compel a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Thus, a plaintiff must aver the "who, what, when, where, and how" of the alleged fraudulent conduct, as well as "set forth what is false or misleading about a statement, and why it is false."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotations and citation omitted).

Third, a Section 10(b) claim must satisfy the PSLRA, which imposes even more stringent rules for pleading scienter and falsity, requiring a "high level of detail."  *South Ferry, LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

**Falsity.**   To satisfy the PSLRA, a plaintiff must identify with particularity: (1) *each* statement alleged to have been misleading and (2) the reasons why *each* statement is misleading. 15 U.S.C. § 78u-4(b)(1); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002), *abrogated on other grounds as recognized by South Ferry*, 542 F.3d at 784; *Silicon Graphics*, 183 F.3d at 984 (Plaintiff "must provide a list of all relevant circumstances in great detail").

**Scienter.**   A plaintiff must also "state with particularity facts giving rise to a strong inference" that *each* defendant acted with fraudulent intent or deliberate recklessness.  15 U.S.C. § 78u-4(b)(2).  A Section 10(b) claim will only survive "if a reasonable person would deem the

Cooley LLP
Attorneys At Law
Palo Alto

10.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1   inference of scienter cogent and at least as compelling as any plausible opposing inference one

2   could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

3   324 (2007).  Thus, "[a] court must compare the malicious and innocent inferences cognizable

4   from the facts pled in the complaint, and only allow the complaint to survive . . . if the malicious

5   inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

6     **C.**  **Securities Act Claim.**

7     To state a claim under Section 11 of the Securities Act, a plaintiff must allege the

8   purchase of securities in an offering pursuant to a registration statement that contained an untrue

9   statement of a material fact or omitted a material fact required to be stated therein or necessary to

10  make the statements therein not misleading *when made*.  15 U.S.C. § 77k(a).  To have standing, a

11  plaintiff who did not purchase shares in the offering *must* trace his or her shares back to the shares

12  issued pursuant to the registration statement of which plaintiff complains.  *Century Aluminum*,

13  729 F.3d at 1106.  A plaintiff who establishes standing must then "set forth an explanation as to

14  why the statement or omission complained of was false or misleading" when made.  *Stac*, 89 F.3d

15  at 1409.

16  **IV.** **ARGUMENT**

17    Plaintiffs fail to plead allegations sufficient to state a claim for relief under Sections 10(b)

18  or 20(a) of the Exchange Act or Sections 11 or 15 of the Securities Act.

19    **A.**  **Plaintiffs' Exchange Act Claims Should Be Dismissed.**

20    Plaintiffs' Complaint does not adequately allege securities fraud under the pleading

21  standards of Rule 8,[9] let alone under the more exacting standards of Rule 9(b) and the PSLRA.

22  As set forth below, Defendants statements were forward looking, and thus protected by the

23  PSLRA's statutory safe harbor, mere expressions of corporate optimism, or were not false when

24  made.  Moreover, Plaintiffs have not pled any facts, much less particularized facts, which show

---

[9]  Plaintiffs' Complaint collects a series of lengthy quotes from ECOtality's public statements and
applies bold font to paragraphs of text, without specifically identifying *which* statements Plaintiffs
claim to be false.  As Judge White recently underscored, this type of pleading plainly does not
satisfy Rule 8.  *See In re Zynga, Inc. Secs. Litig.*, No. C 12-04007 JSW, 2014 U.S. Dist. LEXIS
24673 (N.D. Cal., Feb. 25, 2014).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1    that Defendants acted with an intent to deceive.  Finally, Plaintiffs fail to plead loss causation.

2                    **1.      Plaintiffs fail to plead falsity.**

3           Plaintiffs' Complaint fails to allege with particularity that Defendants made any false

4    statements during the Class Period.[10]   Although it is difficult to ascertain precisely which

5    statements Plaintiffs contend are false, most of the myriad statements in the Complaint that

6    Plaintiffs quote and emphasize with bold font are inactionable *as a matter of law*.

7                    **a.      Most of the statements that are allegedly false are immunized
                             under the PSLRA's express safe harbor.**
8

9           Under the PSLRA's explicit safe harbor provision, if a statement is forward-looking and

10   accompanied by meaningful cautionary language, then no liability attaches, regardless of a

11   defendant's state of mind. 15 U.S.C. § 78u-5(c)(1)(A)(i); *Cutera*, 610 F.3d at 1111-12.  Under

12   *Cutera*, there is *absolute immunity* for forward looking statements when cautionary language is

13   used.  610 F.3d at 1111-12.[11]

14          **The challenged statements were forward-looking.**  The PSLRA defines "forward-

15   looking statements" as those related to future events, including plans and objectives of

16   management, statements regarding future economic performance, and/or the assumptions

17   underlying such statements. 15 U.S.C. § 78u-5(i)(1)(A)-(D).  Here, nearly all of the allegedly

18   false statements are clearly forward-looking and thus statutorily immunized by the PSLRA's safe

19   harbor:[12]

20

21   _____

     [10]   As an initial matter, Mr. Brar's statements during conference calls (¶¶ 70-71, 123-128) are
22   clearly inactionable against Ms. Herrmann.  *See Janus Capital Grp., Inc. v. First Derivative
     Traders*, 131 S. Ct. 2296, 2301-03 (2011) (holding that statements are only actionable under
23   Section 10(b) against the "maker" of the statement, and "the maker of a statement is the person or
     entity with ultimate authority over the statement . . .").  Here, Plaintiffs do not allege that Ms.
24   Herrmann made or had control over any of Mr. Brar's conference call statements.

25   [11]   "Even if no cautionary statement accompanies the forward-looking statement, the plaintiff
     must prove that the defendant made the statement with 'actual knowledge . . . that the statement
26   was false or misleading.'"   *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99-00109 SBA,
     2000 WL 1727377, at *5 (N.D. Cal. Sept. 29, 2000) (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)).
27
     [12]   These are only a sample of the many forward-looking statements quoted in Plaintiffs' lengthy
28   complaint.

                                                                **MOTION TO DISMISS CONSOLIDATED
                                                                AMENDED COMPLAINT
                                                                3:13-CV003791-SC**

- *ECOtality's expectations for completing the EV Project*:

  - "**We believe** that we are well on our way to completing the EV project by summer of 2013 and achieving **our goal** of over 13,000 chargers deployed by the middle of the year." (¶ 70 (emphasis added).)

  - "**We expect** to complete the installation of our Level 2 residential and public charging systems under the EV Project this summer. **We expect** to complete DC Fast Charger installations by Q3." (¶ 125 (emphasis added).)

- *ECOtality's prospects for transitioning from the EV Project*:

  - "**Moving forward** in 2013, **we'll continue** to build upon our multiple lines of business **as we launch** our Blink Network in new markets and are ramping up our sales organization for life beyond the EV Project." (¶ 70 (emphasis added).)

  - "**Our goal** is to promote the use of clean energy technology to best serve our customers while simultaneously cultivating shareholder value as we continue our transition and further build our business." (¶ 122 (emphasis added).)

  - "**[W]e expect** the steps we have implemented in Q1 to leverage and expand our network and put us in a position **to benefit from future growth** in usage and subscription fees; and that will provide us with recurring and predictable revenue streams." (¶ 123 (emphasis added).)

  - "In 2013, **we will continue to focus** on partnering with major retail outlets, large corporate clients, small and medium enterprises, industrial supply companies, utilities, commercial, retail and office building owners, state and local governments and automobile manufacturers." (¶ 131 (emphasis added).)

- *ECOtality's plans for releasing the Minit-Charger 12*:

  - "**[W]e are preparing to begin** installations in the third quarter." (¶ 7 (emphasis added.)

  - "**We'll begin** deliveries of the Minit-Charger 12 by Q3 of this year and we have already established a healthy pipeline of interest in this new product…. **[W]e believe we are primed to see** substantial growth in our Minit-Charger division as we launch new hardware and software offerings this year." (¶ 70 (emphasis added).)

  - "**We see opportunity** for substantial growth in the industrial fast-charging market, and the launch of our Minit-Charger 12 represents our new focus in this market. . . . In line with this trend, **we believe we are in an excellent position to grow** our Minit-Charger product offering, with new hardware and software launches planned for this year." (¶ 127 (emphasis added).)

  - "Our industrial product line expansions, **scheduled to launch later this year** are critical to our growth." (¶ 131 (emphasis added).)

Cooley LLP
Attorneys At Law
Palo Alto

13.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

These statements are quintessentially forward-looking. *See Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *4-5 (N.D. Cal. Mar. 2, 2012) (Conti, J.) (concluding that forecasts were inactionable forward-looking statements); *see also Pound v. Stereotaxis, Inc.*, No. 4:11CV1752 HEA, 2014 WL 1048590, at *5 (E.D. Mo. Mar. 18, 2014) ("[A] statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance.") (internal quotations and citation omitted). In *Pound*, defendants told investors that the company had a "backlog" of "outstanding purchase orders and other commitments that *management believes will result* in recognition of revenue." *Id.* at *1 (emphasis added). The Court held this statement was forward-looking because "[o]nly time can tell whether the orders and commitments included in 'backlog' would ever result in revenue." *Id.* at *5. Here, as in *Pound*, only time could confirm the accuracy of Defendants' predictions, including "*[w]e believe* that we are well on our way to completing the EV project by summer" and "*we believe* we are primed to see substantial growth in our Minit-Charger division." (¶ 70 (emphasis added).) *See Splash*, 2000 WL 1727377, at *6 ("A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made.").

**ECOtality expressly and repeatedly warned of the risks.** To immunize forward-looking statements, risk warnings must convey "substantive information about factors that realistically could cause results to differ." *See Splash*, 2000 WL 1727377, at *7 (internal quotes and citation omitted). Disclosures need not include all such factors so long as the ones included are of "similar significance to those actually realized." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004). Here, every press release, conference call, and SEC filing included express safe harbor language regarding forward-looking statements and referred investors to the detailed risk factors in ECOtality's SEC filings:[13]

---

[13] ECOtality's Forms 10-K, 10-Q, and S-3 explicitly state that each filing "contains forward looking statements" that involve risks and uncertainties, and that terms such as "anticipate," "estimate," "expect," "may," "plan," "project," "believe" and similar expressions are intended to identify forward looking statements. (*See,* Exs. 3 at 3; 18 at 4; 16 at 4.) The filings further caution that "actual outcomes may vary materially from those projected." (*See, e.g.,* Ex. 3 at 3.)

- *ECOtality's expectations for completing the EV Project*:

  o "A large percentage of our revenues depend on the progress of our activities under grants from the DOE. . . . **To the extent the DOE imposes changes which result in significant reduction of future activities under the grants . . . our business, results of operations, and/or financial condition may be materially adversely affected."** (Ex. 3 at 9 (emphasis added).)

  o "**ECOtality North America may not continue to receive DOE funding or any other government funding, which currently comprises a large portion of our consolidated revenue**. . . . We cannot assure you that current levels of government funding for our products and services will continue. Therefore, **the future of these revenue streams is uncertain and out of our control.**" (*Id*. (emphasis added).)

- *ECOtality's prospects for transitioning from the EV Project*:

  o "**Our future growth is dependent upon consumers' willingness to purchase and use electric vehicles.** . . . [W]e are subject to an elevated risk of any reduced demand for, alternative fuel vehicles in general and EVs in particular. **If the market for EVs** does not gain broad market acceptance or **develops more slowly than we expect, our business, prospects, financial condition and operating results will be harmed**." (*Id*. at 8 (emphasis added).)

  o "**Our future revenues and profits, if any, will depend upon . . .** our ability to successfully develop, market, manufacture and distribute our charging stations and chargers . . . **[and the] rate of consumer adoption of EVs in general** . . . ." (*Id*. at 9 (emphasis added).)

- *ECOtality's plans for releasing the Minit-Charger 12*:

  o "**Product development and commercialization milestones may not be met**. . . . **Delayed commercialization schedules may also impact our cash flow, which could require increased funding**." (*Id*. at 11(emphasis added).)

  o "**Our future revenues and profits, if any, will depend upon . . . our ability to successfully develop, market, manufacture and distribute our charging stations and chargers** . . . [and] **our ability to resolve any technical issues in the development and production of our products** . . . ." (*Id*. at 9 (emphasis added).)

  b.    **Defendants' statements of opinion and corporate optimism are not actionable.**

Because reasonable investors do not rely on them, generalized statements of corporate

This disclaimer is echoed in the Company's press releases and conference call transcripts. *See also* Ex. A (Appendix of Risk Factor Disclosures).

Cooley LLP
Attorneys At Law
Palo Alto

15.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

optimism do not constitute securities fraud.  *See, e.g., Cutera*, 610 F.3d at 1111 (recognizing "investors do not rely on vague statements of optimism like 'good,' [or] 'well-regarded'"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Vague statements of opinion are not actionable under the federal securities laws because they are considered immaterial and discounted by the market as mere 'puffing.'") (citation omitted); *In re Downey Sec. Litig. ("Downey I")*, No. CV 08-3261-JFW (RZx), 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009) (collecting citations and holding statements of "hope, opinion, or belief" are not actionable); *see In re Netflix, Inc. Sec. Litig. ("Netflix II")*, 964 F. Supp. 2d 1188, 1194-95 (N.D. Cal. 2013) (Conti, J.) (dismissing plaintiffs' securities fraud claim as to "optimistic statements . . . among candid statements of risk"); *see also In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1072, 1077 (N.D. Cal. 2001) (holding vague assessments such as "healthy," "strong," "robust," "well positioned," "solid," "improved," "better than expected," and "unfolding as planned," are not actionable).  Many of Plaintiffs' complained-of statements fall into this category:

- "We are still in the early stages of building out a nationwide network, but are **very encouraged** by our early success and are **well positioned** to monetize the growth trajectory of the EV industry."  (¶ 70 (emphasis added).)

- "Blink's **robust market presence**, combined with the increasing penetration of plug-in EVs, **well positions** the company for continued growth."  (¶¶ 10, 69 (emphasis added).)

- "[W]e have already established a **healthy pipeline** of interest in this new product."  (¶ 70 (emphasis added).)

- "Our Blink, Minit-Charger and eTec Labs businesses each provide **substantial opportunities** supported by **positive trends** in the commercial, residential and industrial EV markets."  (¶ 122 (emphasis added).)

- "The EV Project has provided us with a **solid foundation** to build upon, and we expect the steps we have implemented . . . put us in a **position to benefit** from future growth . . ." (¶ 123 (emphasis added).)

- "As the EV Project winds down, we have turned our attention to our next stage of growth and are **taking important steps** to meeting our aggressive internal objectives **to cultivate** a long-term, healthy and profitable business."  (¶ 124 (emphasis added).)

Such statements cannot sustain a claim for securities fraud.

Cooley LLP
Attorneys At Law
Palo Alto

16.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.      **Plaintiffs plead no facts to suggest that any challenged statement was false when made.**

Nor do Plaintiffs plead falsity with the particularity required.  To meet this exacting requirement, plaintiffs "must provide a list of all relevant circumstances in great detail" (*Silicon Graphics,* 183 F.3d at 984) and allege "contemporaneous statements or conditions" demonstrating falsity (*Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001)). They do not.

***Progress on the EV Project.*** Plaintiffs allege that Defendants lied when they said that ECOtality had "successfully executed upon the objectives of the EV Project" and that ECOtality was "well on [its] way to completing the EV project by summer of 2013 . . . ."  (*See, e.g.,* ¶ 72.)  But the very documents on which Plaintiffs' base their Complaint make clear that these statements were objectively true.   By July 2013, ECOtality had installed more than 12,000 chargers—over 90% of the EV Project goal (Ex. 1 at 19), had already ***exceeded*** the installation goal of 8,000 residential chargers (*id*. at 9), and had installed approximately 4,000 commercial chargers and 104 DC Fast Charging systems (Ex. 5 at 1).   Given the rate of installation of the commercial and DC Fast chargers at that time (approximately 200 per month and 25 per month, respectively), the Company was on pace to complete installations of the planned 5,000 commercial chargers by December 1, 2013 and the planned 200 DC Fast chargers by November 1, 2013.  (*See* Ex. 5 at 1.)  As the DOE itself made clear, data was being collected and analyzed "from more than 81 million miles of vehicles use and 1.7 million charging events equating to 14,146 Megawatt hours."  (Ex. 1 at 19.)[14]

Significantly, unlike Plaintiffs, the DOE *never* criticized ECOtality for its work on the EV Project.  Plaintiffs do not suggest otherwise.[15]   In fact, as of August 2013, ECOtality had been

---

[14]   Not only do the Office of Inspector General ("OIG") reports cited in Plaintiffs' Complaint make clear that ECOtality had all but completed the EV Project, even the most casual review of third-party analyst reports covering the Company confirms this.  Although Defendants could request judicial notice of these reports because, among other reasons, Plaintiffs expressly state that they have relied on the reports in pleading their claims (¶ 38), Defendants do not do so in order to minimize the burden on the Court.  If the Court would like to review these reports, however, Defendants would be pleased to submit them with an accompanying request for judicial notice.

[15] Plaintiffs grossly distort the OIG's conclusions by alleging that the reports "establish[] that Brar and Herrmann knew ECOtality would not successfully complete the EV project."  (¶ 5.)  In

reimbursed for $97.5 million of its $100 million award.  (Ex. 4 at 7.)  Thus, with more than 97% of the Project amount reimbursed, ECOtality had nearly completed the EV Project.  (*See id.*; *see also* Ex. 1 at 12; ¶ 60.)  The undisputed facts plainly demonstrate that ECOtality's statements regarding its substantial progress under the EV Project were neither false nor misleading when made, especially in light of the Company's repeated warnings that "[o]ur future growth is dependent upon consumers' willingness to purchase and use electric vehicles" and "[a] large percentage of our revenues depend on the progress of our activities under grants from the DOE."[16]  (Ex. 3 at 8, 9.)  *See In re Netflix, Inc., Sec. Litig. ("Netflix I")*, 923 F. Supp. 2d 1214, 1222 (N.D. Cal. 2013) (Conti, J.) (dismissing Section 10(b) claim where defendants' statements only "confirm[ed] Netflix's reliance on a model that worked as Defendants described and [that] failed due to circumstances Netflix had warned investors about in earlier disclosures").

**Post-EV Project Position.**  Plaintiffs contend that the Defendants misled investors into believing the Company was successfully transitioning to selling EV chargers without DOE subsidies.  (*See* ¶ 10.)  Plaintiffs are wrong.  In addition to being inactionable as (a) forward-looking statements and (b) corporate puffery, Defendants' statements about ECOtality's prospects *after* the EV Project were accurate because ECOtality was making substantial progress in residential and commercial non-EV Project sales.  For example, in May 2013 the Company announced the release of its next generation residential charger, which was to be offered at a lower price than predecessor versions.  (*See* Ex. 8 at 4.)  ECOtality had also entered into agreements with several large companies for the post-EV Project installation of commercial chargers, including Kroger and Texas Instruments, all of which was disclosed and known to the market.  (*See id.* at 3; *see also* Ex. 14 at 7.)  Moreover, ECOtality was signing up 500 new memberships to its Blink charging system each week (Ex. 15 ¶ 8) to add to its existing network of

---

reality, the OIG reports' analysis centers on the DOE's management of the EV Project, *not* the mental states of ECOtality's officers.

[16]  In addition, and as described more fully in Section IV.A.3, the allegedly false statements about the Company's progress on the EV Project cannot support a securities fraud claim because there was never any "corrective disclosure" on this issue.  Plaintiffs have not and never will be able to establish loss causation.

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

1  users.  Plaintiffs do not challenge any of these facts.

2  **Minit-Charger 12.**  Plaintiffs allege that Defendants lied by stating that the Minit-Charger

3  12 would be the "foundation" for the Company's next generation of industrial chargers and would

4  be launched in Q3 2013.  (*See, e.g.,* ¶ 96.)  Notwithstanding that Defendants' statements about the

5  *planned* release of the Minit-Charger 12 were, by definition, forward-looking and thus insulated

6  by the PSLRA's safe harbor, Plaintiffs have alleged no particularized facts showing that such

7  statements were false *when made*.

8  For example, CW2's supposed belief that a development schedule calling for the release

9  of the Minit-Charger 12 in June 2013 was "very risky" has no bearing on whether Defendants'

10  predictions for a launch in Q3 2013 – one to three months later – was attainable.  (¶ 90.)  Indeed,

11  CW2's statement that the June 2013 release deadline was "pushed out" still leaves open the

12  possibility of a Q3 2013 launch.  (¶ 90.)  Likewise, CW4's statement that development of the

13  Minit-Charger 12 was "obviously not on schedule" (¶ 94) does not indicate when this

14  determination was made or what it meant for a Q3 2013 launch date.  CW6's statements reflect

15  his or her *lack of* personal knowledge about the Minit-Charger 12 and the anticipated launch date

16  (¶ 95).  CW6 relies on water-cooler talk (i.e., hearsay from someone named "Victor") to speculate

17  that the predicted release date might be delayed.  (*Id.*)  Such obvious hearsay should be

18  disregarded.  *See In re Downey Sec. Litig. ("Downey II")*, No. CV 08-3261-JFW (RZx), 2009

19  WL 2767670, at *9 (C.D. Cal. Aug. 21, 2009) ("[T]he statements of a confidential witness are

20  disregarded if lacking in specificity or based on hearsay, rumor, or speculation.").

21  In addition, the industrial charger (i.e., the Minit-Charger) portion of ECOtality's business

22  was modest relative to the Company's total revenues.  In Q1 2013, *all* Minit-Charger revenue

23  amounted to only $1.9 million compared to the Company's total revenue of $15.9 million (Ex. 13

24  at 2), and the Minit-Charger 12 was merely one new product offering in an existing line of

25  products.  Plaintiffs' allegations regarding the Minit Charger-12 go nowhere.

26  In sum, Plaintiffs have utterly failed to plead falsity with the required particularity.

27

28

Cooley LLP
Attorneys At Law
Palo Alto

19.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

**2.     The Complaint Does Not Plead Facts Giving Rise to a Strong Inference That Any Defendant Acted with Scienter.**

To plead scienter, a complaint must contain specific "contemporaneous statements or conditions" demonstrating that defendants made false or misleading statements intentionally or with deliberate recklessness.[17] *Ronconi*, 253 F.3d at 432.  Plaintiffs must allege particularized facts to demonstrate that *each* defendant had a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 319 (internal quotations and citation omitted).  The Complaint will only "survive a motion to dismiss if the malicious inference is [cogent and] at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.  Here, none of the Complaint's allegations give rise to a strong inference of scienter as to any defendant. *Tellabs*, 551 U.S. at 325-26.

**a.     The confidential witness allegations do not give rise to a strong inference of scienter.**

Plaintiffs rely exclusively on statements of CWs to plead scienter.  Where a plaintiff attempts to plead a "strong inference" of scienter through CW allegations, the Ninth Circuit requires that these allegations "pass two hurdles[.]" *Zucco,* 552 F.3d at 992, 995.  First, the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco,* 552 F.3d at 995.  To do so, a complaint must "provide[] sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Id.* In other words, a complaint must show "that a person in the position occupied by the source would possess the information alleged." *Id.* (internal quotations and citation omitted).  Second, those CW statements that are sufficiently reliable must be "indicative of scienter." *Id.*[18]  Here,

---

[17]   As an initial matter, ECOtality's express and repeated risk warnings, described above, undermine any inference of scienter. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("The detailed risk disclosure in the Debenture Prospectus negates an inference of scienter.").

[18]   While the Ninth Circuit has not yet addressed whether courts should automatically discount allegations attributed to CWs, it has acknowledged that other circuits accord less weight to CWs under *Tellabs. Zucco*, 552 F.3d at 995 n.2 (citing *Ind. Elec. Workers' Pension Trust Fund IBEW*

1   Plaintiffs' Complaint fails on both counts.

2   **(1)  The CW allegations are not reliable.**

3   Plaintiffs' Complaint fails to describe each CW with sufficient particularity to establish

4   their reliability and personal knowledge.[19]

5   First, as the Complaint itself makes clear, several CWs were *not* in a position to give

6   reliable statements.  For example, CW1 makes numerous allegations about what was happening

7   within the **sales** organization, but CW1 was in the **IT** department.  (¶ 40.)  *See Zucco*, 552 F.3d at

8   996 (finding human resources employee had no firsthand knowledge of corporate department).

9   CW5 was a **regional** account manager responsible for **direct** sales (¶ 47), but made statements

10  regarding **indirect** sales **company-wide** (*id.*; *see also* ¶ 105).  This is not enough.  *See In re*

11  *Zumiez Inc. Sec. Litig.*, No. C07-1980-JCC, 2009 WL 901934, at *8 (W.D. Wash. Mar. 30, 2009)

12  (dismissing complaint where plaintiff did not provide "any facts to suggest that the [CWs] were

13  positioned to accurately assess the Company's performance on [] a broad scale"); *see also Pound*,

14  2014 WL 1048590, at *6 (disregarding confidential witness allegations where "[t]here is no

15  allegation that the confidential witnesses were in a position to testify reliably about any relevant

16  fact"); *see also Netflix II*, 964 F. Supp. 2d at 1198  (granting motion to dismiss where CWs did

17  not possess data relevant to the alleged misstatements).

18  _____

19  *v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("courts must discount allegations from confidential sources") and *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir.

20  2007) (*Tellabs* requires courts to "discount allegations [of] . . . 'confidential witnesses'" because "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or

21  how we could take account of plausible opposing inferences" when the confidential witnesses could be lying or nonexistent)).

22  [19]  Significantly, the CWs *only* talked to a single unidentified investigator, and *not to any of*

23  *Plaintiffs' lawyers*.  (¶ 39.)  This fact alone makes the veracity of the CW statements highly questionable, even before assessing their substance.  Although the Defendants do not ask the

24  Court to consider any facts other than those subject to judicial notice, Defendants request that the Court remind Plaintiffs of their responsibilities under Rule 11, particularly with regard to the

25  confidential witnesses identified in their Complaint.  That *none* of Plaintiffs' lawyers have spoken to the confidential witnesses (¶ 39) is a glaring red flag, and much of what the confidential

26  witnesses supposedly told Plaintiffs' investigator is without any factual basis and, in fact, is demonstrably false.  It is for this reason that Circuit and District Courts around the country are

27  loathe to rely on confidential witnesses when rendering opinions.  *See City of Livonia Employees'*

28  *Ret. Sys. & Local 295/Local 851, IBT v. Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013).

Cooley LLP
Attorneys At Law
Palo Alto

21.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

Second, other CWs are not described with enough detail to ensure their supposed statements are accurate. CW4 left ECOtality just one month into the class period, which calls into question the reliability of CW4's statements. *Karpov v. Insight Enters., Inc.*, No. CV09-856-PHX-SRB, 2010 WL 4867634, at *7 (D. Ariz. Nov. 16, 2010) (finding a CW not employed for entire class period is less likely to have "relevant personal knowledge"); *see also Pound*, 2014 WL 1048590, at *6 (concluding that CWs who left the company before the class period "cannot [] have relevant information about facts as they existed during the Class Period"); *see Netflix II*, 964 F. Supp. 2d at 1198 (concluding that CWs who were not employed by defendant company at the relevant time "do not plausibly support Plaintiffs' claims"). CW4 supposedly stated that the Minit-Charger 12 was "obviously not on schedule" and that there was a problem with the battery management system. (¶¶ 46, 94, 137.) But CW4 does not detail: (1) when the Minit-Charger 12 was off schedule, (2) how far off schedule it was, (3) whether others believed it could get back on schedule, or (4) whether anyone else even agreed that it was not on schedule, including, most importantly, Mr. Brar or Ms. Herrmann. (*See id.*)

Third, many of the CW allegations impermissibly rely on hearsay and speculation. *See Downey II*, 2009 WL 2767670, at *9 ("[T]he statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation."). For example, CW6's statements about the Minit-Charger 12 rely entirely on statements from "Victor," but CW6 does not even know Victor's last name, and provides no reason why "Victor" would know anything about the Minit-Charger 12. (¶ 95.) Such hearsay statements are plainly unreliable. *See Zucco*, 552 F.3d at 997 n.4 (holding hearsay statements "may indicate that a confidential witnesses' [*sic*] report is not sufficiently reliable, plausible, or coherent to warrant further consideration"). Similarly, CW3 merely "believed" that he or she knew the timing and cause of an issue involving overheating of the Company's charger plugs (¶ 45), but there are no allegations showing how or why CW3 developed this belief, what it was based on, or that CW3 communicated it to anyone.

In sum, Plaintiffs' CW allegations typify the sort of vague and conclusory allegations that courts have consistently held insufficient and that Congress enacted the PSLRA to prevent.

Cooley LLP
Attorneys At Law
Palo Alto

22.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

1
2

**(2)      The CWs are silent with respect to each Defendant's state of mind.**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

Not only are the CW allegations unreliable, they are not "indicative of scienter" under the second prong of the *Zucco* test.  *Zucco*, 552 F.3d at 995.  *None* of the six CWs claim to know anything about what any Individual Defendant knew or believed at any time during the Class Period.  Indeed, ***only one of the six CWs is alleged to have ever communicated with either Mr. Brar or Ms. Herrmann.***  (¶ 43.)  CW2 vaguely claims that he or she "reported to management" that there were significant problems with the Minit-Charger 12 that "would ***likely*** prevent it from being released by 3Q13 . . . ."  (¶ 43 (emphasis added).)  But CW2 does not claim to have definitively told Mr. Brar or Ms. Herrmann that the Minit-Charger 12 release schedule was not attainable (instead, CW2 supposedly conveyed only that a delay was "likely").  (*Id*.)  Furthermore, CW2's allegations are imprecise and do not include any details about how CW2 informed the defendants or how anyone else knew about CW2's purported concerns.  Without any allegations that the CWs provided Mr. Brar and Ms. Herrmann with information that they later concealed or misrepresented, there are no facts to support scienter.  *See Pound*, 2014 WL 1048590, at *6-7 (discounting statements of confidential witnesses who "operated three reporting levels below the Defendants" and who possessed only "anecdotal information" about the alleged issues at the company); *see also Zucco*, 552 F.3d at 996.

19
20
21
22
23
24
25
26

Finally, there are no allegations to demonstrate that Mr. Brar, Ms. Herrmann, or any other officer or management level employee, agreed with CW2 or that CW2's opinion was the correct one.  Put simply, Plaintiffs do not allege that any of the Defendants knew that the public statements regarding the EV Project, ECOtality's post-EV Project position, or the Minit-Charger 12 were materially false or misleading *when made* -- or that any statements were made by anyone *with an intent to deceive*.  *See Netflix II*, 964 F. Supp. 2d at 1198 (dismissing complaint where a CW's statements "do not indicate that Defendants had actual knowledge . . . at any point before they actually declared it").

27

**b.      The absence of stock sales refutes an inference of scienter.**

28

Plaintiffs cannot bolster their weak scienter allegations by pointing to Defendants' stock

Cooley LLP
Attorneys At Law
Palo Alto

23.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

sales – *because there were none*. Plaintiffs do not, and cannot, allege that Mr. Brar and Ms. Herrmann, or any other ECOtality officer or director, sold a single share of stock during the class period.  To the contrary, they held their ECOtality stock and therefore experienced a significant decline in their personal net worth as ECOtality's stock price tumbled.  At the start of the class period, Mr. Brar and Ms. Herrmann collectively owned more than 110,000 shares of ECOtality.  (Ex. 16 at 2.)  When ECOtality's stock dropped to $0.31 per share on August 12, 2013, Mr. Brar and Ms. Herrmann lost more than $260,000 combined, based on the peak stock price during the class period.  Similar losses were experienced by *all* of ECOtality's other officers and directors who owned common stock.  These facts refute any inference of scienter.  *See Metzler*, 540 F.3d at 1067 (concluding that a defendant's lack of stock sales militated against a strong inference of scienter); *Downey II*, 2009 WL 2767670, at *14 (holding that "any inference of scienter is negated by the complete lack of stock sales by the Individual Defendants during the class period").  Indeed, as the Ninth Circuit has explained, if an officer knew that the company's stock was inflated, he "probably would have bailed out of [his] substantial holdings" rather than incur the same "losses as . . . Plaintiffs themselves." *Worlds of Wonder*, 35 F.3d at 1424-25.

None of the Complaint's allegations create any plausible inference of scienter, let alone a strong one as required by the PSLRA.[20]

### 3.    Plaintiffs Fail to Plead Loss Causation

Loss causation requires a "causal connection between the material misrepresentation and the loss." *Dura,* 544 U.S. at 342.  This causal connection "specifically requires a plaintiff to state that the defendant's fraudulent practices were not only 'revealed to the market' through a 'corrective disclosure,' but also that the corrective disclosure caused the resulting losses." *Brown*

---

[20]   Plaintiffs also appear to allege that Mr. Brar and Ms. Herrmann made false and misleading statements in an effort to prevent the Company's stock from being delisted.  (¶ 121.)  But even if one accepted this allegation as true, such a motivation would be nothing more than a routine business objective of a CEO and CFO and, as such, not probative of scienter.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("PathoGenesis's alleged desires to obtain favorable financing and expand abroad are in themselves ordinary and appropriate corporate objectives. Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud.").

Cooley LLP
Attorneys At Law
Palo Alto

24.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

*v. Ambow Educ. Holding Ltd.*, No. CV 12-5062 PSG (AJWx), 2014 WL 523166, at \*5 (C.D. Cal. Feb. 6, 2014) (quoting *Metzler*, 540 F.3d at 1062-64); *see also Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) ("To be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company.") (internal quotation omitted). A statement is *only* a corrective disclosure if through it "the market actually learns of and reacts to the specific fraud alleged by the plaintiff, as opposed to reacting to reports of the defendant's poor financial health generally." *Brown*, 2014 WL 523166, at \*5.[21]

Plaintiffs fail to plead loss causation. On August 12, 2013, ECOtality issued a Form 8-K that disclosed a confluence of unexpected events which plunged the Company into a cash crisis:

(1) On August 8, 2013, the Company learned that financing that was being pursued from an existing investor would not be forthcoming;

(2) That same day, following the Company notifying the DOE of its funding challenges, the DOE suspended payments to the Company in connection with the EV Project and told the Company that it was not authorized to incur any new cost or obligation;

(3) The Company's board of directors retained FTI Consulting as a restructuring advisor to, among other things, facilitate the possible sale of the Company and its assets;

(4) The Company concluded that it might be forced to file for bankruptcy;

(5) The Company incurred unexpected and significant expenses in connection with a previously disclosed Department of Labor ("DOL") investigation;

(6) The Company had failed to attain sales volumes of its commercial EVSE chargers sufficient to support the Company's operations in the second half of 2013;

(7) The Company would be unable to release a new product offering in the Minit-Charger industrial line until 2014; and

(8) The Company had experienced overheating, and in certain *rare* cases melting, of the plug that connects the EVSE to the electric vehicle. (Ex. 12.)

Following these disclosures, ECOtality's stock price declined $1.15 per share, from $1.46 on August 9 to $0.31 on August 12, 2013. (¶ 161.)

---

[21] It is not enough that a misrepresentation only "touches upon" a later economic loss: to "'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." *Dura*, 544 U.S. at 343 (citing 15 U.S.C. § 78u-4(b)(4)).

Cooley LLP
Attorneys At Law
Palo Alto

25.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

Plaintiffs' Complaint does not allege a single particularized fact showing that any of these disclosures *was known or knowable* until just days before the Company's Form 8-K filing. Moreover, Plaintiffs ignore nearly all of the disclosures alerting the market to the Company's dire financial situation, focusing on only three things:  (1) the DOE would no longer fund the EV Project, (2) ECOtality had failed to attain sufficient EVSE sales volumes to support the Company's post-EV operations, and (3) the Minit-Charger 12 would not be released in Q3 2013, as planned.  (¶ 160.)   Plaintiffs' contention that only these factors led to the decline in ECOtality's stock price belies common sense and is insufficient to adequately plead loss causation.

First, it is clear from the Complaint and the facts subject to judicial notice that Defendants' statements regarding ECOtality's progress under the EV Project did not cause any of Plaintiffs' alleged losses.  The Company's August 12 Form 8-K made no "corrective disclosure," or indeed *any* disclosure, about the Company's progress under the EV Project.  (Ex. 12.)  Rather, it informed investors that ECOtality would not obtain necessary additional financing from a third party, and that *because of its financing challenges* the DOE had suspended payments under the EV Project.  (*Id.*)  The Complaint does not allege that the August 12 announcement "disclosed— or even suggested—to the market" that ECOtality misstated the status of the EV Project.  *Metzler*, 540 F.3d at 1063.

Second, although Plaintiffs claim that three factors caused the Company's stock price to drop, the far more plausible inference is that the decline was attributable to the disclosures about the Company's poor financial health – that additional financing would not be forthcoming and that the Company was exploring possible bankruptcy.  In the Ninth Circuit, a Company's disclosure of its poor financial health – and a resulting stock price drop – is clearly *not* sufficient for a plaintiff to plead loss causation.  *See In re Rackable Sys., Inc. Sec. Litig.*, C 09-0222 CW, 2010 WL 3447857, at *12 (N.D. Cal. Aug. 27, 2010); *see also Downey I*, 2009 WL 736802, at * 15.

In *Downey*, the plaintiff alleged that the defendant's restatement of $99 million in loans as troubled debt constituted a corrective disclosure that revealed earlier statements (that problems

Cooley LLP
Attorneys At Law
Palo Alto

26.

MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC

related to the loans were minor) were false.  2009 WL 736802, at *14-15.  The court disagreed, holding that loss causation was not pled because the alleged corrective disclosures "do not contain a disclosure of wrongdoing, and, at best, demonstrate only that the market learned of and reacted to Downey's 'poor financial health' rather than any alleged fraud."  *Id*. at *15.  Likewise, in *Rackable*, the plaintiffs alleged that the defendants made false and misleading statements about the company's financial projections, internal systems, relationships with customers, and projected sales of products.   2010 WL 3447857, at *4.  But "[a]ll of Defendants' statements that allegedly reveal the 'truth' of the fraud Defendants committed upon the market disclose negative news about Rackable's financial condition, its future prospects or the competition in the computer server industry in general."  *Id*. at *12.  The plaintiffs failed to plead loss causation because "these statements do not reveal the necessary causal link between the alleged fraud and the drop in Rackable's stock price."  *Id*.  Here, as in *Downey* and *Rackable*, Plaintiffs fail to establish a causal link between the alleged fraud and ECOtality's stock drop because ECOtality's August 12 Form 8-K merely disclosed the Company's recent financial struggles, including the failure to obtain financing and a potentially impending bankruptcy, not any alleged fraud.

The Supreme Court has underscored that loss causation is a basic element of any Section 10(b) claim, and it requires more than just proof that the share price was inflated by a misrepresentation on the date of purchase.  *Dura*, 544 U.S. at 342-46.  Rather, a plaintiff must prove that the "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  *Id*. at 346.  The Supreme Court has also made abundantly clear that an actionable loss *must* result from investors learning the truth regarding the previously misrepresented facts, and *not from other unrelated factors*:

> **[L]ower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.**

*Dura*, 544 U.S. at 343 (emphasis added).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1   For each of the foregoing reasons, Plaintiffs' Exchange Act claims should be dismissed.[22]

2   **B.    Plaintiffs' Securities Act Claims Should Be Dismissed.**

3   Plaintiffs' claims under Sections 11 and 15 of the Securities Act are patently deficient and

4   should be dismissed under controlling Ninth Circuit authority.  Aside from failing to adequately

5   allege their claims consistent with Rule 9(b),[23] Plaintiffs fail to allege standing under Section 11.

6   To have standing to bring a Section 11 claim, Plaintiffs must allege that the shares they

7   purchased are traceable back to the offering covered by the allegedly misleading registration

8   statement.  *Century Aluminum Co.*, 729 F.3d at 1106.  Where a company has issued stock in

9   multiple offerings, conclusory allegations that the securities "are traceable" to an allegedly

10  misleading registration statement, without specific supporting facts, will result in dismissal.  *Id.* at

11  1107-08.

12  Plaintiffs' conclusory statement that their shares are "traceable to the Registration

13  Statement" (¶ 186) is plainly deficient.  Nor could Plaintiffs ever cure this deficiency.  Before the

14  private placement, in which 5.1 million shares were sold, ECOtality had over 28 million shares

15  outstanding.  (*See* Ex. 17 at 4.)  Thus, eighty-five percent of ECOtality's outstanding shares

16  cannot be traced to its July 2013 Registration Statement.  "[E]xperience and common sense tell us

17  that when a company has offered shares under more than one registration statement, aftermarket

18  purchasers usually will *not* be able to trace their shares back to a particular offering."  *Century*

---

19  [22]  Plaintiffs' failure to plead a primary violation of Section 10(b) also requires dismissal of their

20  Section 20 claim.  *Splash*, 2000 WL 1727377, at *25-26.  In addition, Plaintiffs fail to allege any facts indicating that Defendants exercised "actual power or control" over a primary violator.  *See*

21  *Red River Res., Inc. v. Mariner Sys.*, CV 11-02589-PHX-FJM, 2012 WL 2507517, at *8-9 (D. Ariz. June 29, 2012).  Plaintiffs' boilerplate allegations of control (¶¶ 119, 120) are as a matter of

22  law insufficient to establish control person liability.  *Anderson v. McGrath*, No. CV-11-01175-PHX-DGC, 2013 U.S. Dist. LEXIS 42575, at *27-28, (D. Ariz. Mar. 26, 2013).

23  [23]  Although the heightened pleading requirements of the PSLRA normally do not apply to

24  Section 11 claims, plaintiffs are required to allege their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their complaint "sounds in fraud."  *Rubke v. Capitol*

25  *Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).  Although Plaintiffs attempt to disclaim their fraud allegations for the purpose of asserting their Section 11 claim (¶ 180), nominal efforts to

26  disclaim allegations of fraud are insufficient.  *Stac*, 89 F.3d at 1405.  The gravamen of Plaintiffs'

27  Complaint is fraud.  For the reasons stated, Plaintiffs fail to adequately allege fraud with particularity, and both their Section 10(b) and Section 11 claims should be dismissed for this

28  reason alone.

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

28.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

*Aluminum,* 729 F.3d at 1107-1108.

Indeed, Plaintiffs do not even attempt to trace back, nor could they. ECOtality's S-3 Registration Statement was filed on July 1, 2013 and went effective on July 9, 2013. (¶¶ 150, 151.) Plaintiff Diamond bought his ECOtality common stock on the open market twenty days later on July 29. (Dkt. 1 at 23-24.) Similarly, Plaintiff Vale's first open market purchase of ECOtality shares after the Registration Statement went effective was on July 12.[24] (Dkt. 30-3 at 2.) Thus, as a matter of law, without *any* factual allegations to support the inference that Plaintiffs' shares can be traced back to the Registration Statement – *i.e.* that they were shares specifically issued via the Registration Statement – Plaintiffs have not adequately pled standing to bring a Section 11 claim. *Century Aluminum,* 729 F.3d at 1108; *see also Krim v. pcOrder.com,* 402 F.3d 489, 497 (5th Cir. 2005) ("The fallacy of Appellants position is demonstrated with the following analogy. Taking a United States resident at random, there is a 99.83% chance that she will be from somewhere other than Wyoming. Does this high statistical likelihood alone, assuming for whatever reason there is no other information available, mean that she can avail herself of diversity jurisdiction in a suit against a Wyoming resident? Surely not").[25]

## V.   CONCLUSION

Despite Plaintiffs' improper efforts to use them as such, the federal securities laws are "not [intended] to provide investors with broad insurance against market losses." *Dura.*, 544 U.S. at 345; *see Basic Inc. v. Levinson*, 485 U.S. 224, 252 (1988) (White, J., concurring in part) (explaining that "[t]here is no support in the Securities Exchange Act, the Rule, or our cases" allowing for the conversion of Rule 10b-5 "into a scheme of investor's insurance"); *see also Meyer*, 710 F.3d at 1196 (Section 10(b) "is not a prophylaxis against the normal risks attendant to speculation and investment in the financial markets"). Plaintiffs fail to plead any particularized

---

[24] Vale made subsequent purchases on July 15, 16, 22, 24, 25, and August 1, 2, and 7. (Dkt. 30-3 at 2.)

[25] Plaintiffs' control person claim under Section 15 should similarly be dismissed due to a lack of standing and Plaintiffs' failure to adequately state an underlying Securities Act violation. 15 U.S.C. § 77o(a); *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

29.

**MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT
3:13-CV003791-SC**

1   facts to demonstrate scienter or falsity, offering only conclusory allegations based on hindsight.

2   Plaintiffs similarly fail to plead any actionable misstatement.  Finally, Plaintiffs fail to plead loss

3   causation or Section 11 standing.  For each of these reasons, Plaintiffs' Complaint should be

4   dismissed.  Moreover, because none of the Complaint's defects are curable, the dismissal should

5   be with prejudice.

6                                          Respectfully submitted,

7   Dated: May 2, 2014                     COOLEY LLP
                                           TOWER C. SNOW (58342)
8                                          JOHN C. DWYER (136533)
                                           JESSICA VALENZUELA SANTAMARIA (220934)
9                                          ADAM C. TRIGG (261498)
                                           JOSEPH B. WOODRING (272940)

10

11                                         _/s/ Tower C. Snow, Jr._____
                                           Tower C. Snow, Jr. (58342)

12                                         *Attorneys for Defendants*
                                           *H. Ravi Brar, Susie Herrmann, Enrique Santacana,*
13                                         *Kevin Cameron, and Andrew Tang*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28