**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ECOTALITY, INC. SECURITIES LITIGATION | ) Master File No. 13-03791-SC ) ) ORDER GRANTING MOTION TO ) <u>DISMISS</u> ) |
| _____ | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS | ) ) ) ) |
| _____ | ) |

## I.   <u>INTRODUCTION</u>

Now before the Court is Defendants H. Ravi Brar, Susie Herrmann, Enrique Santacana, Kevin Cameron, and Andrew Tang's (collectively "Defendants") motion to dismiss.  ECF No. 60. Plaintiffs bring this putative class action against Defendants and ECOtality, Inc. ("ECOtality") for making allegedly misleading statements that caused them to buy overvalued ECOtality stock.  The motion is fully briefed.[1]  Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for disposition without oral argument.  For the reasons set forth below, Defendants' motion is GRANTED.  Some of Plaintiffs' claims are DISMISSED WITH PREJUDICE, while others are DISMISSED WITH LEAVE TO AMEND, as specified below.

_____
[1] ECF Nos. 61 ("Opp'n"); 65 ("Reply").

United States District Court
For the Northern District of California

## II.   BACKGROUND

At the motion to dismiss stage, the Court assumes the truth of Plaintiffs' well-pleaded factual allegations, so these facts come from Plaintiffs' Consolidated Amended Complaint ("CAC").  ECF No. 52.  ECOtality designed, built, and sold electric vehicle ("EV") charging systems.  Id. ¶ 2.  Most of ECOtality's revenues came via the Department of Energy's ("DOE") Vehicle Technologies program.  In 2009, ECOtality received a $100.2 million grant from DOE to deploy EV chargers and analyze their usage (known as the "EV Project").  Pursuant to a 2012 modification to ECOtality's arrangement with DOE, ECOtality was required to deploy 13,200 EV chargers by September 2013 and to complete its data analysis by December 21, 2013.  Id. ¶ 3.

Plaintiffs allege that between April 16, 2013 and August 9, 2013 (the "Class Period"), Defendants made a number of false or misleading statements about ECOtality's progress on the EV Project and the company's business prospects.  After trading had closed on April 15, 2013, ECOtality issued a press release, held a conference call, and filed its fiscal year ("FY") 2012 Form 10-K with the Securities and Exchange Commission ("SEC").  Id. ¶¶ 69.  Plaintiffs allege that a number of the statements made in the press release, conference call, and 10-K were false or misleading.  Plaintiffs also allege that Defendants made false or misleading statements during a May 15 conference call and in a number of other SEC filings.  Plaintiffs further allege that Defendants knew these statements to be false or misleading at the time they were made.  Id. ¶¶ 5-6, 8, 11-14.  In August 2013, ECOtality revealed a number of problems with its business, including its inability to complete

United States District Court
For the Northern District of California

the EV Project, the suspension of DOE payments, ECOtality's failure to sell enough EV chargers to support its operations, and technological problems with its EV chargers.  Id. ¶¶ 20, 157-62. ECOtality's stock price suffered a precipitous drop on August 12. Id. ¶ 21.  ECOtality and its subsidiaries filed for bankruptcy in mid-September.  Id. ¶ 22.

Plaintiffs were ECOtality shareholders.  They purport to represent a class "of all persons who purchased ECOtality common stock during the Class Period and were damaged thereby."  Id. ¶ 163.  The alleged Class Period extends from April 16, 2013 to August 9, 2013.  Defendants were ECOtality officers or directors during the Class Period: Mr. Brar was the Chief Executive Officer ("CEO"), President, and a director; Ms. Herrmann was the Chief Financial Officer ("CFO"); and Messrs. Santacana, Cameron, and Tang were directors.  Plaintiffs bring claims against Mr. Brar and Ms. Herrmann under sections 10(b) (for making false or misleading statements that caused Plaintiffs to buy overvalued ECOtality stock) and 20(a) (for control person liability) of the Securities Exchange Act of 1934 (the "Exchange Act").  They bring additional claims against all five defendants under sections 11 (for including false or misleading information in a registration statement) and 15 (for control person liability) of the Securities Act of 1933 (the "Securities Act").  Id. ¶¶ 1, 172-95.

Defendants move to dismiss Plaintiffs' complaint pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim. Mot. at 10-11.  Defendants contend that (1) Plaintiffs fail to plead falsity; (2) Defendants' statements are protected by a safe harbor provision; (3) Defendants' statements were inactionable

corporate optimism; (4) Plaintiffs fail to plead that Defendants acted with deliberate recklessness or engaged in conscious misconduct; (5) Plaintiffs fail to plead loss causation because they did not identify a "corrective disclosure" that revealed alleged fraud; and (6) Plaintiffs fail to plead facts tracing their shares to the operative registration statement.

**III.  LEGAL STANDARD**

**A.  Motion to Dismiss**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The allegations made in a complaint must be both "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it" and "sufficiently plausible" such that "it is not unfair to require the opposing party to be

United States District Court
For the Northern District of California

subjected to the expense of discovery." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

### B.   Section 10(b) and Rule 10(b)(5)

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j(b).  One such rule prescribed by the SEC is Rule 10b-5.  Rule 10b-5 makes it unlawful to (a) employ any device, scheme, or artifice to defraud; (b) make an untrue statement of material fact or omit a material fact necessary to make a statement not misleading; or (c) engage in an act, practice, or course of business which operates as a fraud or deceit in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.  Plaintiffs allege that defendants violated all three subsections of Rule 10b-5.  CAC ¶ 174.  To establish a violation of Section 10(b) or Rule 10b-5, Plaintiffs must plead five elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." <u>In re Daou Sys.</u>, 411 F.3d 1006, 1014 (9th Cir. 2005).

Plaintiffs must also meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  Additionally, the

**United States District Court**
For the Northern District of California

complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2). The "required state of mind" for establishing securities fraud is the knowing, intentional, or deliberately reckless disclosure of false or misleading statements. See Daou, 411 F.3d at 1014-15. "The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." Id. at 1015 (internal quotation marks omitted).

## IV. **DISCUSSION**

Plaintiffs' CAC is hardly a model of clarity or concision. Rather, it is a redundant and repetitive tangle of verbosity. Defendants argue that "Plaintiffs' Complaint collects a series of lengthy quotes from ECOtality's public statements and applies bold font to paragraphs of text, without specifically identifying which statements Plaintiffs claim to be false." Mot. at 11 n.9. Defendants point out that many judges have rejected, or at least criticized, similar pleading tactics in securities class actions. See id.; Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (collecting cases in which "courts have repeatedly lamented plaintiffs' counsels' tendency to place the burden [] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims.") (citations and internal quotation marks omitted).

United States District Court
For the Northern District of California

Defendants are correct with respect to large sections of the CAC.  Paragraphs 69-111 suffer from precisely the problem Defendants identify.  In those paragraphs, Plaintiffs quote long sections of a press release and conference call transcript.  They highlight certain portions of those documents with bold and italic type.  The quotations are followed by paragraphs describing various alleged deficiencies.  However, not a single sentence connects any of the allegedly misleading statements with contradictory facts known to defendants at the time.  The Court will not attempt to divine Plaintiffs' intentions by trying to match potentially misleading statements with the alleged problems facing ECOtality. Therefore, any allegations contained only in those paragraphs are insufficient to state a claim.

Paragraphs 112-153 do a slightly better job of connecting the dots.  Those paragraphs explain that Plaintiffs make three primary allegations:

(1) Defendants issued a series of statements suggesting that ECOtality was "on track" to complete DOE's EV project when, in fact, Defendants knew that ECOtality was behind schedule and unable to complete the project;

(2) Defendants said that a new product, the Minit-Charger 12 ("Minit-Charger"), would be released in 2013 when, in fact, they knew it would not be; and

(3) Defendants said that ECOtality was making progress in shifting its business from one funded by DOE's EV Project to one funded by private sector sales when, in fact, they knew that no such progress was being made.

///

United States District Court
For the Northern District of California

1   Plaintiffs add an allegation that Defendants' cautionary language

2   was inadequate because it warned in hypothetical terms of problems

3   that were already occurring.  CAC ¶¶ 150-53.

4        Those claims are pleaded sufficiently in the CAC for the Court

5   to assess them.  Plaintiffs apparently allege that a number of

6   other statements were also misleading, but the Court will not

7   attempt to make Plaintiffs' case for them by isolating allegedly

8   misleading statements and matching them to contrary facts.  As

9   specified at the end of this Order, Plaintiffs may amend their

10  complaint if they intend to pursue claims based on any other

11  allegedly misleading statements.

12       Defendants make a number of arguments for dismissal that apply

13  to the claims the Court was able to identify from the CAC.

14  Defendants have also submitted a request for judicial notice.  The

15  Court analyzes the request for judicial notice first, and then

16  discusses each argument for dismissal in turn.

17       **A.   Request for Judicial Notice**

18       Defendants have requested judicial notice of twenty exhibits.

19  Defendants argue that judicial notice is proper because the

20  documents were either incorporated by reference into the CAC, or

21  are not subject to reasonable dispute and can be accurately and

22  readily determined from sources whose accuracy cannot be

23  questioned.  ECF No. 60-2 ("RJN") at 2-3.

24       Plaintiffs agree that Exhibits 1-5, 11-15, and 17-19 are

25  incorporated by reference into the CAC and that judicial notice is

26  therefore proper.  ECF No. 63 ("RNJ Response") at 1.  The Court

27  ///

28  ///

takes judicial notice of these documents, but does not necessarily assume their truth.[2]

Plaintiffs also have no objection to Exhibits 6-10 or Exhibit 20, because they are SEC filings of the sort that courts routinely take notice of in securities fraud cases. Id. at 2. The Court therefore takes notice of those documents as well.

Plaintiffs' only objection is to Exhibit 16, a proxy statement filed with the SEC listing percentage ownership of ECOtality shares by individual or entity. Plaintiffs argue that Exhibit 16 is irrelevant because they bring no claims of insider sales. Id. Defendants argue that Exhibit 16 is relevant because it indicates that they did not sell their stock prior to ECOtality's precipitous decline. Defendants claim that that failure to sell their stock indicates a lack of scienter, and that courts have routinely taken notice of similar filings in other cases. ECF No. 65 ("RJN Reply") at 3-4. In most of the cases Defendants cite, however, the defendants allegedly sold their shares prior to a major decrease in value in order to profit from an artificially inflated share price. See Gaylinn v. 3Com Corp., 185 F. Supp. 2d 1054, 1058 (N.D. Cal. 2000); Copperstone v. TCSI Corp., C 97-3495 SBA, 1999 WL 33295869, at *2 (N.D. Cal. Jan. 19, 1999). Judicial notice of the

---

[2] Defendants urge the Court to consider all documents incorporated into the CAC for their truth in their entirety. They point to several cases holding that the contents of documents incorporated by reference into a complaint are presumed to be true. However, were the Court to assume the truth of all documents incorporated by reference into the CAC, that would mean assuming the truth of all of Defendants' allegedly false or misleading statements. That cannot be the intended result of the cases Defendants cite, or it would be impossible ever to successfully plead a fraud claim. See Gammel v. Hewlett-Packard Co., 905 F. Supp. 2d 1052, 1061-62 (C.D. Cal. 2012) (explaining the difference between judicial notice and incorporation by reference, and considering documents incorporated by reference, but not for the truth of the matters they assert).

United States District Court
For the Northern District of California

defendants' holdings in those cases was, therefore requested by the
plaintiffs.  That is not alleged here, and Plaintiffs in fact
oppose judicial notice of the exhibit.

Nonetheless, Defendants correctly point out that some courts
have treated a <u>lack</u> of significant stock sales by defendants as
evidence against scienter.  <u>See</u> <u>In re Apple Computer Sec. Litig.</u>,
886 F.2d 1109, 1117 (9th Cir. 1989); <u>In re Downey Sec. Litig.</u>, CV
08-3261-JFW(RZX), 2009 WL 2767670, at *13-14 (C.D. Cal. Aug. 21,
2009) ("In this case, any inference of scienter is negated by the
complete lack of stock sales by the Individual Defendants during
the class period.").  Therefore, they argue, the Court should
consider their evidence as part of a competing inference of
scienter under <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551
U.S. 308, 314 (2007).  However, <u>Tellabs</u> does not grant defendants
an opportunity to provide competing <u>evidence</u> at the pleadings
stage.  That case held only that courts must consider "competing
inferences rationally drawn <u>from the facts alleged</u>."  <u>Id.</u> (emphasis
added).  Plaintiffs do not allege any facts regarding Defendants'
shares.  Plaintiffs do not assert any claims related to Defendants'
shares in ECOtality, nor do they put those shares at issue (as the
plaintiffs did in the cases Defendants cite).  Despite the
heightened pleading standards in securities fraud cases, it is
still inappropriate for the Court to consider contrary evidence
from Defendants at this stage.  Accordingly, Defendants' request
for judicial notice is DENIED with respect to Exhibit 16.

**B.   <u>PSLRA Safe Harbor</u>**

The PSLRA includes a safe harbor provision for a statement
that is "identified as a forward-looking statement, and is

accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A)(i).  As defined by statute, forward-looking statements include financial projections, statements of plans and objectives for future operations, and statements of future economic performance.  Id. § 78u-5(i).  Such statements are protected by the safe harbor provision, even if made with actual knowledge that they are false or misleading.  See In re Cutera Sec. Litig., 610 F.3d 1103, 1111-13 (9th Cir. 2010).  Generally, "statements related to future expectations and performance" are forward-looking and protected by the safe harbor provision.  Police Ret. Sys. v. Intuitive Surgical, Inc., 12-16430, 2014 WL 3451566, at *5 (9th Cir. July 16, 2014).

Some of Defendants' statements were undoubtedly forward-looking.  For example, Plaintiffs argue that Defendants' statement that "[w]e'll begin deliveries of the Minit-Charger 12 by Q3 of this year" was not forward looking "because Brar said '[w]e'll begin deliveries' (not we expect to begin deliveries)."  Opp'n at 18.  Plaintiffs do not explain why there is any meaningful difference; both "we will begin deliveries" and "we expect to begin deliveries" are forward-looking statements whose truth cannot be determined at the time they are made.  This is an example of a forward-looking statement and is inactionable.

Several more of the statements Plaintiffs highlight are also forward-looking.  For example, the following statements are both forward-looking:

    1. "[W]e expect the steps we have implemented in Q1 to leverage and expand our network and put us in a position to benefit from future growth in usage and subscription

fees; and that will provide us with recurring and predictable revenue streams."  CAC ¶ 123.

2. "[W]ith our network and growth strategy, . . .  we should be able to capture a reasonable share of this market over time."  Id. ¶ 124.

These statements resemble statements the Ninth Circuit has classified as forward-looking.  In a recent case, the Ninth Circuit held that statements regarding a company's relevance to a growing economic sector, and corresponding expectations regarding the company's growth, were forward-looking.  See Intuitive Surgical, 2014 WL 3451566 at *5.

A number of other allegedly misleading statements include Defendants' claims that ECOtality was "on track" or "on schedule" to complete certain projects or commitments.  Such statements include:

1. Mr. Brar's statement in the May 15, 2013 press release that "[w]e are on track to complete the commitments under the EV Project by the end of this year."  CAC ¶ 122;

2. The statement in ECOtality's 1Q13 Form 10-Q that "[t]he EV Project is scheduled for completion at the end of 2013."  Id. ¶ 129; and

3. Mr. Brar's statement that "[w]e are on track to begin delivery in the third quarter to satisfy our healthy pipeline of interest in [the Minit-Charger]."  Id. ¶ 127.

In one sense, these statements are predictions that ECOtality will meet certain goals or schedules.  However, they could also be interpreted as statements about ECOtality's present status, and in that sense the truth of the statements does not depend on any

United States District Court
For the Northern District of California

future condition.  The Ninth Circuit recently declined to "resolve whether the safe harbor covers non-forward-looking portions of forward-looking statements . . . ."  <u>Intuitive Surgical</u>, 2014 WL 3451566, at *5.  Other courts have disagreed as to whether similar statements qualify as forward-looking.  See <u>Szymborski v. Ormat Techs., Inc.</u>, 776 F. Supp. 2d 1191, 1198-99 (D. Nev. 2011) ("The authority on whether statements that a company is 'on track' are forward-looking statements is split . . . .").  In this District, judges have indicated that such statements may or may not be forward-looking.  Judge Wilken dealt with the issue in <u>In re Secure Computing Corp. Securities Litigation</u>:

> Defendants' statements that Secure was on track to meet analysts' earnings expectations . . . were, in part, projections that Secure would have quarterly earnings that were consistent with analysts' reported estimates. Plaintiffs, however, argue that these statements are actionable regardless of whether Secure ultimately met those expectations, because the statements were misrepresentations about current business conditions.  By stating that Secure was on track to meet expectations, Defendants represented that a reasonable person who knew what Defendants knew at the time the statements were made could reasonably conclude that Secure was likely to meet analysts' expectations.  Considered as statements of current business conditions, these statements were not forward-looking.  For purposes of this order, the Court accepts Plaintiffs' representation that they are alleging that Defendants misrepresented current business conditions rather than alleging that the forward-looking aspects of Defendants' statements were false or misleading when made.

120 F. Supp. 2d 810, 818 (N.D. Cal. 2000).  Judge Walker reached a similar conclusion in <u>In re Copper Mountain Securities Litigation</u>:

> The truth of such statements [including a statement that the company was "on track" to meet future goals], in large part, depends upon the occurrence of future events (such as the possibility that the CLECs would curtail future business).  But to the extent that such statements rested upon a characterization of the present state of

the company, such statements are not properly considered forward-looking. . . .

311 F. Supp. 2d 857, 880 (N.D. Cal. 2004).

These holdings appear consistent with First Circuit precedent regarding statements "composed of elements that refer to estimates of future possibilities and elements that refer to present facts." In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 212 (1st Cir. 2005). Stone & Webster involved a statement that the Company "has on hand and has access to sufficient sources of funds to meet its anticipated operating, dividend and capital expenditure needs." Id. at 207. As the First Circuit pointed out, "the statement asserts that the Company has present access to funds sufficient to meet anticipated future needs." Id. at 212 (emphasis in original).

The Third Circuit, by contrast, has held that statements that a company is "on track" or "positioned for" something "when read in context, cannot meaningfully be distinguished from the future projection of which they are a part." Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009). At least one district court has read Avaya as a split from Secure Computing. See Szymborski, 776 F. Supp. 2d at 1198-99. However, the disagreement is not necessarily so stark; none of these cases created hard and fast rules, and all three cases (either explicitly or implicitly) emphasized the importance of the context of the statements.

The Court is inclined to follow the other judges in this District, but the standard they have developed is mostly unhelpful. Secure Computing and Copper Mountain hold that these types of statements are not forward-looking to the extent that they describe current business conditions or rest upon a characterization of the

14

**United States District Court**
For the Northern District of California

present state of the company.  To some extent, every prediction,
projection, or forward-looking statement must be based on current
conditions, unless it is totally divorced from reality.  It was
obviously not the intention of Congress to subject every such
statement to liability.  What the case law agrees upon is that
context is critical to determining whether statements are forward-
looking.

Of the statements at issue in this case, Mr. Brar's assertions
that ECOtality was "on track" or "scheduled" to complete the EV
Project by the end of 2013 is the least likely to be considered
forward-looking.  Those statements certainly were not financial
projections, though they were arguably objectives for future
operations.  However, the statements might be construed, like the
statement in Secure Computing, as statements regarding current
business conditions.  Ultimately, the Court need not decide whether
these statements were forward-looking.  As described below, the
Court finds that Plaintiffs have failed to adequately plead falsity
or scienter with respect to those statements.  Plaintiffs' claims
based on ECOtality's assertions that it was on track to finish the
EV project fail regardless of application of the safe harbor.

Defendants' statements regarding the release of the Minit-
Charger are quintessentially forward-looking.  Though Defendants
used similar language -- again, a statement that ECOtality was "on
track" -- these statements fit precisely within the definition of
forward-looking statements in the statute.  The PSLRA explains that
a forward-looking statement is, among other things, "a statement of
the plans and objectives of management for future operations,
including plans or objectives relating to the products or services

of the issuer." 15 U.S.C. § 78u-5(i)(1)(B).  The context of the statement makes its forward-looking nature even clearer.  Just before stating that ECOtality was on track to begin delivery of the Minit-Charger in 3Q13, Mr. Brar said, "We see opportunity for substantial growth in the industrial fast-charging market, and the launch of our Minit-Charger 12 represents our new focus in this market."  CAC ¶ 127.  Mr. Brar was undoubtedly discussing ECOtality's plans relating to the future release of a product.  The Court finds that Defendants' statements regarding ECOtality's plans for the release of the Minit-Charger were forward-looking as defined by the PSLRA safe harbor.

Simply because the statements were forward-looking, however, does not necessarily mean they are entitled to protection. The statute requires that forward-looking statements be accompanied by meaningful cautionary language.  The conference calls, press releases, and SEC filings at issue in this case all included some cautionary language.  Plaintiffs do not claim that the cautionary language was inadequate on its face.  Indeed, the cautionary disclaimers that accompanied the conference calls and press releases were very similar to language the Ninth Circuit has approved.  Compare ECF No. 60-3 ("Woodring Decl.") Ex. 2 at 2, Woodring Decl. Ex. 13 at 1, and Woodring Decl. Ex. 19 at 7, with Intuitive Surgical, 2014 WL 3451566, at *6.  ECOtality's SEC filings also included cautionary language and sections identifying specific risk factors that might cause forward-looking statements to be inaccurate.  See Woodring Decl. Ex. 3 at 3, 8-15; Woodring Decl. Ex. 18 at 4, 8.
///

**United States District Court**
For the Northern District of California

1    Instead, Plaintiffs argue that Defendants' cautionary language

2  was defective because of what Defendants knew at the time.  These

3  arguments come in two flavors, but they share common critical

4  elements.  First, Plaintiffs argue that the cautionary language was

5  not meaningful because defendants knew that the forward-looking

6  statements were false, but that the cautionary language did not

7  explain that knowledge.  <u>See</u> Opp'n at 19.  Second, Plaintiffs argue

8  that the cautionary language warned of potential future problems

9  that Defendants knew were already occurring.  <u>See id.</u> at 20.

10    The first argument is based on a case that the undersigned

11  decided in 2008.  <u>See</u> <u>Rosenbaum Capital, LLC v. McNulty</u>, 549 F.

12  Supp. 2d 1185, 1191 (N.D. Cal. 2008) (Conti, J.) (holding that,

13  when a forward-looking statement is made with actual knowledge that

14  it is false, accompanying cautionary language can only be

15  meaningful if it articulates the reasons why the forward-looking

16  statement is false) (citing <u>In re SeeBeyond Tech. Corp. Sec.</u>

17  <u>Litig.</u>, 266 F.Supp.2d 1150, 1165 (C.D. Cal. 2003)).  <u>Rosenbaum</u>

18  predates <u>Cutera</u>, and Defendants argue that <u>Rosenbaum</u> is no longer

19  good law after <u>Cutera</u>.  <u>See</u> Reply at 4.

20    One of the primary issues decided in <u>Cutera</u> was whether the

21  two safe harbor provisions -- 15 U.S.C. Sections 78u-5(c)(1)(A) and

22  (B) -- should be read conjunctively or disjunctively.  Subsection

23  (A) provides safe harbor for forward-looking statements accompanied

24  by meaningful cautionary language, and subsection (B) provides safe

25  harbor for statements made without actual knowledge that they were

26  false or misleading.  The <u>Cutera</u> plaintiffs argued that "a

27  sufficiently strong inference of actual knowledge would overcome a

28  claim of safe harbor protection even for statements identified as

**United States District Court**
For the Northern District of California

1   forward-looking and accompanied by meaningful cautionary language."

2   Cutera, 610 F.3d at 1112.  The Ninth Circuit unequivocally rejected

3   that argument, holding that "subsections (A) and (B) and their

4   subpoints each offer safe harbors for different categories of

5   forward-looking statements."  Id. at 1113.  This holding had a very

6   important ramification: "Under subsection (A)(i), . . . if a

7   forward-looking statement is identified as such and accompanied by

8   meaningful cautionary statements, then the state of mind of the

9   individual making the statement is irrelevant, and the statement is

10  not actionable regardless of the plaintiff's showing of scienter."

11  Id. at 1112.  Rosenbaum and SeeBeyond, however, require the Court

12  to inquire into the speaker's state of mind to determine whether

13  the cautionary language is meaningful.  But the meaningful

14  cautionary language requirement appears in Subsection (A)(i), to

15  which the Ninth Circuit has held the speaker's state of mind is

16  irrelevant.  Rosenbaum and SeeBeyond were therefore abrogated by

17  Cutera, and Defendants are correct that neither remains good law.

18      Plaintiffs' second argument fares no better.  Plaintiffs argue

19  that cautionary language is not meaningful if it warns of future

20  possibilities that Defendants know are already occurring.  For

21  example, Plaintiffs argue that, when projecting the 3Q13 release of

22  the Minit-Charger, Defendants warned of potential problems that

23  could derail the product's release.  But, Plaintiffs argue, that

24  language was defective because Defendants knew that the problems of

25  which they warned were, in fact, already occurring and would

26  therefore delay the release date.  Though couched in slightly

27  different terms, this is essentially the same argument as before:

28  Defendants knew their statements were misleading, and therefore the

1  cautionary language could not be meaningful unless it explained why

2  the statement was misleading.  Once again, determining whether to

3  apply such a standard to the cautionary language requires inquiring

4  into the speaker's state of mind.

5      In support of their arguments, Plaintiffs cite two Ninth

6  Circuit cases.  The first, In re Convergent Technologies Securities

7  Litigation, 948 F.2d 507 (9th Cir. 1991), was decided before the

8  PSLRA was enacted.  The second, Berson v. Applied Signal

9  Technology, Inc., 527 F.3d 982, 985 (9th Cir. 2008), predates

10  Cutera and is inapposite.  Berson involved was a securities class

11  action against Applied Signal Technologies ("AST").  AST's

12  customers were almost exclusively federal government agencies, and

13  its contracts permitted government customers to issue "stop-work

14  orders" for up to 90 days.  The plaintiff shareholders alleged that

15  AST immediately ceased to earn money on stopped orders and that

16  stopped orders were often canceled.  AST never got paid for

17  canceled contracts.  The plaintiffs alleged that AST counted

18  stopped work as part of its "backlog" (work the company had

19  contracted to do but had not yet performed), even though the

20  stopped work was unlikely ever to be performed.  Id. at 984.  AST's

21  SEC filings included warnings that potential changes in delivery

22  schedules and order cancellations rendered the "backlog at any

23  particular date . . . not necessarily representative of actual

24  sales to be expected . . . ."  Id. at 985-86.

25      The Ninth Circuit held that AST's definition of "backlog" was

26  misleading.  The Court determined that it was reasonable to

27  interpret the warning to mean that stopped work was not included in

28  the backlog.  The Court did mention that the warning regarding

United States District Court
For the Northern District of California

19

United States District Court
For the Northern District of California

1  changes and cancellations of deliveries "speaks entirely of as-yet-

2  unrealized risks and contingencies. Nothing alerts the reader that

3  some of these risks may already have come to fruition . . . ."  Id.

4  at 986.  However, that sentence appears in a discussion of whether

5  the statements were misleading, not a discussion of the adequacy of

6  cautionary language for a forward-looking statement.  The Ninth

7  Circuit held that the statements were not forward-looking, and

8  therefore not protected by the safe harbor, without analyzing the

9  adequacy of the accompanying cautionary language.  Id. at 990.

10 Given Cutera's blanket prohibition on analyzing the speaker's state

11 of mind when applying Section 78u-5(c)(1)(A), the Court finds that

12 Defendants' cautionary language was meaningful.  Accordingly, the

13 Court finds that Defendants' statements regarding the future

14 release of the Minit-Charger were protected by the PSLRA safe

15 harbor as forward-looking statements.  Plaintiffs' claims related

16 to those statements are DISMISSED WITH PREJUDICE.

17     **C.  Corporate Optimism**

18     Corporate optimism, or "puffery," is not actionable under the

19 PSLRA.  "When valuing corporations, . . . investors do not rely on

20 vague statements of optimism like 'good,' 'well-regarded,' or other

21 feel good monikers.  This mildly optimistic, subjective assessment

22 hardly amounts to a securities violation.  Indeed, professional

23 investors, and most amateur investors as well, know how to devalue

24 the optimism of corporate executives."  Cutera, 610 F.3d at 1111

25 (9th Cir. 2010) (citations and some internal quotations omitted).

26 As a result, the a court in this District has held (and the Ninth

27 Circuit has affirmed) that statements including "[w]e're doing well

28 and I think we have a great future," "[b]usiness will be good this

United States District Court
For the Northern District of California

year . . . [w]e expect the second half of fiscal 1992 to be
stronger than the first half, and the latter part of the second
half to be stronger than the first ...," "[e]verything is clicking
[for the 1990s] . . . [n]ew products are coming in a wave, not in a
trickle . . . [o]ld products are doing very well" and that "I am
optimistic about Syntex's performance during this decade" are
inactionable corporate optimism.  In re Syntex Corp. Sec. Litig.,
855 F. Supp. 1086, 1095 (N.D. Cal. 1994) aff'd, 95 F.3d 922 (9th
Cir. 1996).

Many of Defendants' statements regarding the transition from
the EV Project to private sector sales are inactionable corporate
optimism.  Those statements include:

1. "We are making progress in shifting our business from one
   primarily dependent on the EV Project to a company with a
   diversified product and services offering."  Woodring
   Decl. Ex. 14 at 7;

2. "[E]ach of our 3 complementary product and service
   offerings represent a growth opportunity, a significant
   growth opportunity."  Woodring Decl. Ex. 13 at 4.

3. "The EV Project has provided us with a solid foundation
   to build upon."  Id. at 1;

4. "As the EV Project winds down, we have turned our
   attention to our next stage of growth and are taking
   important steps to meeting our aggressive internal
   objectives to cultivate a long-term, healthy and
   profitable business."  Id. at 2;

5. "[A] clear growing market opportunity exists."  Id. at 3;

///

**United States District Court**
For the Northern District of California

1       6. "[W]e continue to grow our Blink network and have

2          demonstrated some solid progress with our recent sales

3          initiatives." Id.;

4       7. "[W]e're making progress on shifting our business to one

5          with a significant concentration of revenue in one

6          project to a well-diversified business." Id. at 4;

7       8. "We are still in the early stages of building out a

8          nationwide network, but are very encouraged by our early

9          success and are well positioned to monetize the growth

10          trajectory of the EV industry." Woodring Decl. Ex. 2 at

11          4; and

12       9. "Blink's robust market presence, combined with the

13          increasing penetration of plug-in EVs, well positions the

14          company for continued growth." Woodring Decl. Ex. 19 at

15          5.

16 These are the statements on which Plaintiffs rely to support their

17 claim that Defendants falsely represented progress in shifting

18 their business from the EV Project to more diverse sources. See

19 CAC ¶ 139. All of them include statements like "making progress,"

20 "significant growth opportunity," "solid foundation," "important

21 steps," "healthy and profitable business," "clear growing market

22 opportunity," and "solid progress." These are precisely the sort

23 of vaguely optimistic statements that are inactionable under the

24 PSLRA. The Court finds that they are "too vague to have caused a

25 reasonable investor to rely on them. . . . These statements are

26 nothing more than 'puffing,' which reasonable investors know do not

27 guarantee future success." Syntex, 855 F. Supp. at 1095.

28 ///

United States District Court

For the Northern District of California

1    A Second Circuit case is almost directly on point.  Rombach v.

2  Chang was a securities class action against the officers and

3  directors of Family Golf Centers, Inc. ("Family Golf").  355 F.3d

4  16 (2d Cir. 2004).  The underwriters and managers of Family Golf's

5  secondary public offering were also named as defendants.  During

6  1998, Family Golf acquired three other companies.  Id. at 167.

7  Family Golf issued a number of press releases indicating that the

8  acquisitions were "progressing smoothly."  Id. at 168, 172-74.  The

9  Second Circuit upheld a dismissal of the complaint with prejudice

10  for several reasons, including that "expressions of puffery and

11  corporate optimism do not give rise to securities violations."  Id.

12  at 174.

13    Like the statements that Family Golf's mergers were

14  "progressing smoothly," Defendants' vague assertions that ECOtality

15  was "making progress" were expressions of puffery and corporate

16  optimism.  All of the statements upon which Plaintiffs rely to

17  support their claim that ECOtality falsely or misleadingly

18  represented its transition from the EV Project are similar to

19  statements that the Ninth and Second Circuits have held

20  insufficient to give rise to securities fraud.  Therefore, the

21  Court finds that those statements are not actionable.  Plaintiffs'

22  claims that rely upon those statements are DISMISSED WITH

23  PREJUDICE.

24    **D.   Falsity and Scienter**

25    Defendants argue that Plaintiffs have failed to plead facts

26  (1) suggesting that Defendants' statements were false when made or

27  (2) giving rise to a strong inference that any defendant acted with

28  scienter.  As discussed above, the falsity and scienter elements

are often collapsed into a single inquiry.  <u>See</u> <u>Daou</u>, 411 F.3d at

1015.  The Court deems it appropriate to discuss them together

here.

The PSLRA requires a complaint to "state with particularity

facts giving rise to a strong inference that the defendant acted

with the required state of mind."  15 U.S.C. § 78u-4.  In <u>Tellabs</u>,

the Supreme Court further explained how strong that inference must

be:

> The inference that the defendant acted with scienter need
> not be irrefutable . . . or even the 'most plausible of
> competing inferences.' . . . Yet the inference of
> scienter must be more than merely 'reasonable' or
> 'permissible' -- it must be cogent and compelling, thus
> strong in light of other explanations.  A complaint will
> survive, we hold, only if a reasonable person would deem
> the inference of scienter cogent and at least as
> compelling as any opposing inference one could draw from
> the facts alleged.

<u>Tellabs</u>, 551 U.S. at 324 (2007) (internal quotation marks and

citations omitted).  The Ninth Circuit has also elucidated the

pleading standard: "the complaint must contain allegations of

specific contemporaneous statements or conditions that demonstrate

the intentional or the deliberately reckless false or misleading

nature of the statements when made." <u>Ronconi v. Larkin</u>, 253 F.3d

423, 432 (9th Cir. 2001) (internal quotations omitted).  In other

words, the defendant's knowledge or deliberately reckless

disclosure of false or misleading information must be at least as

compelling as any other inference that can be drawn from the facts

in the CAC.  The Supreme Court has further emphasized that the

Court must "assess all the allegations holistically," and that

"[t]he inquiry . . . is whether all of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not

///

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   whether any individual allegation, scrutinized in isolation, meets

2   that standard."   <u>Tellabs</u>, 551 U.S. 308, 322-23, 326.

3       Because the other Section 10(b) claims are dismissed for other

4   reasons, the Court discusses these elements only with respect to

5   claims arising out of Defendants' statements regarding completion

6   of the EV Project.  Plaintiffs allege that Defendants claimed

7   ECOtality was on track to complete the EV project when, in fact,

8   Defendants knew that ECOtality was far behind schedule and would be

9   unable to complete the project on time.  The key statements from

10  Defendants were:

11          1. Mr. Brar's statement during an April 15, 2013 conference

12             call that "[w]e believe that we are well on our way to

13             completing the EV project by summer of 2013 and achieving

14             our goal of over 13,000 chargers deployed by the middle

15             of the year."  CAC ¶ 70; Opp'n at 7; and

16          2. Mr. Brar's statement from the May 15, 2013 press release

17             that "We are on track to complete the commitments under

18             the EV Project by the end of this year . . . ."  CAC ¶

19             122; Opp'n at 7.

20      Plaintiffs' claim that ECOtality was not, in fact, on track

21  to complete the project is based almost entirely on two DOE

22  reports, one from July 2013 (Woodring Decl. Ex. 1 ("July DOE

23  Rpt.")), and one from October 2013 (Woodring Decl. Ex. 4 ("October

24  DOE Rpt.")).  See Opp'n at 7-8; CAC ¶¶ 72-84.  First, Plaintiffs

25  point out that the October DOE report noted that "as early as May

26  2013, Department officials concluded that Ecotality would be unable

27  to complete installations on schedule and would not achieve the

28  required data collection milestones."  October DOE Rpt. at 4.

**United States District Court**
For the Northern District of California

1   There are numerous problems with relying on that report to
2   demonstrate Defendants' scienter.  First, the report is from
3   October and merely notes DOE conclusions from "as early as" May.
4   Plaintiffs fail to mention that the same DOE report states that DOE
5   "became aware that Ecotality was not on track to meet its September
6   2013 milestone for completing charging station installations" on
7   May 21.  October DOE Rpt. at 3.  There is, however, no indication
8   as to who reached that conclusion, or how it was reached.
9   Additionally, DOE reached that conclusion <u>after</u> both of Mr. Brar's
10  allegedly misleading statements.  Second, there is no indication
11  that Defendants were aware of those findings on either April 15 or
12  May 15.  The report does not state that ECOtality's employees
13  agreed with DOE's findings or whether DOE's findings were
14  communicated to ECOtality at that time.  The only information the
15  report provides as to when the findings were communicated to
16  ECOtality is that "in June 2013, the Department notified Ecotality
17  that it would be required to complete a corrective action
18  plan . . . ."  <u>Id.</u>  DOE therefore communicated its concerns to
19  ECOtality in June, again <u>after</u> both allegedly misleading
20  statements.  Third and finally, the DOE report's finding that
21  ECOtality would be unable to complete the EV project on time was
22  based on the deadline that existed in May 2013.  Plaintiffs
23  acknowledge that, at that time, the deadline for installations was
24  September 2013.  CAC ¶ 74.  Therefore, DOE's determination that
25  ECOtality would be unable to complete installations by September
26  cannot be said to contradict Mr. Brar's May 15 statement that
27  ECOtality would finish the project by the end of the year.
28  ///

Remarkably, Plaintiffs allege that "[t]he fact that the DOE concluded by May 2013 that ECOtality would not complete installations on schedule and would not achieve required data collection milestones establishes that defendants knew this undisclosed adverse information on April 15, 2013."  CAC ¶ 81. However, Plaintiffs provide no facts whatsoever to corroborate that allegation.  The only supporting facts that Plaintiffs include are general allegations regarding Defendants' access to the documents ECOtality submitted to DOE.  But whether or not ECOtality had access to the underlying facts, there is nothing to indicate that anyone at ECOtality had reached any sort of conclusion that on-time completion of the EV Project was impossible.

As a result, Plaintiffs have not pleaded facts sufficient to raise a strong inference of scienter with respect to either statement.  The only fact Plaintiffs allege regarding Defendants', rather than DOE's, opinion that ECOtality was behind schedule is that DOE "would have learned of these problems from reports ECOtality was required to provide and from periodic compliance audits."  Id.  That fact fails to raise any inference of scienter; even assuming Defendants communicated the underlying problems to DOE, there is no indication that Defendants reached a similar conclusion.  Moreover, a DOE conclusion from May 21 has no bearing whatsoever on Defendants' state of mind on April 15 or May 15. With respect to the May press release, the DOE report concluded that ECOtality was behind schedule to meet the September installation deadline, but Mr. Brar said that ECOtality was on track to finish the project by the end of the year.  Finally, the only DOE report expressing these concerns was from October -- after

**United States District Court**
For the Northern District of California

ECOtality's bankruptcy -- and therefore had the benefit of
hindsight.   There is no discussion at all of who decided that
ECOtality was behind schedule in May or how that conclusion was
reached.   The October DOE report therefore cannot be said to raise
any inference, much less a strong inference, that  Defendants
knowingly or recklessly made false or misleading statements.[3]

Plaintiffs also repeatedly point to a line from the October
DOE report indicating that ECOtality was "drastically behind
schedule." <u>See</u> CAC ¶¶ 5, 73, 74, 81, 98, 115, 134, 141; Opp'n at
2, 5, 8, 14, 19, 21, 22.   However, that line appears in a paragraph
discussing ECOtality's projections from January and July of 2013.
According to the January projections, ECOtality would complete all
residential stations and all but 32 commercial installations by
August 2013 -- at least a month before the late September deadline.
It was not until July 2013 that ECOtality submitted information to
DOE that allowed DOE to decide that ECOtality was "drastically

---

[3] Plaintiffs also argue that Defendants' scienter can be inferred
through the "core operations" doctrine. Plaintiffs' argument is
based on <u>Reese v. Malone</u>.  747 F.3d 557, 569 ("It may also be
reasonable to conclude that high-ranking corporate officers have
knowledge of the critical core operation of their companies."); <u>see</u>
Opp'n at 14-15.  While the EV Project was indisputably one of
ECOtality's core operations, Plaintiffs have not pleaded facts
sufficient to demonstrate that <u>anyone</u> at ECOtality knew that the
project was so beleaguered that it would be impossible to complete
on time.  Thus it would be unreasonable to impute that knowledge to
ECOtality's officers and directors.  Additionally, the Ninth
Circuit has clarified that "[w]here a complaint relies on
allegations that management had an important role in the company
but does not contain additional detailed allegations about the
defendants' actual exposure to information, it will usually fall
short of the PSLRA standard." <u>S. Ferry LP v. Killinger</u>, 542 F.3d
776, 784 (9th Cir. 2008).  Plaintiffs do not plead such detailed
allegations; their only claim is that Defendants "had access to the
quarterly EV Project progress reports . . . ." <u>Opp'n</u> at 14.  Not
only does this allegation of "access" fall short of the actual
exposure requirement, but Plaintiffs fail to plead facts
demonstrating that ECOtality possessed any contradictory
information to which Defendants <u>could be</u> exposed.

**United States District Court**
For the Northern District of California

behind schedule." October DOE Rpt. at 5. Even then, the problem
was that "the planned increase in installation rates had not
materialized." Id. Therefore, nothing in the October DOE report
demonstrates that anyone at ECOtality knew the EV Project was
behind schedule until July. Based on these facts, Mr. Brar might
well have reasonably relied on an anticipated increase in
installation rates when he made those statements in April and May.

Perhaps more importantly, the July DOE report (still after the
allegedly misleading statements were made, but nonetheless closer
to the "specific contemporaneous statements or conditions" the
Ninth Circuit prefers) includes some suggestions that ECOtality may
have been on schedule. The EV project called for ECOtality to
install 8,000 residential chargers and 5,000 commercial chargers.
The July report states that "[t]he Ecotality project . . . has
successfully deployed . . . 12,000 chargers (over 90 percent of
planned deployments)" and that "Ecotality had significantly
exceeded the residential participation goals in the project." July
DOE Rpt. at 9, 19. In other words, by July 2013, ECOtality had
already completed its residential charger deployments, and had
deployed 12,000 of the 13,000 total units the EV Project required.
ECOtality's Corrective Action Plan, submitted to DOE on July 9,
2013, states that ECOtality had deployed 4,000 of the target 5,000
commercial chargers. ECOtality's deployment rate was about 200
chargers per month, which put ECOtality on pace to complete the
installations by November 2013. Woodring Decl. Ex. 5 ("CAP") at 1.
Additionally, the Corrective Action Plan stated that ECOtality had
deployed 104 of 200 DC Level 2 charging units, and was continuing
to do so at a rate of 25 per month. Id. ECOtality estimated that

United States District Court
For the Northern District of California

1   it would be 20 units short of the project goal by September, but at

2   that rate would complete installations by November.  Thus the facts

3   alleged by Plaintiffs demonstrate that, as late as July 2013,

4   ECOtality apparently believed it was still on target to complete

5   installation of the commercial chargers before the end of 2013.

6   The facts alleged therefore strongly suggest that Mr. Brar may have

7   been entirely truthful when he said ECOtality was "on track" to

8   complete the project by the end of the year.

9        The Supreme Court has held that "[t]he strength of an

10  inference cannot be decided in a vacuum. The inquiry is inherently

11  comparative: How likely is it that one conclusion, as compared to

12  others, follows from the underlying facts?"  Tellabs, 551 U.S. at

13  323.  Based on the fact before the Court, the inference that

14  Defendants reasonably believed that ECOtality was on track to

15  finish the EV Project is much stronger than the inference that they

16  knew, or recklessly failed to know, that it was not.  Indeed, the

17  facts Plaintiffs plead cannot be said to raise an inference of

18  scienter at all.  The Court finds that Plaintiffs have failed to

19  plead facts giving rise to a strong inference that, in April or May

20  of 2013, Defendants knew, or recklessly failed to know, that

21  ECOtality was not on track to complete the EV project.  Moreover,

22  the Court finds that Plaintiffs have failed to plead facts

23  sufficient to demonstrate falsity; they have failed to plead that,

24  on April 15 or May 15, ECOtality was in a position that rendered it

25  impossible to complete the project on schedule.  Accordingly,

26  Defendants' motion is GRANTED with respect to the statements

27  regarding on-schedule completion of the EV Project.  Plaintiffs'

28  ///

claims arising from those statements are DISMISSED WITH LEAVE TO
AMEND.

### E.   The Section 11 Claim

When a company makes a public offering, it must file a set of
documents, known as a registration statement, with SEC.  Section 11
of the Securities Act creates a private remedy for a purchaser of a
security if any part of the registration statement, "when such part
became effective, contained an untrue statement of a material fact
or omitted to state a material fact required to be stated therein
or necessary to make the statements therein not misleading . . . ."
15 U.S.C. § 77k(a).  "The plaintiff in a § 11 claim must
demonstrate (1) that the registration statement contained an
omission or misrepresentation, and (2) that the omission or
misrepresentation was material, that is, it would have misled a
reasonable investor about the nature of his or her investment.  No
scienter is required for liability under § 11; defendants will be
liable for innocent or negligent material misstatements or
omissions." Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994)
(citations omitted).  To have standing to bring a Section 11 claim,
a plaintiff must be able to trace his shares back to the relevant
offering, though he need not actually purchase shares during that
offering.  In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104,
1106 (9th Cir. 2013).

Section 11 claims are frequently not fraud claims.  When they
are not fraud claims, they are not held to the heightened pleading
standards of Rule 9(b).  However, "the particularity requirements
of Rule 9(b) apply to claims brought under Section 11 when . . .
they are grounded in fraud." In re Stac Elecs. Sec. Litig., 89

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  F.3d 1399, 1404-05 (9th Cir. 1996).  Where "the entire complaint

2  against a particular defendant alleges a unified course of

3  fraudulent conduct, it is 'grounded in fraud,' and Rule 9(b)

4  applies to the whole of that complaint."  <u>Vess v. Ciba-Geigy Corp.</u>

5  <u>USA</u>, 317 F.3d 1097, 1108 (9th Cir. 2003).

6          ECOtality filed a Form S-3 Registration Statement in

7  accordance with the sale of 5.1 million shares of stock to a group

8  of investors on June 12, 2013.  The registration statement

9  referenced the risk warnings from ECOtality's 2012 Form 10-K.  CAC

10  ¶¶ 150-51.  For the reasons discussed previously, plaintiffs allege

11  that the risk warnings in the 2012 Form 10-K were defective.

12  Accordingly, they argue, the registration statement was inaccurate

13  and misleading because it incorporated by reference defective risk

14  warnings and omitted material facts necessary to make the

15  registration statement not misleading.  <u>Id.</u> ¶¶ 152-53.  Defendants

16  respond that (1) Plaintiffs' Section 11 claims should be held to

17  the Rule 9(b) pleading standards, and (2) Plaintiffs cannot trace

18  their shares of ECOtality securities to the registration statement.

19  Mot. at 28-29.

20          In their discussion of the Section 11 claim, Plaintiffs' CAC

21  includes a disclaimer to the effect that

22          [The Section 11 claim] does not sound in fraud. All of
            the preceding allegations of fraud or fraudulent conduct
23          and/or motive are specifically excluded from this Count.
            Plaintiffs do not allege that the Officer Defendants or
24          the Director Defendants had scienter or fraudulent
            intent, which are not elements of a §11 claim.
25

26  CAC ¶ 180.  The Second Circuit rejected similar disclaimers in

27  <u>Rombach</u>, holding that Plaintiffs' assertion that their Section 11

28  claims "do[ ] not sound in fraud" did not matter because "the

**United States District Court**
For the Northern District of California

1  wording and imputations of the complaint are classically associated

2  with fraud."  355 F.3d at 172 (citing In re Stac Elecs. Secs.

3  Litig., 89 F.3d at 1405 n.2).

4      It is abundantly clear that Plaintiffs allege a unified course

5  of fraudulent conduct.  Indeed, Plaintiffs' Section 11 claim is

6  predicated on the fact that Defendants incorporated the allegedly

7  fraudulent Form 10-K into the registration statement.  Thus,

8  Plaintiffs essentially incorporated their fraud claims into their

9  Section 11 claim.  Therefore, Plaintiffs' Section 11 claim is

10  subject to the Rule 9(b) pleading standards.  But Plaintiffs

11  explicitly decline to allege that Defendants had fraudulent intent

12  with respect to the registration statement.  Plaintiffs' Section 11

13  claim is DISMISSED for that reason.

14      Additionally, Plaintiffs do not plead any facts sufficient to

15  demonstrate that their shares are traceable to the allegedly false

16  or misleading registration statement.  Plaintiffs do not respond to

17  this argument, except to admit that "the allegations may not be

18  sufficient to establish that plaintiffs Joseph W. Vale and Jonathan

19  W. Diamond purchased stock traceable to the July 9, 2013

20  Registration Statement . . . ."  Opp'n at 30 n.6.  Mr. Vale and Mr.

21  Diamond are two of the five named plaintiffs in this case, CAC ¶¶

22  26-30, but they are the only two whose shares Plaintiffs allege are

23  traceable to the registration statement, id. ¶¶ 183, 186.

24  Plaintiffs have therefore also failed to plead facts sufficient to

25  confer standing for their Section 11 claim.  For that reason as

26  well, this claim is DISMISSED WITH PREJUDICE.

27  ///

28  ///

**V.    CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss is GRANTED.  It is hereby ORDERED that:

1. Plaintiffs' claims based on Defendants' statements that ECOtality was on track to complete the EV Project are DISMISSED WITH LEAVE TO AMEND because Plaintiffs failed to adequately plead falsity or scienter.  If Plaintiffs can plead additional facts to establish those elements, they may amend their complaint to do so.

2. Plaintiffs' claims based on Defendants' predictions about the release date of the Minit-Charger are DISMISSED WITH PREJUDICE because those statements were forward-looking and protected by the PSLRA safe harbor.

3. Plaintiffs' claims based on Defendants' statements regarding ECOtality's transition away from the EV Project are DISMISSED WITH PREJUDICE because those statements were inactionable corporate optimism.

4. To the extent that Plaintiffs bring additional claims based on allegedly false or misleading statements not specifically discussed in this Order, Plaintiffs failed to explain why those statements were false with the requisite particularity.  Any such claims are DISMISSED WITH LEAVE TO AMEND.

5. Plaintiffs' Section 11 claims are DISMISSED WITH PREJUDICE because they are grounded in fraud but failed to meet the Rule 9(b) pleading standards and because Plaintiffs failed to plead facts sufficient to demonstrate that their shares are traceable to the relevant registration statement.

///

Plaintiffs may file an amended complaint that addresses the concerns identified above within thirty (30) days of the signature date of this Order.  Failure to do so may result in the dismissal of all claims in this action with prejudice.

     IT IS SO ORDERED.

     Dated: September FIJ, 2014

UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

35