1   COOLEY LLP
    TOWER C. SNOW, JR. (58342) (tsnow@cooley.com)
2   101 California Street, 5th Floor
    San Francisco, CA  94111-5800
3   Telephone:     (415) 693-2000
    Facsimile:     (415) 693-2222
4
    COOLEY LLP
5   JESSICA VALENZUELA SANTAMARIA (220934) (jsantamaria@cooley.com)
    ADAM C. TRIGG (261498) (atrigg@cooley.com)
6   Five Palo Alto Square
    3000 El Camino Real
7   Palo Alto, CA 94306-2155
    Telephone:     (650) 843-5000
8   Facsimile:     (650) 849-7400

9   COOLEY LLP
    JOSEPH B. WOODRING (272940) (jwoodring@cooley.com)
10  1333 2nd Street, Suite 400
    Santa Monica, CA 90401
11  Telephone:     (310) 883-6400
    Facsimile:     (310) 883-6500
12
    Attorneys for Defendants
13  H. RAVI BRAR and SUSIE HERRMANN

14  [Additional Counsel on Signature Page]

15                 UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17                   SAN FRANCISCO DIVISION

18
    In re ECOtality, Inc. Securities Litigation    |    Case No.  3:13-CV-03791-SC
19                                                  |    (Consolidated with Case Nos.
                                                    |    13-cv-03840 and 13-cv-45679)
20  ─────────────────────────────────
21  This Document Relates To:                       |    **STIPULATION IN SUPPORT OF
                                                    |    DEFENDANTS H. RAVI BRAR AND SUSIE
22       ALL ACTIONS.                               |    HERRMANN'S ADMINISTRATIVE MOTION
                                                    |    TO RELATE CASES (CIVIL L.R. 3-12 & 7-
23                                                  |    11)**
24                                                  |    Judge:      Hon. Samuel Conti
25
26
27
28

**STIPULATION**

WHEREAS, on October 15, 2013, six competing movants, including Joseph W. Vale ("Vale"), filed motions to consolidate three substantially similar actions (*Lin et al. v. ECOtality, Inc. et al.* [No. 13-CV-03791], *Cohen v. ECOtality, Inc. et al.* [No. 13-cv-03840], and *Fleming v. Brar et al.* [No. 13-cv-45679]), to appoint the movants as lead plaintiff, and to approve the movants' selection of lead counsel in the above captioned action;

WHEREAS, on December 13, 2013, the Court issued an order consolidating the three actions under the caption *In re ECOtality Securities Litigation*, Case No. 13-cv-03791-SC ("*Securities Litigation*"), appointing Joseph Vale as Lead Plaintiff, and approving Lead Counsel ("Consolidation Order") in the above captioned action (Dkt. No. 47);

WHEREAS, on January 31, 2014, Plaintiffs in the *Securities Litigation* filed a Consolidated Amended Complaint ("CAC"), which brought claims on behalf of all purchasers of ECOtality common stock between April 16, 2013 and August 9, 2013 (Dkt. No. 52);

WHEREAS, on May 2, 2014, Defendants moved to dismiss the CAC (Dkt. No. 60);

WHEREAS, on September 16, 2014, the Court granted Defendants' Motion to Dismiss, dismissing some of plaintiffs' claims with prejudice and others with leave to amend (Dkt. No. 70);

WHEREAS, on October 23, 2014, Lead Plaintiff in the *Securities Litigation* action filed a Notice of Settlement (Dkt. No. 73);

WHEREAS, on October 23, 2014, a complaint was filed in the United States District Court for the Northern District of California captioned *Special Situations Fund III QP, LP et al. v. Brar et al.*, Case No. 14-cv-04717-JSC ("*Special Situations*");

WHEREAS, plaintiffs in the *Special Situations* action are members of the putative class in the *Securities Litigation*;

WHEREAS, plaintiffs in the *Special Situations* action allege they purchased common stock of ECOtality under a Securities Purchase Agreement dated June 12, 2013, and further allege that defendants violated the federal securities laws and California Corporations Code;

1    WHEREAS, attached hereto as Exhibit A is a copy of the CAC filed in the *Securities*

2  *Litigation* action (Dkt. No. 52);

3    WHEREAS, attached hereto as Exhibit B is a copy of the complaint filed in the *Special*

4  *Situations* action.

5    NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED among the parties,

6  through their respective counsel, as follows:

7    1.    The *Securities Litigation* and *Special Situations* actions concern substantially the

8  same parties, transactions, events and federal causes of action.

9    2.    It appears likely that there will be an unduly burdensome duplication of labor and

10  expense if the *Securities Litigation* and *Special Situations* actions are conducted before different

11  Judges.

12    3.    The *Securities Litigation* and *Special Situations* actions should be related, and the

13  *Special Situations* action should be reassigned to The Honorable Samuel Conti.

14    4.    Because of the status of each case, the *Securities Litigation* and *Special Situations*

15  actions should not be consolidated under the Consolidation Order entered in the *Securities*

16  *Litigation*.

17

18    **IT IS SO STIPULATED.**

19    **Respectfully Submitted,**

20  Dated: November 18, 2014          COOLEY LLP
                                      TOWER C. SNOW, JR. (58342)
21                                    JESSICA VALENZUELA SANTAMARIA (220934)
                                      ADAM C. TRIGG (261498)
22                                    JOSEPH B. WOODRING (272940)

23

24                                            */s/ Joseph B. Woodring*
                                      _____
25                                       Joseph B. Woodring (272940)

26                                    Attorneys for Defendants
                                      H. RAVI BRAR and SUSIE HERRMANN
27

28

1    Dated: November 18, 2014             ROBBINS GELLAR RUDMAN & DOWD LLP
                                          CHRISTOPHER P. SEEFER (201197)
2                                         KENNETH J. BLACK (291871)

3

4                                                  */s/ Christopher P. Seefer*
                                          Christopher P. Seefer (201197)
5

6                                         Post Montgomery Center
                                          One Montgomery Street, Suite 1800
7                                         San Francisco, CA 94104
                                          Telephone:    (415) 288-4545
                                          Facsimile:    (415) 288-4534
8                                         Email:        chriss@rgrdlaw.com

9                                         Lead Counsel for Plaintiff in *In re ECOtality
                                          Securities Litigation*, Case No. 13-cv-03791-SC
10

11                                        ZELDES HAEGGQUIST & ECK, LLP
                                          AMBER L. ECK (177882)
12                                        625 Broadway, Suite 1000
                                          San Diego, CA 92101
13                                        Telephone:    (619) 342-8000
                                          Facsimile:    (619) 342-7878

14                                        Additional Counsel for Plaintiff in *In re ECOtality
                                          Securities Litigation*, Case No. 13-cv-03791-SC
15

16

17   Dated: November 18, 2014             LOWENSTEIN SANDLER LLP
                                          MICHAEL J. McGAUGHEY (198617)
18                                        STEVEN M. HECHT (*appearance pro hac vice*)

19

20                                                 */s/ Steven M. Hecht*
                                          Steven M. Hecht (*appearance pro hac vice*)
21

22                                        1251 Avenue of the Americas
                                          New York, NY 10020
23                                        Telephone: 646-414-6902
                                          Fax: 973-597-2381
24                                        E-mail: shecht@lowenstein.com

25                                        Attorneys for Plaintiffs in *Special Situations Fund III
                                          QP, LP et al. v. Brar et al.*, Case No. 14-cv-04717-JSC
26

27

28

3

1 | **ATTESTATION OF CONCURRENCE IN FILING**

2 |        Pursuant to the General Order No. 45, section 45 X(B), for The United States District

3 | Court for the Northern District of California, I, Joseph B. Woodring, hereby attest that the

4 | concurrence to the filing of the foregoing document has been obtained from Christopher P. Seefer

5 | and Steven M. Hecht, who have provided the conformed signatures above.

6 | Dated: November 18, 2014           COOLEY LLP
TOWER C. SNOW, JR. (58342)

7 | JESSICA VALENZUELA SANTAMARIA (220934)
ADAM C. TRIGG (261498)

8 | JOSEPH B. WOODRING (272940)

10 | */s/ Joseph B. Woodring*
Joseph B. Woodring (272940)

12 | Attorneys for Defendants
H. RAVI BRAR and SUSIE HERRMANN

# EXHIBIT A

1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  CHRISTOPHER P. SEEFER (201197)
3  KENNETH J. BLACK (291871)
   Post Montgomery Center
4  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
5  Telephone:  415/288-4545
   415/288-4534 (fax)
6  chriss@rgrdlaw.com
7  kennyb@rgrdlaw.com

8  Lead Counsel for Plaintiffs

9  [Additional counsel appear on signature page.]

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12 | In re ECOTALITY, INC. SECURITIES | ) | Master File No. 3:13-cv-03791-SC |
   | LITIGATION | ) |  |
13 |  | ) | CLASS ACTION |
   | ———————————————————— | ) |  |
14 |  | ) | CONSOLIDATED AMENDED |
   | This Document Relates To: | ) | COMPLAINT FOR VIOLATIONS OF THE |
15 |  | ) | FEDERAL SECURITIES LAWS |
   | ALL ACTIONS. | ) |  |
16 | ———————————————————— | ) | DEMAND FOR JURY TRIAL |
17 | HUA-CHEN JENNY LIN and JONATHAN | ) |  |
   | W. DIAMOND, Individually and on Behalf of | ) |  |
18 | All Others Similarly Situated, | ) |  |
   |  | ) |  |
19 |                    Plaintiffs, | ) |  |
   |  | ) |  |
20 |            vs. | ) |  |
   |  | ) |  |
21 | ECOTALITY, INC., H. RAVI BRAR, SUSIE | ) |  |
   | HERRMANN, ENRIQUE SANTACANA, | ) |  |
22 | KEVIN CAMERON and ANDREW TANG, | ) |  |
   |  | ) |  |
23 |                    Defendants. | ) |  |
   | ———————————————————— | ) |  |
24
25
26
27
28

901561_1

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................................1

II.  JURISDICTION AND VENUE .................................................................................7

III.  PARTIES ...................................................................................................................8

IV.  SOURCES OF ALLEGATIONS ...............................................................................9

V.  DESCRIPTION OF ECOTALITY AND THE EV PROJECT ................................13

    A.  ECOtality Manufactured EV Charging and Energy Storage Systems, and Most of the Company's Revenues Were Generated by the DOE's EV Project ...........................................................................................................13

    B.  Before the Class Period, Brar and Herrmann Knew that Installations of EV Project Chargers Were Drastically Behind Schedule, that There Were Significant Problems with the Development of the Minit-Charger 12 and that Unsubsidized Sales of EV Chargers Were Significantly Less than Forecast ....................................................................................................16

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ......................................................................................................18

    A.  April 15, 2013: Brar and Herrmann Falsely Represent that ECOtality Is Well on Its Way to Successfully Completing the EV Project, that the Company Will Begin Deliveries of the Minit-Charger 12 by 3Q13 and that ECOtality Is Well Positioned to Grow Beyond the EV Project ...........................18

        1.  Brar and Herrmann Knew that ECOtality Would Not Successfully Complete the EV Project Requirements .....................................................21

        2.  Brar and Herrmann Knew There Were Problems with the Development of the Minit-Charger 12 that Would Prevent Any Sales in 2013 ......................................................................................24

        3.  Brar and Herrmann Knew that Unsubsidized Sales of EV Chargers Were Significantly Less than Internal Forecasts and Insufficient to Support the Company's Operations ...........................................................27

    B.  April 15, 2013: Brar and Herrmann Make False and Misleading Statements in ECOtality's 2012 Form 10-K ........................................................31

    C.  ECOtality's Stock Price Increases 35% After Brar and Herrmann Make Materially False and Misleading Statements on April 15, 2013, Thereby Avoiding the Delisting of the Company's Stock on the NASDAQ .....................34

    D.  May 15, 2013: Brar and Herrmann Falsely Represent that ECOtality Is on Track to Complete the Commitments of the EV Project, that the Company Will Begin Installations of the Minit-Charger 12 by 3Q13 and that

Page

ECOtality Is Making Progress Shifting Its Business from One Being Dependent on the EV Project ..................................................................... 35

1. In May 2013, Brar and Herrmann Knew ECOtality Would Be Unable to Complete EV Project Requirements ........................... 40

2. In May 2013, Brar and Herrmann Knew the Deadline for the Release of the Minit-Charger 12 Had Been Extended Because of Unacceptable Performance Shortfalls During Prototype Verification Testing ..................................................................... 41

3. In May 2013, Brar and Herrmann Knew ECOtality Was Unable to Sell a Sufficient Number of EV Chargers to Support the Company's Operations and that the Company Was Not Making Progress Shifting Its Business from One Dependent on the EV Project to a Well Diversified Business ......................................... 42

E. June 2013: Brar and Herrmann Announce that ECOtality Raised $8.2 Million of Capital in a Private Placement and Make Additional False and Misleading Statements ................................................................. 43

F. July 2013: Defendants Issue an Inaccurate and Materially Misleading Registration Statement and Prospectus ....................................... 46

VII. AUGUST 12, 2013: THE END OF THE CLASS PERIOD – ECOTALITY ANNOUNCES NUMEROUS PROBLEMS THAT CAUSE THE COMPANY'S STOCK PRICE TO DECLINE 79 PERCENT ................................................. 47

VIII. LOSS CAUSATION ........................................................................... 50

IX. CLASS ACTION ALLEGATIONS ....................................................... 52

COUNT I ......................................................................................... 55

COUNT II ........................................................................................ 55

COUNT III ....................................................................................... 56

COUNT IV ....................................................................................... 57

PRAYER FOR RELIEF ....................................................................... 58

JURY DEMAND ................................................................................ 59

## I.    INTRODUCTION

1.    This is a securities class action on behalf of all purchasers of the common stock of ECOtality, Inc. ("ECOtality" or the "Company") between April 16, 2013 and August 9, 2013, inclusive (the "Class Period").  Plaintiffs seek to pursue remedies against H. Ravi Brar ("Brar"), ECOtality's former Chief Executive Officer ("CEO"), and Susie Herrmann ("Herrmann"), ECOtality's former Chief Financial Officer ("CFO"), under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.[1]  Plaintiffs also seek to pursue remedies against Brar, Herrmann and three of the Company's directors under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of persons who acquired shares of ECOtality's common stock pursuant or traceable to the Company's false and misleading Registration Statement and Prospectus issued in July 2013.

2.    Before filing for bankruptcy in September 2013, ECOtality, designed, manufactured, tested and sold electric vehicle ("EV") charging and energy storage systems.  The Company manufactured and sold four types of EV chargers, including: (a) a Level 2 wall-mount unit, referred to as the Blink Level 2 Residential Charger; (b) a commercial stand-alone Level 2 charger, known as the Blink Level 2 Pedestal Charger; (c) the Blink DC Fast Charger; and (d) the Minit-Charger, a line of advanced fast-charge systems for industrial applications, including material handling and airport ground support equipment.

3.    Prior to and during the Class Period, ECOtality derived most of its revenues from the Department of Energy ("DOE") for its participation in the DOE's Vehicle Technologies Program.  In 2009, ECOtality was awarded a grant of $100.2 million to deploy Blink chargers and analyze EV charger usage data ("EV Project").  The EV Project was modified in 2012 and required ECOtality to deploy 13,200 EV chargers by September 2013 and to complete data collection and analysis by December 31, 2013.  Consumers and businesses that participated in the EV Project received the EV chargers for free and credit toward installation costs in exchange for allowing ECOtality to draw data on how their charging units and EVs were being used.  Thus, investors knew that ECOtality had to

---

[1]    This case is stayed against ECOtality in light of the Company's bankruptcy filing.  *See* Dkt. No. 46.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:13-cv-03791-SC

1  complete the EV Project by the end of 2013 and that the Company would then need to sell its

2  products without government subsidies.

3      4.    As detailed below, during the Class Period, defendants created the misleading

4  impression that ECOtality was successfully completing the EV Project and successfully transitioning

5  the Company to selling its products and services without government subsidies. For example, when

6  reporting the Company's 2012 results on April 15, 2013, Brar and Herrmann falsely represented that

7  ECOtality had "successfully executed upon the objectives of the EV Project" and was "well on [its]

8  way to completing the EV project by summer of 2013 and achieving [its] goal of over 13,000

9  chargers deployed by the middle of the year." When reporting the Company's 1Q13 results on May

10 15, 2013, Brar and Herrmann assured investors that ECOtality was "on track to complete the

11 commitments under the EV Project by the end of this year." In the Company's U.S. Securities and

12 Exchange Commission ("SEC") filings, they warned that there *would* be a material adverse effect on

13 ECOtality's business *if* the Company failed to meet the obligations of the EV Project but did not

14 disclose that the Company was already failing to meet them.

15     5.    Information included in two reports prepared by the DOE's Office of Inspector

16 General ("OIG") in July 2013 and October 2013 establishes that Brar and Herrmann knew ECOtality

17 would not successfully complete the EV Project. Indeed, the OIG found that "as early as May 2013,

18 Department officials concluded that ECOtality would be unable to complete installations on

19 schedule and would not achieve required data collection milestones." The OIG found that

20 installations were "drastically behind schedule," that a previously planned increase in installation

21 rates had not materialized, that 1,000 commercial chargers had not been installed, that 70% of Fast

22 Chargers had not been installed and that the installation rate for commercial chargers was one-half to

23 one-seventh of what was required to meet the installation deadlines. The OIG also reported that

24 ECOtality's internally developed deployment projections showed that the Company would not be

25 able to complete data collection milestones. And the OIG found substantial manufacturing and

26 installation cost overruns.

27     6.    In June 2013, the DOE informed ECOtality that it had to submit a corrective action

28 plan to address the pace of EV charger installations. ECOtality submitted a report in July 2013,

1   which the DOE did not approve and required to be significantly modified. Before the modifications

2   were made, however, the Company informed the DOE on August 7, 2013 that it might not be able to

3   meet its obligations under the EV Project. The DOE suspended payments to ECOtality; and on

4   August 12, 2013, the end of the Class Period, ECOtality publicly disclosed its problems with the EV

5   Project (and other problems).

6          7.      During the Class Period, Brar and Herrmann also falsely represented that they were

7   successfully transitioning the Company to selling its products and services without government

8   subsidies, including false and misleading statements about ECOtality's new Minit-Charger, the

9   Minit-Charger 12. On April 15, 2013, Brar and Herrmann represented that the Minit-Charger 12

10  was the "'foundation of our next generation of industrial fast charge solutions'" and that ECOtality

11  would "begin deliveries of the Minit-Charger 12 by Q3 of this year." On May 15, 2013, they

12  represented that the Minit-Charger 12 was the Company's "'first step to rejuvenate our presence in

13  the industrial sector, and we are preparing to begin installations in the third quarter.'"

14         8.      Information provided by former ECOtality employees, including a former engineer

15  who was responsible for the development of the Minit-Charger 12, and sworn statements by

16  defendant Brar in a declaration filed in the Company's bankruptcy on September 17, 2013, establish

17  that Brar and Herrmann knew their representations about the Minit-Charger 12 were materially

18  misleading. The former engineer described numerous problems with the development of the Minit-

19  Charger 12, including the need to redesign the product after outside consultants submitted a design

20  that was not viable and an unrealistic development schedule imposed by Brar. Problems arose

21  during prototype verification testing in April 2013 that caused the Company in May 2013 to extend

22  the release date to 2014. A former ECOtality electrical engineer said that the development of the

23  Minit-Charger 12 was "obviously not on schedule" and described some of the problems. Another

24  former ECOtality employee was told by a colleague in May or June 2013 that the Minit-Charger 12

25  did not work and could not be fixed.

26         9.      In August 2013, the Company acknowledged that the Minit-Charger 12 would not be

27  introduced in 2013 because it "exhibited unacceptable performance shortfalls during prototype

28  verification testing." In his sworn declaration, however, Brar admitted the problems with the Minit-

1  Charger 12 were known in 1Q13 and 2Q13. Brar stated in the declaration that ECOtality's

2  bankruptcy was "the result of a confluence of several adverse events *occurring during the first and*

3  *second quarters of 2013*," including the "inability to release a scheduled new product offering in

4  their Minit-Charger industrial line."

5        10.    Finally, Brar and Herrmann misled investors into believing they were successfully

6  transitioning the Company to selling its Blink EV charger products and services without government

7  subsidies. On April 15, 2013, they falsely represented, *inter alia*, that ECOtality had "established

8  three complementary lines of business – Blink®, Minit-Charger and eTec Labs – that provide us

9  with a stable, diversified and expanding revenue base"; that "Blink's robust market presence,

10  combined with the increasing market penetration of plug-in EVs, well positions the company for

11  continued growth"; and that ECOtality was "well positioned to monetize the growth trajectory of the

12  EV industry." On May 15, 2013, they represented that the Company's "'Blink, Minit-Charger and

13  eTec Labs businesses each provide substantial opportunities supported by positive trends in the

14  commercial, residential and industrial EV markets'" and that ECOtality had already demonstrated

15  solid progress: "As we transition to nongovernment-generated revenue, we continue to grow our

16  Blink network and have demonstrated some solid progress with our recent sales initiatives."

17        11.    Information included in the OIG reports; information provided by former ECOtality

18  employees; and other sworn statements by defendant Brar in the declaration he filed in the

19  Company's bankruptcy establish Brar and Herrmann knew these representations were materially

20  misleading.

21        12.    Brar and Herrmann knew that ECOtality had not been profitable when most of its

22  sales were subsidized sales under the EV Project as the Company reported an $11.9 million

23  operating loss in 2012 when 72% of its 2012 revenues were subsidized sales under the EV Project.

24  They also knew that demand for EVs and EV chargers was less than expected in 2012 because, as

25  the OIG reported, utilization of EV chargers was very poor in six EV Project regions. Brar and

26  Herrmann also knew the increased cost of manufacturing and installing EV chargers, which the OIG

27  reported had increased by as much as 200%, would negatively impact the profitability of any

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC        - 4 -

1  unsubsidized sales that could be made. And they knew the overheating of connector plugs and the

2  Company's failure to install EV charging stations on a timely basis would negatively impact sales.

3      13.    ECOtality's former product manager stated that data in the Company's CRM system

4  showed sales in 2012 and 2013 were extremely short of internal Company forecasts and that

5  ECOtality was only selling a couple of commercial Blink chargers per week in 2013 before the

6  former product manager resigned in July 2013. A former regional account manager stated that

7  ECOtality set up an indirect sales channel with dealers but that very few sales were actually made in

8  2013. In his declaration, Brar admitted that, in 1Q13 and 2Q13, ECOtality failed to attain sales

9  volumes of its EV chargers that were sufficient to support its operations and that the connector plug

10  that connected the EV charger to the EV was overheating and, in certain cases, melting when the EV

11  was charging.

12      14.    Former ECOtality employees described product problems that negatively impacted

13  sales. For example, information provided by two former employees establishes that the overheating

14  of connector plugs was occurring before and during the Class Period, that there were hundreds of

15  overheating reports and that the overheating was caused by a defective cable provided by a contract

16  manufacturer, REMA. A former employee also stated that thousands of EV chargers were upgraded

17  due to other problems.

18      15.    Brar and Herrmann's materially false and misleading statements and omissions

19  caused the Company's stock price to trade at artificially inflated prices. Indeed, following their false

20  and misleading statements on April 15, 2013, ECOtality's stock price increased 35% to $1.30 on

21  April 16, 2013, which saved the Company from having its stock delisted by the NASDAQ for

22  trading at less than $1 per share. The stock price continued to trade at artificially inflated prices,

23  reaching a Class Period high price of $2.40 on May 14, 2013.

24      16.    The numerous undisclosed problems were negatively impacting the Company's

25  business, including the ability to fund continued operating losses. ECOtality reported a $588,000 net

26  loss in 1Q13, cash declined from $6.4 million to $3.4 million and current assets were less than

27  current liabilities. Instead of disclosing the various problems causing the liquidity problems, Brar

28  and Herrmann misled a private group of investors who purchased 5.1 million shares of the

1  Company's stock for $1.60 per share, raising $8.2 million.  On June 13, 2013, ECOtality publicly

2  announced that it had entered into a Securities Purchase Agreement with the investors.  The

3  Securities Purchase Agreement, which was also disclosed on June 13, 2013, was signed by Brar and

4  contained numerous representations and warranties that were materially false and misleading,

5  including that the Company's previously issued press releases and SEC reports did not contain any

6  materially misleading statements or omissions and that the Company has complied in all material

7  respects with all applicable requirements, terms and conditions of each government contract and

8  government assistance agreement.

9       17.  On July 1, 2013, the Company filed an S-3 Registration Statement with the SEC that

10  registered for resale the shares sold to the private investors on June 12, 2013.  The Registration

11  Statement was signed by each defendant and contained untrue statements of material facts, omitted

12  to state other facts necessary in order to make the statements made not misleading and omitted to

13  state material facts required to be stated therein.   Specifically, the Registration Statement

14  incorporated by reference the risk warnings in the 2012 Form 10-K that were materially misleading

15  because defendants failed to disclose that the warned-of risks were already occurring.

16       18.  The $8.2 million was raised – and the shares registered for resale – after the DOE

17  concluded that ECOtality would be unable to complete the installation and data collection

18  requirements of the EV Project and after the DOE required the Company to submit a corrective

19  action plan.  In addition, the $8.2 million was raised after the release date of the Minit-Charger 12

20  was pushed to 2014 and after the Company was unable to sell sufficient numbers of EV chargers

21  without government subsidies to support its operations.

22       19.  On August 6, 2013, the Company unexpectedly announced that the 2013 Annual

23  Meeting of Stockholders, originally scheduled to be held on August 22, 2013, had been postponed to

24  October 29, 2013, and that annual financial data required to be disclosed prior to the 2013 Annual

25  Meeting of Stockholders would not be made available until September 2013.  Investors learned why

26  a few days later.

27       20.  On August 12, 2013, ECOtality publicly revealed for the first time numerous

28  problems with the business, including the inability to successfully complete the EV Project, the

1  DOE's suspension of all payments to the Company, the inability to release the Minit-Charger 12 in

2  2013, the failure to sell a sufficient number of EV chargers to support the Company's operations in

3  2013, and the overheating – and in certain rare cases melting – of EV charger connector plugs during

4  charging. The Company also reported that the problems "significantly impact[ed] its ability to meet

5  its ongoing obligations and to fund anticipated operating losses" and that ECOtality might file for

6  bankruptcy in "the very near future." As summarized above and detailed herein, all of these

7  problems were known by Brar and Herrmann during the Class Period.

8       21.    In response to this unexpected negative news, ECOtality's stock price plummeted

9  79% to just $0.31 per share on August 12, 2013, causing millions of dollars in losses to class

10  members.

11       22.    On September 16, 2013, ECOtality and its subsidiaries each filed a voluntary petition

12  for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy

13  Court for the District of Arizona. Financial reports filed in the bankruptcy show that the Company's

14  unrestricted cash had declined to just $147,061 on the date of the bankruptcy and that ECOtality's

15  year-to-date net loss had grown to $15.4 million through September 30, 2013 and to $18.1 million

16  by the end of the year.

17  **II.    JURISDICTION AND VENUE**

18       23.    Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein

19  arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, and

20  §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o. This Court has jurisdiction over the

21  subject matter of this action under 28 U.S.C. §§1331 and 1337, §27 of the Exchange Act and §22 of

22  the Securities Act.

23       24.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C.

24  §1391(b) as the Company is headquartered in this District and the alleged misconduct was transacted

25  in and emanated from this District.

26       25.    In connection with the acts alleged in this Complaint, Defendants, directly or

27  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

28  the mails, interstate telephone communications and the facilities of the national securities markets.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC        - 7 -

1    **III.    PARTIES**

2          26.    Joseph W. Vale ("Vale") was appointed Lead Plaintiff by the Court on December 13,

3    2013.  Dkt. No. 47.  As set forth in the Certification filed by Vale on October 15, 2013, Vale

4    purchased 101,240 shares of ECOtality common stock between June 25, 2013 and August 7, 2013

5    and has been damaged thereby.  Dkt. No. 30-2.

6          27.    Plaintiff Hua-Chen Jenny Lin ("Lin"), as set forth in a Certification attached to a

7    complaint filed on August 15, 2013, purchased 41,000 shares of ECOtality common stock between

8    May 20, 2013 and May 29, 2013 and has been damaged thereby.

9          28.    Plaintiff Jonathan W. Diamond ("Diamond"), as set forth in a Certification attached

10    to a complaint filed on August 15, 2013, purchased 865 shares of ECOtality common stock on July

11    29, 2013 and has been damaged thereby.

12          29.    Plaintiff Eric M. Cohen ("Cohen"), as set forth in a Certification attached to a

13    complaint filed on August 19, 2013, purchased 10,995 shares of ECOtality common stock between

14    April 15, 2013 and June 20, 2013 and has been damaged thereby.

15          30.    Plaintiff Francis X. Fleming, Jr. ("Fleming"), as set forth in a Certification attached to

16    a complaint filed on October 3, 2013, purchased 1,110 shares of ECOtality common stock on May

17    28, 2013 and has been damaged thereby.

18          31.    Defendant H. Ravi Brar was, throughout the Class Period, ECOtality's Chief

19    Executive Officer ("CEO"), President and a director.  Defendant Brar joined the Company as Chief

20    Financial Officer ("CFO") in November 2010 and was named CEO, President and a director in

21    September 2012.  As detailed herein, Brar made the materially false and misleading statements

22    alleged by plaintiffs.  Brar participated in the preparation of the Company's press releases issued on

23    April 15, 2013 and May 15, 2013, was quoted in the press releases and had ultimate authority over

24    the statements included therein.  He was the primary Company spokesperson during the April 15,

25    2013 and May 15, 2013 conference calls and made the specific statements plaintiffs allege were false

26    and misleading.  He signed the Form 8-K filed on June 13, 2013 and the stock purchase agreement

27    included as an exhibit to the Form 8-K.  Brar also signed the 2012 Form 10-K, the 1Q13 Form 10-Q

28    and the Registration Statement.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC                                                                                              - 8 -

32.     Defendant Susie Herrmann was ECOtality's CFO throughout the Class Period.  Until September 2012, when she was named CFO, Defendant Herrmann served as the Company's Vice President of Corporate Finance and had been with the Company since February 2008.  As detailed herein, Herrmann made the materially false and misleading statements alleged by plaintiffs.  Herrmann signed the Forms 8-K filed on April 15, 2013 and May 15, 2013 and therefore made the false and misleading statements in the press releases attached as exhibits to the Forms 8-K and had the ultimate authority over the statements included therein.  She attended the April 15, 2013 and May 15, 2013 conference calls and signed the Form 8-K filed on June 13, 2013.  Herrmann also signed the 2012 Form 10-K, the 1Q13 Form 10-Q and the Registration Statement.

33.     Defendant Enrique Santacana ("Santacana") served as a director of ECOtality and signed or authorized the signing of the false and misleading Registration Statement.

34.     Defendant Kevin Cameron ("Cameron") served as a director of ECOtality and signed or authorized the signing of the false and misleading Registration Statement.

35.     Defendant Andrew Tang ("Tang") served as a director of ECOtality and signed or authorized the signing of the false and misleading Registration Statement.

36.     Defendants Brar and Herrmann are referred to herein as the "Officer Defendants."

37.     Defendants Santacana, Cameron and Tang are referred to herein as the Director Defendants and are named as defendants solely for violations of the Securities Act.  The Officer and Director Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement.

IV.     SOURCES OF ALLEGATIONS

38.     The sources of the allegations include various public documents, including ECOtality press releases, ECOtality conference call transcripts, reports ECOtality filed with the SEC, reports prepared by analysts that followed the Company and articles in the financial press.  In addition, the allegations are based on two reports issued by the DOE's OIG, Office of Audits and Inspections, on July 25, 2013 and October 31, 2013.  Some of the allegations are based on pleadings and documents filed in the ECOtality bankruptcy.

39.     Some of the allegations included herein are based on information provided by former ECOtality employees referred to as confidential witnesses ("CW") to lead counsel's investigator. The information provided by the former employees is reliable and credible because: (a) the witnesses worked at ECOtality during the Class Period; (b) each of the witnesses stated he or she had personal knowledge of the information provided; (c) the witnesses' job titles and responsibilities support their claims of personal knowledge of the information provided; (d) the witnesses' accounts corroborate one another; and (e) the witnesses' accounts are corroborated by other information alleged herein.

40.     CW1 was a Product Manager in Phoenix, Arizona from August 2012 until CW1 resigned on July 12, 2013 because CW1 was increasingly skeptical of ECOtality's prospects. CW1 was a Product Manager for ECOtality's Microsoft Dynamics CRM and Sage MAS500 ERP systems. The CRM system was a repository for all sales orders, forecasts, sales leads and sales opportunities (leads became opportunities if a potential customer expressed interest). The ERP system was a repository for sales orders that needed to be fulfilled, *i.e.*, shipped and installed. According to CW1, Brar and Herrmann had access to the CRM and ERP systems. CW1 reported to Dan Howard, the Company's IT Director, who reported to defendant Herrmann.

41.     As detailed herein, CW1 knew from the data in the CRM system that sales in 2012 and 2013 were extremely short of internal Company forecasts and that ECOtality was only selling a couple of commercial Blink chargers per week in 2013 before CW1 resigned in July 2013. CW1 also knew from the data in the ERP system that there was a backlog of Blink orders for the EV Project, some as long as two years, because ECOtality had not installed chargers that had been purchased.

42.     CW2 worked at ECOtality's Phoenix offices from June 2012 until August 15, 2013, when CW2 was laid off. From June 2012 to January 2013, CW2 was an Engineering Manager for ECOtality's Industrial group, which was developing the Minit-Charger 12. CW1 reported to Garrett Beauregard ("Beauregard"), a Senior Vice President of Engineering, who reported to COO Murray Jones ("Jones"). In January 2013, CW2 became the Company's Director of Hardware Engineering, which expanded CW2's job responsibilities to include the entire Company, including Blink chargers for the EV Project. However, the Minit-Charger 12 was the main program CW2 worked on

1   throughout CW2's tenure at ECOtality. After becoming the Company's Director of Hardware

2   Engineering, CW2 reported to Chief Technology Officer Paul Gordon ("Gordon"), who reported to

3   Jones or Brar.

4         43.    As detailed herein, in written reports and during weekly staff meetings in 2012 and

5   2013, CW2 reported to management, including defendants Brar and Herrmann, that there were

6   significant problems with the development of the Minit-Charger 12 that would likely prevent it from

7   being released by 3Q13, the time period defendants publicly represented ECOtality would begin

8   deliveries of the Minit-Charger 12. CW2 stated that the release date was pushed out in May 2013

9   after the first prototypes ran into issues during testing and that an internal development schedule did

10   not project deliveries of the Minit-Charger 12 until 2014. Indeed, CW2 resigned in May 2013

11   because CW2 was increasingly concerned about ECOtality's prospects but was persuaded to stay at

12   ECOtality by being promoted and given a significant increase in salary and with the understanding

13   that there was a very good chance that the development of the Minit-Charger 12 would not be

14   completed by the end of 2013.

15         44.    CW2 also said that ECOtality had issues obtaining enough materials to build Level 2

16   chargers for the EV Project and that there were also field issues in deploying Level 2 chargers. CW2

17   never saw a 2013 forecast for Blink chargers and said that during town hall meetings, Brar and COO

18   Jones could not answer questions about how many Blink chargers were expected to be sold in 2013.

19         45.    CW3 was a hardware design engineer at ECOtality's Phoenix facility from April

20   2011 until September 2013, when CW3 was laid off. CW3 worked on the development of the Blink

21   Level 2 chargers. As detailed below, CW3 believed that the overheating of EV charger plugs

22   publicly disclosed by ECOtality in August 2013 was occurring in early 2013, that the overheating

23   was caused by a defective cable provided by a contract manufacturer and that brand-new cables

24   received from the contract manufacturer in June and July 2013 were also overheating. CW3 also

25   said that, in March/April 2013, ECOtality postponed the release of an upgraded and modified

26   version of the Blink EV charger that was scheduled to be released in June/July 2013 because

27   ECOtality was running low on cash.

28

46. CW4 was an electrical engineer in the Company's Phoenix facility from May 2008 until May 2013, when CW4 was laid off. CW4 reported to Dmitri Hochard, ECOtality's Manager of Hardware Engineering, who reported to Senior Vice President of Engineering Beauregard. During the last year of CW4's employment, CW4 worked on the development of a newer version of the Blink Level 2 charger and on the Minit-Charger 12 board design. As detailed below, CW4 stated that the development of the Minit-Charger 12 was "obviously not on schedule" and that one of the problems with its development was the charging cable interfering with the battery management system because the high current and high voltage charging cable was installed next to the low voltage communication cable.

47. CW5 was a regional account manager from September 2010 until August 2013, when CW5 was laid off. CW5 was responsible for direct, non-EV Project sales of Blink chargers in the central United States and reported to Greg Fiorti, ECOtality's Senior Vice President of Sales, who reported to COO Jones. As detailed below, CW5 said that in 2013 ECOtality developed relationships with dealers to sell the Company's Blink chargers (indirect sales) but that very few sales actually occurred. CW5 said that one of the reasons for the lack of sales was ECOtality's failure to provide sales training to the dealers, including the failure to roll out an online "Blink Central" training "portal." Indeed, CW5 said that introduction of the portal was delayed until August 2013 and was not aware of any dealer that actually placed an order for a Blink EV charger.

48. In addition, CW5 said that there were probably only 25-30 direct (non-dealer) sales in 2013 by the Company and that there was a lack of inventory – particularly Blink residential chargers.

49. CW6 was a Field Service Superintendent and Lab Technician in Phoenix from May 2012 until August 2013, when CW6 was laid off. As a Field Service Superintendent, CW6 was essentially the lead technician for the installation and service of Blink Level 2 chargers. As a Lab Technician, CW6 developed upgrades for Blink Level 2 chargers. CW6 reported to Field Services Director Rob Rizzo, who reported to Brar. As detailed below, CW6 stated that the overheating of EV charger plugs publicly disclosed by ECOtality in August 2013 began in October 2012, that there were hundreds of overheating reports that CW6 and others investigated and that the overheating occurred on newer EVs that charged up to 20-30 amps. CW6 also stated that the Company worked

1  closely with engineers from Nissan and Toyota to determine the cause of the overheating and

2  determined it was caused by a defective cable provided by a contract manufacturer, REMA.

3  According to CW6, ECOtality removed the cables and replaced them with new REMA cables that

4  could handle higher amperages.

5       50.    CW6 also described other problems with the Blink Level 2 chargers. CW6 told Brar

6  that the Company's Linux-based Level 2 chargers had problems with file uploading and

7  downloading and often suffered from corrupted files, which required CW6 and others to make

8  service calls to upgrade the chargers. CW6 stated that thousands of upgrades took place in the field

9  and involved moving a very small and delicate hydrogen board; testing software and hardware,

10  including CMDA modules; and removing cables during testing. CW6 told Brar that the Linux-based

11  Level 2 chargers should be upgraded before being shipped to customers.

12       51.    CW6 expected the Minit-Charger 12 to be released in March 2013; and when it was

13  not, CW6 began asking when it would be released because CW6 needed to see the Minit-Charger 12

14  to determine what the service requirements would be. CW6 was unable to get an answer and

15  therefore asked an ECOtality electrical engineer named Victor (CW6 could not recall Victor's last

16  name) in May or June 2013 when it would be released. Victor told CW6 that the Minit-Charger 12

17  did not work, that it could not be fixed and that one of the problems was the failure of the 12-volt

18  transformers to work correctly.

19  **V.  DESCRIPTION OF ECOTALITY AND THE EV PROJECT**

20      **A.  ECOtality Manufactured EV Charging and Energy Storage Systems,**
          **and Most of the Company's Revenues Were Generated by the DOE's**
21            **EV Project**

22       52.    ECOtality was formerly known as Alchemy Enterprises, Ltd. and changed its name to

23  ECOtality, Inc. in November 2006. ECOtality was incorporated in 1999 and was headquartered in

24  San Francisco, California.

25       53.    Before filing for bankruptcy in September 2013, ECOtality, together with its

26  subsidiaries, engaged in designing, manufacturing, testing, and commercializing EV charging and

27  energy storage systems in the United States and internationally. ECOtality made charging and

28  power-storage systems for EVs under the Blink and Minit-Charger brands. It also did testing for

1  government agencies, auto makers and utilities. ECOtality had four operating subsidiaries:

2  ECOtality North America ("ECONA"), Innergy Power Corporation, Fuel Cell Store and ECOtality

3  Australia Pty Ltd.[2] ECOtality reported in its SEC filings that a majority of the Company's revenues,

4  including revenue for the EV Project, was generated by ECONA.

5      54. The Company manufactured four types of EV chargers, including: (a) a Level 2 wall-

6  mount unit referred to as the Blink Level 2 Residential Charger; (b) a commercial stand-alone Level

7  2 charger, known as the Blink Level 2 Pedestal Charger; (c) the Blink DC Fast Charger; and (d) the

8  Minit-Charger, a line of advanced fast-charge systems for industrial applications, including material

9  handling and airport ground support equipment. ECOtality reported that Blink Level 2 chargers

10  delivered a full charge in two to eight hours and that the Blink DC Fast Chargers provided a full

11  charge in less than 30 minutes (depending on battery size).

12      55. ECONA received monetary awards from the DOE under the DOE's Vehicle

13  Technologies Program, which aimed to decrease U.S. oil dependence by developing and deploying

14  advanced transportation technologies. Historically, the DOE's Vehicle Technologies Program was

15  allocated about $300 million annually; but the scope of the program significantly increased when it

16  received approximately $2.8 billion in funds as part of the American Recovery and Reinvestment

17  Act of 2009.

18      56. **The Original EV Project.** ECOtality received about $35 million from 2005 to 2011

19  for two multi-year projects to test and evaluate advanced technology vehicles. In 2009, ECOtality

20  was awarded a grant of $100.2 million to deploy and analyze charging infrastructure for EVs in five

21  metropolitan locations. The objective of the grant was to develop, implement and study techniques

22  for optimizing the effectiveness of infrastructure supporting widespread EV deployment. The grant

23  would finance the largest U.S. demonstration to date of EVs and related infrastructure and to gather

24  data to guide future widespread EV deployment.

25

26     [2]   Innergy Power Corporation designs and manufactures thin sealed lead batteries and high-quality

27  flat-panel multicrystalline Photovoltaic solar modules. Innergy is also developing EV battery technology and designing/building battery packs in SLA, NiMH and Li chemistries. Fuel Cell Store

28  is a provider of information, educational products, and services related to the fuel cell industry.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC      - 14 -

57.   Under the original EV Project, ECOtality would install Level 2 units in residential (the Blink Level 2 Residential) and commercial (the Blink Level 2 Pedestal) locations, and Fast Chargers (the Blink DC Fast Charger) in commercial locations and every ten miles along two major transportation corridors.  These original requirements were established to ensure accessibility to EV charging stations and eliminate anxiety associated with EV owners running out of energy.  ECOtality planned to develop, manufacture and install 14,960 EV-charging units by December 2011 in five states – Arizona (Phoenix & Tucson metropolitan areas), Washington (Seattle area), Oregon (Portland, Salem, Corvallis and Eugene), California (San Diego) and Tennessee (Knoxville, Chattanooga and Memphis).

58.   Consumers and businesses that enrolled in the project received a charging station paid for through the grant, as well as credit toward installation costs.  Residential participants in the program received a Level 2 Blink residential charging station, a $1,200 credit toward its installation and $550 per month in exchange for allowing ECOtality to draw data on how their charging units and EVs were being used.  Commercial businesses received Level 2 Blink pedestal and/or DC Fast Charging stations and credit toward installation, also in exchange for allowing ECOtality to collect data.  The deadline for installing the 14,960 EV chargers in the five metropolitan areas was December 2011, and ECOtality was required to then analyze data from the charging stations for 16 months and therefore complete the analysis by April 2013.  The data was analyzed to evaluate and identify methods for improving the effectiveness of charging infrastructure, as well as to develop lessons learned to assist in the EV market as it matured.

59.   ECOtality reported in its 2012 Form 10-K that the total estimated costs of the EV Project were projected to be $218.7 million; and that the Company would receive $100.2 million for completing its EV project obligations, which included the production and installation of charging units, support of EV deployment, program operation, gathering and analysis of data and preparation of EV use reports for the DOE, as well as management of the overall project.

60.   ECOtality also reported in its 2012 Form 10-K that the revenue from the EV project represented a substantial portion (72%) of the Company's total revenue in 2012 and that a substantial majority of revenue in 2013 would be generated from DOE-related activity, including the EV

Project. ECOtality reported that the DOE made payments to the Company based on expenditures incurred in the delivery of the services and that ECOtality recognized revenue from the EV Project as the related services were performed, based upon the actual efforts incurred relative to the amount of total effort expected to be incurred in the performance under each agreement. Costs eligible for reimbursement included both capital expenditures and operating expenses incurred under the EV Project, including costs of charging units, materials, salaries, overhead, outsourced and subcontracted expenses and other operating expenses.

    **B.    Before the Class Period, Brar and Herrmann Knew that Installations of EV Project Chargers Were Drastically Behind Schedule, that There Were Significant Problems with the Development of the Minit-Charger 12 and that Unsubsidized Sales of EV Chargers Were Significantly Less than Forecast**

61.    **Modification of EV Project.** Due to less-than-expected demand for EVs and the failure of anticipated demand for EV chargers to materialize, the DOE and ECOtality modified the program in July 2012. The number of regions was increased from five to ten, the requirement to install fast commercial chargers every ten miles was eliminated and the number of charging stations to be installed was reduced from 14,960 to 13,200. Of the 13,200 chargers to be installed, approximately 8,000 were residential and approximately 5,000 were commercial. In its 2012 Form 10-K, ECOtality reported that the ten regions included: (a) Phoenix and Tucson; (b) Los Angeles and San Diego; (c) San Francisco; (d) Dallas, Fort Worth and Houston; (e) Seattle, Portland, Eugene, Salem and Corvallis; (f) Nashville, Knoxville, Memphis and Chattanooga; (g) Chicago; (h) Philadelphia; (i) Atlanta; and (j) Washington, DC.

62.    The added regions increased travel and administrative costs, so the DOE also lowered the residential installation incentive for participants from $1,200 to $400. The OIG reported that the elimination of the ten-mile installation requirement altered the original intention to overcome consumers' driving range anxiety and that the reduced installation incentive may not have been sound and in the best interest of taxpayers.

63.    To provide time for the installation of EV charging stations in the additional regions and to compensate for poor market conditions, the DOE extended the infrastructure deployment deadline from December 31, 2011 to September 2013 and the data collection deadline from April

1   2013 to December 2013.  As a result, instead of the originally planned 16 months of data from each

2   EV charging station, a year or less of data would be obtained from 3,300 of the 13,000 level 2 units

3   and 70% of the Fast Chargers.  ECOtality reported these modifications were made in July 2012.

4         64.    **Installations Behind Schedule.**  The OIG reported that ECOtality planned to

5   increase the installation rate in 2013 to meet the 13,200 reduced milestone in the modified EV

6   Project.  Thus, Brar and Herrmann knew before the Class Period that ECOtality was behind schedule

7   on installations of EV charging stations, even though the number of installed charging stations had

8   been reduced from 14,960 to 13,200 and the deadline extended from December 2011 to September

9   2013.

10         65.    **Costs of Fabricating EV Charging Stations Increase.**  The costs to fabricate EV

11   charging units also increased substantially.  According to the OIG, the costs of level 2 residential

12   chargers increased 57% over the course of the project, the costs for Fast Chargers increased 140%

13   and the costs of 200 commercial chargers increased 200%.  The OIG also reported that some of

14   those cost increases could have resulted from installation contractors and subcontractors overbilling

15   ECOtality.  The OIG reported that "cost layering" increased costs by a factor of eight because:

16   (a) subcontractors' quotes were nearly six times, on average, the actual wages paid for installation

17   labor; and (b) contractors increased quotes from subcontractors by 40%.  Therefore, $1 in actual

18   installation costs would cost ECOtality $8.40 [($1 x 6) x 1.4].

19         66.    **Poor Utilization of EV Charging Stations.**  Utilization of many EV charging

20   stations was poor before the beginning of the Class Period.  ECOtality categorized the utilization of

21   EV charging stations as high, medium or poor based on usage per week data it obtained and

22   analyzed.  According to the OIG, as of October 2012, poor-performing EV charging stations

23   represented 78% of the units in Memphis; 74% of the units in Washington, DC; and 60% of the units

24   in Phoenix, Tucson, Knoxville and Dallas.

25         67.    **Minit-Charger 12 and Non-EV Project Sales:** As summarized above and detailed

26   herein, information provided by former ECOtality employees and sworn statements by Brar in the

27   declaration filed in the Company's bankruptcy establish that Brar and Herrmann knew there were

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC         - 17 -

1  problems with the development of the Minit-Charger 12 and that ECOtality was not selling sufficient

2  numbers of EV chargers without government subsidies to support the Company's operations.

3         68.    Thus, before the Class Period, Brar and Herrmann knew that: (a) lower-than-expected

4  demand resulted in the modification of the EV Project, including an increase in regions, a reduced

5  number of installations and extensions of the installation and data gathering deadlines; (b) ECOtality

6  was behind schedule on installing EV charging stations, even though the number of required

7  installations had declined; (c) the costs of manufacturing EV chargers had increased substantially;

8  (d) utilization of many EV chargers was poor; (e) there were problems with the development of the

9  Minit-Charger 12; and (f) ECOtality was not selling sufficient numbers of EV chargers without

10  government subsidies to support the Company's operations.

11  **VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

12

13      **A.    April 15, 2013: Brar and Herrmann Falsely Represent that ECOtality Is Well on Its Way to Successfully Completing the EV Project, that the Company Will Begin Deliveries of the Minit-Charger 12 by 3Q13 and that ECOtality Is Well Positioned to Grow Beyond the EV Project**

14

15

16         69.    The Class Period starts on April 16, 2013. On the evening of April 15, 2013, after the

17  close of trading, ECOtality issued a press release, held a conference call and filed its FY12 Form

18  10-K with the SEC, in which the Company announced its financial results for its fourth quarter and

19  fiscal year ended December 31, 2012. In the press release, Brar and Herrmann created the

20  misleading impression that ECOtality was successfully completing the EV Project (which required

21  installations to be completed by September 2013 and data analysis to be completed by December 31,

22  2013) and successfully transitioning the Company to selling its products and services without

23  government subsidies. They falsely represented that: (a) the Company had "successfully executed

24  upon the objectives of the EV Project;" (b) the Minit-Charger 12 was unveiled in January, targeted

25  the sweet spot of the market and served as the foundation of ECOtality's next generation of

26  industrial fast-charge solutions; (c) ECOtality's financial performance in 2012 reflected the health of

27  the Company and the continued execution of its business model; and (d) Blink's robust market

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC              - 18 -

presence and increasing market penetration of EVs positioned the Company well for continued

growth:

> "*Our strong financial performance for the year reflects the health of the company and our continued execution upon our business model,*" stated Ravi Brar, ECOtality's President and Chief Executive Officer. *"We have established three complementary lines of business* – Blink®, Minit-Charger and eTec Labs – *that provide us with a stable, diversified and expanding revenue base*. 2012 was marked by substantial growth as we more than doubled the size of the Blink network, *validated our business model* with the introduction of access fees, and *successfully executed upon the objectives of the EV Project*. We ended the year with more than 10,000 Blink charging stations and 55 DC fast chargers installed making ECOtality the nation's largest DC charging network."

> *                *                *

> "*ECOtality has established a dominant market position in the EV industry and is continuing to expand its footprint with the company's strategic national accounts that host its Blink chargers,*" continued Brar. "Additionally, the recent formation of Collaboratev, LLC, a partnership with ChargePoint, is a milestone for the industry and parallels the growth of the banking industry by allowing customers to access all charging networks with one access card and one bill. *Blink's robust market presence, combined with the increasing market penetration of plug-in electric vehicles, well positions the company for continued growth.*

> "*This January, we unveiled the Minit-Charger 12, a product that targets the sweet spot of the market and serves as the foundation of our next generation of industrial fast charge solutions. The company has a renewed focus on our Minit-Charger business and is committed to substantially expanding its market presence in the industrial sector to capitalize on increasing electrification trends.*"[3]

70.    **Statements During April 15, 2013 Conference Call.**  During the conference call on

April 15, 2013, Brar and Herrmann made additional statements that perpetuated the misleading

impression that ECOtality was successfully completing the EV Project and successfully transitioning

the Company to selling its products and services without government subsidies.  Brar made the

following statements:

> We believe that *we are well on our way to completing the EV project by summer of 2013 and achieving our goal of over 13,000 chargers deployed by the middle of the year*.

> *                *                *

> We are still in the early stages of building out a nationwide network, but *are very encouraged by our early success and are well positioned to monetize the growth trajectory of the EV industry*.

---

[3]    All emphasis in bold and italics is added, unless otherwise noted.

1                                    *      *      *

2          *Our sales team's focus on national accounts continues to be an area of
3   success for us with many recent national account agreements in place.*

4                                    *      *      *

5          In January we expanded our product offering by unveiling the Minit-Charger
    12, our next-generation of industrial fast charger.  *We'll begin deliveries of the
6   Minit-Charger 12 by Q3 of this year and we have already established a healthy
    pipeline of interest in this new product.*

7          The launch of the 12 is representative of our renewed focus on our industrial
8   Minit-Charger segment.  The economy is gradually turning the corner and as a result
    many companies that have been saving their cash are now spending it on facility and
9   equipment upgrades that mirror the gradual shift in the country's manufacturing and
    industrial sectors.

10         We're seeing substantial trends in the marketplace to go electric when it
    comes to material handling applications and we believe *we are primed to see
11  substantial growth in our Minit-Charger division as we launch new hardware and
    software offerings this year*.

12                                   *      *      *

13
           *Overall our fourth-quarter and annual results were largely driven by the
14  continued successful rollout of the nationwide Blink network and our ability to
    successfully execute upon the deliverables of the EV project.*  Moving forward in
15  2013, we'll continue to build upon our multiple lines of business as we launch our
    Blink Network in new markets and are *ramping up our sales organization for life
16  beyond the EV Project*.

17         *With our interoperability JV and our strategies for building out and
    monetizing this growing industry, we believe ECOtality remains at the forefront of
18  the evolving EVSE market.  With our footprint of over 10,000 installed chargers,
    our loyal and growing membership base and the strength of the Blink network and
19  brand, we are well positioned to continue to grow in 2013*.

20         71.    During the question-and-answer session, Roth Capital analyst Philip Shen asked

21  about the Company's plans to sell EV chargers independent of the EV Project in 2013, and Brar

22  assured investors that ECOtality was now focused on selling product after successfully installing EV

23  Project chargers and rebuilding the entire sales organization:

24         [Shen:]  And in terms of commercial charger sales, independent sales, if you will, do
           you have any in Q4?  And then . . . *talk to us about your plan for selling units
25         independent of the EV project in 2013*?

26         [Brar:]  Sure.  Nothing meaningful in Q4.  Q4 was all about trying to get the
           EV project placements into the rear view mirror so that *we can focus on selling
27         product going forward and I think we were successful doing that.  In Q1 we made
           huge strides in reorganizing and really rebuilding the entire sales organization* and

28

901561_1
    CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
    LAWS - 3:13-cv-03791-SC                                                                    - 20 -

beginning the process of building an indirect channel, which I think we have mentioned in the past is going to be a way to distribute this product.

*We simply cannot afford a large 50 or 25 person national sales force, so we are very aggressive about building out the indirect channel and that is what we focused on in Q1.* And I think we will see success in the balance of the year with this approach. But *the focus up until the end of last year really had been on making sure the 13,000 plus chargers under the EV project had a home and an install location*.

### 1. Brar and Herrmann Knew that ECOtality Would Not Successfully Complete the EV Project Requirements

72. Information included in the two reports prepared by the DOE's OIG Office of Audits and Inspections establishes that Brar and Herrmann knew ECOtality had not "successfully executed upon the objectives of the EV project" and that the Company was not "well on [its] way to completing the EV project by summer of 2013 and achieving [its] goal of over 13,000 chargers deployed by the middle of the year." The OIG reports show that ECOtality would not be able to meet the installation and data analysis objectives of the EV Project.

73. **Installations Drastically Behind Schedule.** The OIG reported that ECOtality had informed the DOE in 2013 that it had to increase its installation rate to meet the modified milestones in the EV Project agreement – the installation of 13,200 charging stations by September 2013 – even though the modified number of required installations had been lowered from 14,960 and the date by which the charging stations had to be installed was extended from December 2011 to September 2013.

74. Despite the increased installation rate, the OIG reported that "as early as May 2013, Department officials concluded that ECOtality would be unable to complete installations [of 13,200 charging stations] on schedule [by September 2013] and would not achieve required data collection milestones." Indeed, the OIG found that installations were "drastically behind schedule," that the planned increase in installation rates had not materialized, that 1,000 commercial chargers had not been installed, that 70% of Fast Chargers had not been installed and that the installation rate for commercial chargers was one-half to one-seventh of what was required to meet the installation deadline.

75. As a result, ECOtality asked the DOE to extend the installation deadline a second time – to December 31, 2013 – and to allow the 13,000 chargers to be either residential or commercial, rather than including the 5,000 and 8,000 minimums.

76. **Inability to Complete Data Collection Milestones.** The OIG reported that ECOtality's internally developed deployment projections showed that the Company would not be able to complete data collection milestones – even though the amount of data collection had been reduced from 16 months to as little as three months – including the inability to provide the minimum required data for about 420 charging stations.

77. **Cost Overruns.** The OIG found that costs for Blink Level 2 chargers had increased 57%, costs of Fast Chargers had increased 140% and costs of 200 commercial EV chargers were about 200% higher than the original budgeted cost per unit due, in part, to cost overruns and charger modifications. The DOE reimbursed the Company for the 200 chargers, but ECOtality only installed 107 of the chargers.

78. The OIG received complaints that a contractor "overcharged participants and the DOE based on the scope of work performed, improper billing, and price gouging" and subsequently found that subcontractors charged six times the labor cost to install EV chargers and that contractors then increased these charges by 40%. These "cost layering" practices therefore increased costs by a factor of eight because: (a) subcontractors' quotes were nearly six times, on average, the actual wages paid for installation labor; and (b) contractors increased quotes from subcontractors by 40%. Therefore, $1 in actual installation costs would cost ECOtality and the DOE $8.40 [($1 x 6) x 1.4].

79. **Poor Utilization of EV Chargers.** The OIG reported that the utilization of EV charging stations was very poor in six of the regions in which they were installed. ECOtality categorized the utilization of EV charging stations as high, medium or poor based on the data ECOtality obtained and analyzed. According to the OIG, as of October 2012, poor-performing EV charging stations represented 78% of the units in Memphis; 74% in Washington, DC; and 60% for Phoenix, Tucson, Knoxville and Dallas. The Company's failure to sell a sufficient number of EV chargers in 2013 to support its operations establishes that there was insufficient demand for EVs and EV charging stations in 2013.

80. **DOE Requires Corrective Action Plan.** In June 2013, the DOE notified ECOtality that it would be required to complete a corrective action plan describing how it would meet overall award requirements. The action plan required several specific documents, including a certification of financial commitment. ECOtality submitted a report in July 2013, but the DOE did not approve it and required significant modifications. Before the modifications were made, however, the Company informed the DOE on August 7, 2013 that it might not be able to meet its obligations under the EV Project, which caused the DOE to suspend all payments to ECOtality.

81. The fact that the DOE concluded by May 2013 that ECOtality would not complete installations on schedule and would not achieve required data collection milestones establishes that defendants knew this undisclosed adverse information on April 15, 2013. Indeed, the DOE concluded that installations were "drastically behind schedule" and would have learned of these problems from reports ECOtality was required to provide and from periodic compliance audits, both of which ECOtality reported were conditions of the EV Project. The EV Project Agreement disclosed by ECOtality stated that the Company's reporting requirements were included in DOE F 4600.2, a Federal Assistance Reporting Checklist. The checklist required the Company to submit progress reports each quarter or as specified by the DOE, and other reports. The EV Project Agreement also stated that the DOE had the right to make site visits at reasonable times to review project accomplishments.

82. The inability to complete installations or achieve required data collection milestones directly contradicted the representations that the Company had "successfully executed upon the objectives of the EV Project" and that ECOtality was "well on [its] way to completing the EV project by summer of 2013 and achieving [its] goal of over 13,000 chargers deployed by the middle of the year."

83. **Former ECOtality Employees Also Describe Problems.** CW1 and CW2 also said there were problems with the EV Project. CW1 said the data in the ERP system showed there was a backlog of Blink orders for the EV Project, some as long as two years, because ECOtality had not installed chargers that had been purchased. According to CW1, one recurring problem causing delayed installations was not being able to contact customers who were given the chargers for free.

84.     CW2 said that ECOtality had issues obtaining enough materials to build Level 2 chargers for the EV Project and that there were field issues in deploying Level 2 chargers. CW3 and CW6 said that the overheating of EV charger plugs was occurring throughout 2013, and CW6 said there were hundreds of overheating reports that CW6 and others investigated. CW6 also said that the Company's Linux-based Level 2 chargers had problems with file uploading and downloading and often suffered from corrupted files, which required CW6 and others to make service calls and upgrade thousands of EV chargers.

**2.     Brar and Herrmann Knew There Were Problems with the Development of the Minit-Charger 12 that Would Prevent Any Sales in 2013**

85.     Information provided by former ECOtality employees, and by Brar in his sworn declaration, establishes that Brar and Herrmann knew there were problems with the development of the Minit-Charger 12 that would prevent it from being released or sold in 2013.

86.     On August 12, 2013, ECOtality filed a Form 8-K with the SEC, in which it reported the Company had "experienced certain material adverse developments that in the aggregate significantly impact its ability to meet its ongoing obligations and to fund anticipated operating losses." ECOtality reported that the material adverse developments included the Company's inability to release the Minit-Charger 12 – which was critical to ECOtality's growth – because it exhibited unacceptable performance shortfalls during prototype verification testing:

> Since the Company's capital raise described in the Current Report on Form 8-K filed on June 20, 2013, the Company has experienced certain material adverse developments that in the aggregate significantly impact its ability to meet its ongoing obligations and to fund anticipated operating losses. These developments include but are not limited to:
>
> *          *          *
>
> (ii)     The Company's inability to release a scheduled new product offering in its Minit Charger industrial line. Our industrial product line expansion with the Minit-Charger 12 product, which was scheduled to launch later this year, was critical to our growth. However, because ***the Minit Charger 12 product exhibited unacceptable performance shortfalls during prototype verification testing, such product will not be introduced in 2013. Accordingly, there will be no revenues from the product in 2013***.

87.     Although this negative adverse information was publicly disclosed by ECOtality on August 12, 2013, defendant Brar admitted in a sworn declaration filed in the Company's bankruptcy that the problems with the Minit-Charger 12 were occurring in 1Q13 and 2Q13:

> The Debtor's chapter 11 cases are not the result of an "overleveraged" balance sheet, a single adverse event or a long-term decline in revenues. Rather, *the Debtor's entry into chapter 11 can best be described as the result of a confluence of several adverse events occurring during the first and second quarters of 2013, which significantly impacted the Debtor's liquidity situation*. . . .
>
> Among other things, six factors precipitated the Debtor's decision to file these chapter 11 cases. These factors include: (i) the Debtor's failure to attain sales volumes of their commercial Electric Vehicle Service Equipment ("EVSE") sufficient to support their operations; *(ii) the Debtor's inability to release a scheduled new product offering in their Minit-Charger industrial line*; (iii) the Debtor's inability to obtain additional financing that would allow them to finance their operations; (iv) the DOE's suspension of payments to the debtors in connection with the EV Project; (v) the significant expenses and liquidated damages incurred by the Debtors in connection with a settlement with the United States Department of Labor ("DOL"); and (vi) uncertainty regarding the resolution of a phenomenon occurring in some of the Debtor's previously installed EVSEs.

88.     Information provided by CW2, the former Director of Hardware Engineering who was responsible for the development of the Minit-Charger 12, establishes that there were numerous problems with its development before and during the Class Period. In written reports and during weekly staff meetings in 2012 and 2013, CW2 reported to management, including defendants Brar and Herrmann, that there were significant problems with the development of the Minit-Charger 12 that would likely prevent it from being released by 3Q13, the date defendants publicly represented ECOtality would begin deliveries of the Minit-Charger 12.

89.     CW2 said that, in November 2012, the design for the Minit-Charger 12 prepared by outside consultants was abandoned because the design was not viable. According to CW2, at that time a January 2013 deadline was imposed to prepare a new design, and development was to be completed so the Minit-Charger 12 could be released in June 2013. In fact, CW2 prepared a development schedule that included the January 2013 and June 2013 deadlines after Brar told CW2 to put together a new development schedule and to "make it happen."

90.     However, CW2 said that the new development schedule was "very risky," depended on absolutely no mistakes being made and that CW2 and other engineers did not believe the deadline could be achieved. CW2 reported to upper management – including Beauregard, Gordon, Jones, and

1  Brar – that there was a high degree of risk with these deadlines, including direct conversations with

2  Brar in December 2012 and January 2013.

3       91.    CW2 said the risks with the development schedule continued to be discussed at

4  weekly staff meetings in 2013 attended by Brar and Herrmann and included in reports CW2 prepared

5  and distributed to meeting participants.  CW2 said the reports always showed that risks with the

6  schedule could result in delays of 10 to 12 weeks.  CW2 said that some of the risks CW2 reported

7  included that ECOtality pushed the limits on the technology, a limited number of engineers

8  experienced with this kind of design work, the Company not having a sufficient number of qualified

9  engineers and the need to qualify the Minit-Charger 12 with organizations like Underwriters

10  Laboratories.

11       92.    CW2 said that there were issues with the Minit-Charger 12 when prototype

12  verification testing began in April 2013 and that by May 2013, the June 2013 release deadline was

13  pushed out.  As a result, CW2 hired Patrice Lethellier in May 2013 to assist with development.  In

14  May 2013, CW2 resigned due to concerns about the Company's prospects but agreed to stay at

15  ECOtality based on the understanding that there was a very good chance the Minit-Charger 12 would

16  not be completed until the end of 2013.

17       93.    CW2 said that there was a tremendous amount of work required to qualify the Minit-

18  Charger 12 with organizations like Underwriters Laboratories as prototype verification testing

19  continued in June, July and August.  As a result, ECOtality began looking at an "off-the-shelf"

20  system – a PowerOne module – that would enable the Company to "go to market" but at much lower

21  margins.

22       94.    CW4, the former ECOtality electrical engineer who worked on Minit-Charger 12

23  board design, said that the development of the Minit-Charger 12 was "obviously not on schedule"

24  and that there were challenges with electro-magnetic compatibility.  Specifically, CW4 said that

25  when the Minit-Charger 12 was plugged into an EV, a battery management system was supposed to

26  monitor the status of the battery in the EV because the battery could be damaged if overcharged.

27  CW4 explained that one of the problems with the development of the Minit-Charger 12 was the

28  charging cable interfering with the battery management system because the high current and high

1   voltage charging cable was installed next to the low voltage communication cable, thereby causing a

2   lot of current and noise.

3       95.    CW6, the former Field Service Superintendent and Lab Technician, began asking

4   when the Minit-Charger 12 would be released in March 2013 because CW6 needed to see it to

5   determine what the service requirements would be.  CW6 was unable to get an answer and therefore

6   asked an ECOtality electrical engineer named Victor in May or June 2013 when it would be

7   released.  According to CW6, Victor flat-out told CW6 that the Minit-Charger 12 did not work, that

8   it could not be fixed and that one of the problems was the failure of the 12-volt transformers to work

9   correctly.

10      96.    These facts show that Brar and Herrmann misled investors by representing that:

11  (a) the Minit-Charger 12 had been "unveiled" in January 2013 and was the "foundation of our next

12  generation of industrial fast charge solutions"; (b) ECOtality would "begin deliveries of the Minit-

13  Charger 12 by Q3 of this year"; and (c) ECOtality was "primed to see substantial growth in our

14  Minit-Charger division as we launch new hardware and software offerings this year."  Those

15  representations were misleading because defendants concealed the unrealistic development schedule

16  and "unacceptable performance shortfalls during prototype verification testing" that they knew

17  would prevent the Minit-Charger 12 from being sold in 2013.

18          **3.    Brar and Herrmann Knew that Unsubsidized Sales of EV
                    Chargers Were Significantly Less than Internal Forecasts and
19                  Insufficient to Support the Company's Operations**

20      97.    Brar and Herrmann knew ECOtality was not successfully transitioning the Company

21  to making unsubsidized sales of Blink EV charger products and services.  In fact, they knew

22  ECOtality had not been profitable when most of its sales were subsidized sales under the EV Project.

23  ECOtality reported an $11.9 million operating loss in 2012 when 72% of its 2012 revenues were

24  subsidized sales under the EV Project.  The residential and commercial customers that participated in

25  the EV Project and generated those revenues, however, received the EV chargers for free and

26  received credits for a portion of the installation costs.  Residential customers also received $550 per

27  month for participating in the EV Project, which the OIG reported was "overly generous" but

28  necessary for the EV Project to be consummated.  In fact, the OIG reported that ECOtality would

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC                                                              - 27 -

1    have encountered a significant financial burden without it.  Thus, Brar and Herrmann knew the

2    Company would need to sell EV chargers to customers who would have to actually pay for them.

3          98.    In addition, Brar and Herrmann knew other facts that would prevent the Company

4    from selling its Blink EV chargers without government subsidies or selling them at a profit.  They

5    knew demand for EVs and EV chargers was less than expected in 2012 because, as the OIG

6    reported, utilization of EV chargers was very poor in six of the EV Project regions.  They also knew

7    the increased cost of manufacturing and installing EV chargers, which the OIG reported had

8    increased by as much as 200%, would negatively impact the profitability of any unsubsidized sales

9    that could be made.  And they knew the overheating of connector plugs and the Company's failure to

10   install EV charging stations on a timely basis – the OIG reported the Company's installations were

11   "drastically behind schedule" – would negatively impact sales.

12         99.    Admissions by Brar in the sworn declaration he filed in the Company's bankruptcy

13   and information provided by former Company employees establish that Brar and Herrmann knew

14   ECOtality was unable to sell a sufficient number of EV chargers without government subsidies.

15   Brar admitted in the declaration that in 1Q13 and 2Q13, ECOtality failed to attain sales volumes of

16   its EV chargers that were sufficient to support its operations and that the connector plug that

17   connected the EV charger to the EV was overheating and, in certain rare cases, melting when the EV

18   was charging.

19         100.   Information provided by former ECOtality employees also establishes that Brar and

20   Herrmann knew ECOtality was not able to sell a sufficient number of EV chargers without

21   government subsidies.  Indeed, CW1 knew from the data in the CRM system that sales in 2012 and

22   2013 were extremely short of internal Company forecasts and that ECOtality was only selling a

23   couple of commercial Blink chargers per week in 2013 before CW1 resigned in July 2013.  CW1

24   said that Brar and Herrmann had access to the data in the CRM system; and during the Company's

25   May 15, 2013 conference call, Brar stated that ECOtality closely monitored sales on a weekly basis.

26         101.   CW1 explained that poor sales of Blink chargers resulted in the revamping of the

27   Company's sales organization by Chief Revenue Officer Greg Fioriti.  According to CW1, the

28   Company shifted to using external sales representatives who were not employees of ECOtality,

1   which resulted in sales personnel at ECOtality declining from 14-16 people to just two when CW1

2   resigned in July 2013.  During the April 15, 2013, conference call, Brar acknowledged that

3   ECOtality could not afford a national sales force and was aggressively building out an indirect sales

4   channel.  Despite the change in the sales organization, CW1 said that sales never took off.

5       102.    Others in the Company told CW1 that sales were poor.  For example, CW1 stated that

6   part of the sales reorganization included the implementation of a system whereby external sales

7   representatives could enter sales orders into the CRM system remotely.  However, when CW1 asked

8   Sales Operation Manager Kristen Loynd ("Loynd") if she was being negatively impacted by not

9   having the sales ordering system in place, Loynd responded that she was not because she was only

10  entering about one sales order per week.

11      103.    CW1 also said that there were hundreds of sales leads in the CRM system but that

12  they were not being converted to sales opportunities (customer demonstrating some level of

13  commitment) or sales because the number of internal sales personnel declined to just two and the

14  external sales representatives were not provided the leads.  Loynd told CW1 that external sales

15  representatives were expected to find their own leads.

16      104.    CW1 resigned in July 2013 due to the Company's poor sales and CW1's increasing

17  skepticism of ECOtality's prospects.  In retrospect, CW1 felt that the Company's senior executives

18  misled investors and also felt that they had "lied to our [employees] faces" during a town hall

19  meeting in May 2013 when they provided a detailed overview of ECOtality's prior year results and

20  projections for what they expected the Company to do in the year ahead.

21      105.    CW5, the former regional account manager, stated that ECOtality developed

22  relationships with dealers who would sell the Company's Blink chargers but that very few indirect

23  dealer sales actually occurred in 2013.  CW5 said that one of the reasons for the lack of sales was

24  ECOtality's failure to provide sales training to the dealers, including the failure to roll out an online

25  "Blink Central" training "portal."  Indeed, CW5 said that introduction of the portal was delayed until

26  August 2013 and was not aware of any dealer that actually placed an order for a Blink EV charger in

27  2013.  In addition, CW5 said that there were probably only 25-30 direct (non-dealer) sales in 2013

28  by the Company and that there was a lack of inventory – particularly Blink residential chargers.

106. CW2, the Director of Hardware Engineering responsible for the development of the Minit-Charger 12, never saw a forecast for Blink chargers and stated that neither Brar nor COO Jones could tell employees during a "kick-off" meeting in December 2012 or January 2013 how many Blink chargers were expected to be sold in 2013. CW2 also said that employees kept asking when and how sales of Blink chargers would begin and that, during a town hall meeting, COO Jones got upset at the continuing questions and told employees to quit asking about the forecast for EV chargers. CW2 stated that it became "kind of a joke" among the members of the Minit-Charger 12 team that they were being asked to develop a product that could be sold when the EV side of the business could not even come up with a forecast.

107. Former ECOtality employees also provided information establishing that the overheating of connector plugs was occurring before and during the Class Period. CW6 stated that the overheating of EV charger plugs publicly disclosed by ECOtality in August 2013 began in October 2012, that there were hundreds of overheating reports that CW6 and others investigated and that the overheating occurred on newer EVs that charged up to 20-30 amps. CW6 also stated that the Company worked closely with engineers from Nissan and Toyota to determine the cause of the overheating and determined it was caused by a defective cable provided by a contract manufacturer, REMA. According to CW6, ECOtality removed the cables and replaced them with new REMA cables that could handle higher amperages.

108. CW3, the former hardware design engineer, believed the overheating of connector plugs was occurring in early 2013, that the overheating was caused by a defective cable provided by a contract manufacturer and that even brand-new cables received from the contract manufacturer in June and July 2013 were overheating.

109. CW6 described other problems with the Company's EV chargers. CW6 told Brar that the Company's Linux-based Level 2 chargers had problems with file uploading and downloading and often suffered from corrupted files, which required CW6 and others to make service calls to upgrade the chargers. As a result, CW6 told Brar that the Linux-based Level 2 chargers should be upgraded before being shipped to customers. However, CW6 stated that thousands of upgrades took place in the field and involved moving a very small and delicate hydrogen board; testing software

and hardware, including CMDA modules; and removing cables during testing. CW3 said that, in March/April 2013, ECOtality postponed the release of an upgraded and modified version of the Blink EV charger that was scheduled to be released in June/July 2013 because ECOtality was running low on cash.

110.    In short, because Brar and Herrmann knew that ECOtality was unable to sell a sufficient number of EV chargers without government subsidies, they also knew their representations were materially false and misleading.  Indeed, the facts show that defendants knew: (a) the Company's financial performance in 2012 did not "reflect[] the health of the [C]ompany and [its] continued execution upon [the] business model"; (b) the Company's three lines of business (Blink, Minit-Charger and eTec Labs) did not "provide[] [the Company] with a stable, diversified and expanding revenue base"; and (c) the Company's Blink chargers did not "well position[] the Company for continued growth" or "well position[] [the Company] to monetize the growth trajectory of the EV industry."

111.    In addition, these facts show that Brar and Herrmann misled by stating that the "sales team's focus on national accounts continues to be an area of success for us with many recent national account agreements in place" and by stating that "in Q1 we made huge strides in reorganizing and rebuilding the entire sales organization," including "building out the indirect channel."  Indeed, CW1 said sales of EV chargers were extremely short of forecast; CW5 said the indirect sales channel was not generating sales; CW2, CW3 and CW6 described product problems impacting sales; and Brar stated that the Company failed to attain sales volumes of its EV chargers in 1Q13 and 2Q13 that were sufficient to support its operations.

### B.    April 15, 2013: Brar and Herrmann Make False and Misleading Statements in ECOtality's 2012 Form 10-K

112.    On April 15, 2013, ECOtality also filed its annual financial report for its fiscal year ended December 31, 2012 on Form 10-K with the SEC.  The Form 10-K was signed by Brar and Herrmann and included materially false and misleading statements and omissions that perpetuated the misleading impression that ECOtality was successfully completing the EV project and successfully transitioning the Company to selling its products and services without government

subsidies.  In the Overview of the Business section of the Form 10-K, defendants continued to falsely represent that ECOtality was successfully supporting and managing the EV project:

> With an extensive history in the EV supply equipment industry*, we have been successful in our bids for public and private funding to support and manage EV charging infrastructure research and deployment programs, including a $100.2 million cost-share grant ("DOE Contract") from the U.S. Department of Energy ("DOE"), to lead, support and manage the largest deployment of EVs and charging infrastructure in U.S. history (this initiative, the "EV Project").* The EV Project seeks to collect data on the use of EV charging infrastructure and to meet these needs is deploying Blink residential and commercial charging stations in multiple major metropolitan areas throughout the United States.  As the project manager for The EV Project, we are uniquely positioned to capture significant share of the domestic market for EV charging solutions and to collect the most data on usage/charging patterns and miles driven.

113.    Brar and Herrmann knew or were reckless in not knowing that these statements were materially false and misleading because they knew, as detailed in the two OIG reports, that ECOtality was unable to complete installations on schedule and would not achieve data collection milestones.

114.    Brar and Herrmann also made materially false and misleading risk warnings in the Form 10-K because the warned-of risks had already occurred and were adversely impacting the Company.  For example, defendants warned that there *would* be a material adverse effect on ECOtality's business *if* the Company failed to meet its obligations of the EV project, including producing and delivering products, services and reports on a timely basis:

> A large percentage of our revenues depend on the progress of our activities under grants from the DOE.  The government has a unilateral ability to make changes in the terms of grants.  To the extent the DOE imposes changes which result in significant reduction of future activities under the grants, changes in the nature or extent of reimbursable costs, or changes for which we are unable to negotiate equitable adjustments, our business, results of operations, and/or financial condition may be materially adversely affected.

> On September 30, 2009, ECOtality North America was awarded a grant from the DOE structured as a cost-share agreement in the amount of $99.8 million, of which $13.4 million was sub-funded to federal research and development centers.  On June 17, 2010, ECOtality North America was awarded a $15.0 million extension to the original cost-share grant, of which $1.2 million was sub-funded to federal research and development centers (such contract, as extended, the "DOE Contract").  The contract term ends in 2013.  The contract is expected to result in up to $100.2 million in revenue to us, which we expect to represent a substantial portion of our revenues while it is in effect.  *As a condition of the DOE Contract, we are required to meet certain obligations, including, but not limited to, producing and delivering products, services and reports on a timely basis in accordance with required standards, and properly accounting for and billing our products.*

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:13-cv-03791-SC                                                                                   - 32

1       Certain costs allowable for reporting as Company cost-share (referred to as "in kind costs") represent certain estimated costs of ownership incurred by the owners of the vehicles in the program.  With respect to such in kind costs, the Company incurs minimal costs.  Our ability to report such costs depends on the number of electric vehicles that are deployed at any given time.  ***To the extent that the deployment of vehicles is delayed, or the total number of vehicles is less than projected, or the quantity of installed chargers is less than projected, total realizable revenue and associated billable costs will be less than the full contract amount provides for.***

6       In addition, ***we are subject to periodic compliance audits in connection with grants from the DOE.  If we are unable to properly perform our obligations under those agreements, or if any compliance audits result in material deficiencies, material adjustments to the previously submitted claims and/or to the amounts recognized as revenue in our financial statements could occur, which would have a material adverse effect on our business, financial condition and results of operations.***

10      115.    Brar and Herrmann knew these statements were materially false and misleading

11  because ECOtality was not delivering EV chargers on a "timely basis" but was instead "drastically

12  behind schedule."  That caused the DOE to suspend all payments to ECOtality under the EV Project,

13  which the Company admitted had a significant impact on ECOtality's financial results.

14      116.    Brar and Herrmann also misled investors by representing that commercialization

15  schedules ***could*** be delayed ***if*** ECOtality did not meet development milestones:

16      ***Product development and commercialization milestones may not be met.***

17      Certain of our product development programs are in the pre-commercial stage. The success of each product development program is highly dependent on our correct interpretation of commercial market requirements, pricing and our analysis of the applicable product specifications, offerings and appropriate development milestones. If our market requirements analysis is flawed, or if the requirements and conditions of the market change, we may develop a product that does not meet the cost and performance requirements for a successful commercial product. ***If we do not meet the required development milestones, our commercialization schedules could be delayed, which could result in alternative product offerings being purchased from competitors.  Delayed commercialization schedules may also impact our cash flow, which could require increased funding.***

23      117.    Brar and Herrmann knew these statements were materially misleading because, as

24  Brar stated in his declaration and as CW2 explained, the Minit-Charger 12 had demonstrated

25  "unacceptable performance shortfalls during prototype verification testing" in 1Q13 and 2Q13,

26  which prevented any sales of the Minit-Charger 12 in 2013.

27      118.    Similarly, Brar and Herrmann misled investors by representing that product failures

28  might damage the Company's reputation, cause sales to decline or require ECOtality to repair or

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:13-cv-03791-SC                                                                 - 33 -

replace defective products. However, Brar and Herrmann failed to disclose, as Brar stated in his

sworn declaration, that, in 1Q13 and 2Q13, the Minit-Charger 12 was exhibiting unacceptable

performance shortfalls during prototype verification testing that prevented it from being introduced

in 2013 and that EV charger plugs were overheating and melting when charging EVs:

> ***Problems with product quality or performance may cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.***
>
> Our products are sold with various materials and workmanship warranties for technical defects. These warranties range in length from 1 to 10 years. As a result, we bear the risk of warranty claims after we have sold our products and recognized net sales. As of December 31, 2012, our accrued warranty expense was approximately $0.6 million.
>
> Because of the limited operating history of our products, we have been required to make assumptions regarding the durability and reliability of our products. Our assumptions could prove to be materially different from the actual performance of our products, causing us to incur substantial expense to repair or replace defective products in the future. ***Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective products, which could have a material adverse effect on our financial condition and results of operations***.

119.     The Company's disclosures in the 2012 Form 10-K about the possible delisting of its

stock by the NASDAQ establish that Brar and Herrmann knew the concealed facts needed to be

disclosed. ECOtality disclosed that the failure to maintain the listing requirements of the NASDAQ

Capital Market could result in a delisting of its common stock and that it was at risk of being delisted

from NASDAQ if it did not regain compliance with the minimum $1 bid price per share required by

NASDAQ. But the Company also disclosed it had received letters from NASDAQ stating that

ECOtality's stock would be delisted if the stock did not trade at $1 per share or higher by May 6,

2013.

**C.      ECOtality's Stock Price Increases 35% After Brar and Herrmann Make Materially False and Misleading Statements on April 15, 2013, Thereby Avoiding the Delisting of the Company's Stock on the NASDAQ**

120.     Following the statements on April 15, 2013, the Company's stock price increased

35% from $0.96 on April 15, 2013 to $1.30 on April 16, 2013, on extremely high trading volume of

more than 2.69 million shares trading, or more than eight times the average daily volume over the

preceding ten trading days.

121.     As alleged above, Brar and Herrmann knew the Company's stock would be delisted if the stock price was not at least $1 per share.  Their false and misleading statements on April 15, 2013, which caused the Company's stock price to increase and trade above $1 per share, saved the stock from being delisted.  Indeed, on April 30, 2013, the Company filed a Current Report on Form 8-K in which it reported the NASDAQ had "determined that for the last 10 consecutive business days, from April 16, 2013 to April 29, 2013, the closing bid price of the Company's common stock ha[d] been at $1.00 per share or greater" and that "the Company ha[d] regained compliance with Listing Rule 5550(a)(2)[,]" so the common stock of ECOtality was no longer subject to delisting.

**D.     May 15, 2013: Brar and Herrmann Falsely Represent that ECOtality Is on Track to Complete the Commitments of the EV Project, that the Company Will Begin Installations of the Minit-Charger 12 by 3Q13 and that ECOtality Is Making Progress Shifting Its Business from One Being Dependent on the EV Project**

122.     **Statements in May 15, 2013 Press Release.**  On May 15, 2013, after the close of trading, ECOtality issued a press release announcing its financial results for its first quarter of 2013, ended March 31, 2013.  In the press release, Brar and Herrmann continued to perpetuate the misleading impression that ECOtality was successfully completing the EV Project and successfully transitioning the Company to selling its products and services without government subsidies.  Brar and Herrmann stated that ECOtality was on track to complete the commitments under the EV project by the end of the year, that the installations of the Minit-Charger 12 would begin in 3Q13 and that ECOtality was making progress in shifting the business from being primarily dependent on the EV Project, to a company with diversified products and services:

> "Our first quarter results reflect continued installations of our prevalent and growing Blink® network," stated Ravi Brar, ECOtality's President and Chief Executive Officer.  "***We are on track to complete the commitments under the EV Project by the end of this year***, and have now focused our attention on our next stage of growth.  ***Our Blink, Minit-Charger and eTec Labs businesses each provide substantial opportunities supported by positive trends in the commercial, residential and industrial EV markets.***  Our goal is to promote the use of clean energy technology to best serve our customers while simultaneously ***cultivating shareholder value as we continue our transition and further build our business***."

*     *     *

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:13-cv-03791-SC                                                                     - 35 -

**First Quarter 2013 Operational Highlights**

      *Announced the launch of the Minit-Charger 12, the foundation for the next generation of Minit-Charger's industrial products.*

               \*        \*        \*

      "*We are making progress in shifting our business from one primarily dependent on the EV Project to a company with a diversified product and services offering serving consumers, industrial and government clients,*" Mr. Brar continued. "We believe that *each of our three complementary product and service offerings present compelling growth opportunities and we have set aggressive internal sales targets. Our efforts to expand our national account program have been encouraging, as the recent agreements with Kroger and Texas Instruments demonstrate our early traction and the viability of our charging stations and network. We are actively working to expand our Blink network across the country through our indirect sales channels and dealer network.* In addition, *the Minit-Charger 12 is our first step to rejuvenate our presence in the industrial sector, and we are preparing to begin installations in the third quarter.*"

123.   <u>**Statements During May 15, 2013 Conference Call.**</u> During the conference call held with investors later on the evening of May 15, 2013, Brar and Herrmann made additional statements that perpetuated the misleading impressions that ECOtality was successfully completing the EV program and successfully transitioning the Company to sell its products and services without government subsidies. In his opening remarks, Brar assured investors that ECOtality was laser focused on wrapping up EV Project commitments, that the EV Project provided a solid foundation to build upon and that the Company was further monetizing its Minit-Charger product offerings:

      Now, as you know, this year our business will undergo a considerable transition. *We are laser focused on wrapping up our commitments under the EV Project and even more focused to a greater extent on growing our network and our annuity on a go-forward basis by executing on our business model. The EV Project has provided us with a solid foundation to build upon, and we expect the steps we have implemented in Q1 to leverage and expand our network and put us in a position to benefit from future growth in usage and subscription fees; and that will provide us with recurring and predictable revenue streams. We also turned our attention to further monetizing our Minit Charger* and Etec Labs product and service offerings, *where we see additional growth opportunities.*

124.   Brar made similar remarks later in the conference call, telling investors that a clear, growing market opportunity existed and that ECOtality would capture a reasonable share over time:

      *As the EV Project winds down, we have turned our attention to our next stage of growth and are taking important steps to meeting our aggressive internal objectives to cultivate a long-term, healthy and profitable business.* Specifically, we plan to further expand our national Blink network; leverage the expansive existing Blink charger infrastructure to generate an annuity, initially through usage fees, software licensing and maintenance agreements; as well as extend our focus to our other two

business segments, where we see considerable opportunity to extract additional value.

                              \*      \*      \*

**What this all means for us is very simple: One, that a clear, growing market opportunity exists; and two, that with our network and growth strategy, . . . we should be able to capture a reasonable share of this market over time.**

125.     Moreover, Brar falsely represented that ECOtality would complete the installations of EV chargers under the EV Project when the DOE had already concluded that the Company would not be able to meet the September 2013 deadline for installations:

**We expect to complete the installation of our Level 2 residential and public charging systems under the EV Project this summer. We expect to complete DC Fast Charger installations by Q3.**

126.     Following that false and misleading statement, Brar continued to assure investors that ECOtality was successfully transitioning away from dependence on the EV Project:

**Looking at the statistics in this market, *we believe there's a clear path to profitability from our EV charging network*, particularly as the number of EVs and members increase, thereby increasing utilization as a natural byproduct. *As we transition to nongovernment-generated revenue, we continue to grow our Blink network and have demonstrated some solid progress with our recent sales initiatives. In fact, the deals we're doing today are indicative of the types of agreements that will propel us forward.***

                              \*      \*      \*

**Our primary direct selling efforts have multiple channels. . . . The value of this pipeline grew roughly 36% in the first quarter; and, of course, it's something that we closely monitor on a weekly basis. Further, we're actively establishing sales distribution channels to broaden our reach and penetration, both to establish Blink markets as well as key growth geographies. We believe that vertically-oriented independent sales representatives and service-oriented dealer resellers are a fantastic opportunity for us to grow rapidly but also strategically; and it's really, frankly the only way to do it. . . . The first quarter was spent understanding and identifying who some of our best candidates in both categories could be. As we continue the second quarter, our goal is to begin signing those channels and getting them under productive agreements. . . . [W]e have met multiple times with 94 organizations who have the potential to effectively sell the Blink value proposition.**

127.     Brar also falsely represented that ECOtality was "on track" to begin delivery of the Minit-Charger 12 even though he knew that it had already exhibited unacceptable performance shortfalls during prototype verification testing that would prevent any sales in 2013:

**We see opportunity for substantial growth in the industrial fast-charging market, and the launch of our Minit-Charger 12 represents our new focus in this market.**

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:13-cv-03791-SC             - 37

*We are on track to begin delivery in the third quarter to satisfy our healthy pipeline of interest in this product*. . . . We are seeing more and more facilities transition from battery rooms to fast-charging and opportunity charging in the industrial workplace. We are also seeing economic improvements in the macro level and aiding and enabling companies to spend on capex to upgrade their equipment. *In line with this trend, we believe we are in an excellent position to grow our Minit-Charger product offering, with new hardware and software launches planned for this year.*

128.    Brar concluded his prepared remarks by falsely assuring investors that ECOtality was making progress on shifting its business from the EV Project and that there was a significant growth opportunity for non-EV Project sales:

*As you can see, we are making progress on shifting our business from one with a significant concentration of revenue in one project to a well diversified business.* We believe that each of our three complementary product and service offerings represent a growth opportunity. A significant growth opportunity. We have set aggressive internal sales targets, and we intend to meet them.

129.    **Statements in 1Q13 Form 10-Q.**  On May 15, 2013, ECOtality also filed its quarterly financial report for its first quarter of 2013, ended March 31, 2013, on Form 10-Q with the SEC. The Form 10-Q was signed and certified as to veracity under §§302 and 906 of the Sarbanes Oxley Act of 2002 by Brar and Herrmann. Brar and Herrmann misled investors by representing in the Form 10-Q that ECOtality had been leading and managing the EV Project and deploying charging stations throughout the United States because they failed to disclose that the Company would not be able to meet the September 2013 installation deadline or the December 31, 2013 data analysis deadline:

Through several competitive bidding opportunities, *we have been awarded a variety of government reimbursable cost contracts, including a $100.2 million cost-share grant from the U.S. Department of Energy ("DOE") to lead, support and manage the largest deployment of EVs and charging infrastructure in U.S. history (this initiative, the "EV Project")*. The goal of the EV Project is to develop, implement and study techniques for optimizing the deployment of charging infrastructure to support widespread market acceptance of EVs in the U.S. and internationally, as well as to identify commercially viable business models to create a sustainable EV charging industry. To achieve this objective, *we have been deploying Blink residential and commercial charging stations in multiple major metropolitan areas throughout the United States*. The EV Project officially launched on October 1, 2009, and included participation by Nissan and over 40 other government, utility and industry partners. The EV Project currently represents the world's largest EV infrastructure project as well as the largest network connecting charging stations to the grid, EVs and commercial retailers.

*        *        *

*The EV Project is scheduled for completion at the end of 2013*. On a project-to-date basis through March 31, 2013, we have received $91.5 million under the project.

130. Brar and Herrmann also misled investors by representing that the successful completion of the EV Project was one of two main objectives in 2013 to ensure the success of the business because they knew that ECOtality would not meet the September 2013 installation deadline or the December 31, 2013 data analysis deadline:

*We have two main objectives in 2013 to ensure the success of our business. The first is the successful completion of the EV Project.* As we complete our EVSE installations and compile the data, we finalize setting out the infrastructure footprint and internalizing the experience and knowledge gained that will form the foundation upon which our new commercial EVSE and Blink Network business will be built.

131. Brar and Herrmann misled investors by stating that the Company had made significant organizational changes in anticipation of the changing needs of the business as the EV Project wound down; that it would continue to focus on partnerships to sell it products; and that industrial product line expansions, scheduled to be launched later in the year, were critical to ECOtality's growth. Defendants, however, failed to disclose that, in 1Q13 and 2Q13, ECOtality failed to attain sales volumes of its EV chargers sufficient to support its operations, that the connector plugs that connected the EV chargers to the EVs were overheating and, in certain rare cases, melting when the EVs were charging and that the Minit-Charger 12 exhibited unacceptable performance shortfalls during prototype verification testing and would therefore not be introduced in 2013:

*In 2012, we made significant organizational changes in our sales and field operations in anticipation of the changing needs of the business as the EV Project activities wind down. In 2013, we will continue to focus on partnering with major retail outlets, large corporate clients, small and medium enterprises, industrial supply companies, utilities, commercial, retail and office building owners, state and local governments and automobile manufacturers.*

*Our industrial product line expansions, scheduled to launch later this year are critical to our growth. In support of this business we will continue to maintain a marketing and sales focus on the recovering warehouse and airport ground support equipment markets.*

132. The risk warnings in the 2012 Form 10-K were incorporated by reference in the 1Q13 Form 10-Q and falsely represented that certain risks could materially affect ECOtality's business if

they occurred.  Those representations misled investors because the numerous problems that were

already having a material adverse effect on the Company were not disclosed:

> In addition to the other information set forth in this report, ***you should carefully consider the risk factors discussed in "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2012, which could materially affect our business, financial condition or future results***.  We caution the reader that these risk factors may not be exhaustive.  We operate in a continually changing business environment and new risks emerge from time to time.  Management cannot predict such new risk factors, nor can we assess the impact, if any, of such new risk factors on our business or to the extent to which any factor or combination of factors may impact our business.  There have not been any material changes during the quarter ended March 31, 2013 from the risk factors disclosed in the aforementioned Annual Report on Form 10-K for the year ended December 31, 2012.

### 1. In May 2013, Brar and Herrmann Knew ECOtality Would Be Unable to Complete EV Project Requirements

133.    The OIG reports show that Brar and Herrmann knew ECOtality would be unable to

complete the installation and data collection milestones when they assured investors on May 15,

2013 that: (a) the Company was "on track to complete the commitments under the EV Project by the

end of this year"; and (b) one of the Company's two main objectives in 2013 was "the successful

completion of the EV Project."

134.    The OIG reported that "as early as May 2013, Department officials concluded that

ECOtality would be unable to complete installations [of 13,200 charging stations] on schedule [by

September 2013] and would not achieve required data collection milestones."  And the OIG found

that the Company was not even close to completing installations, reporting that installations were

"drastically behind schedule," that the planned increase in installation rates had not materialized, that

1,000 commercial chargers had not been installed, that 70% of Fast Chargers had not been installed

and that the installation rate for commercial chargers was one-half to one-seventh of what was

required to meet the installation deadlines.  The OIG reported that ECOtality's internally developed

deployment projections showed that the Company would not be able to complete data collection

milestones – even though the amount of data collection had been reduced from 16 months to as little

as three months – including the inability to provide the minimum required data for about 420

charging stations.

2.   **In May 2013, Brar and Herrmann Knew the Deadline for the Release of the Minit-Charger 12 Had Been Extended Because of Unacceptable Performance Shortfalls During Prototype Verification Testing**

135.   The information provided by CW2, CW4 and CW6 and the statements by Brar in the declaration filed in the Company's bankruptcy show that Brar and Herrmann knew the Minit-Charger 12 would not be sold in 2013 when they told investors on May 15, 2013 that: (a) ECOtality was "preparing to begin installations in the third quarter"; (b) ECOtality was "on track to begin delivery in the third quarter"; and (c) ECOtality was "in an excellent position to grow our Minit-Charger product offering, with the new hardware and software launches planned for this year."

136.   As alleged above, defendant Brar admitted in a sworn declaration filed in the Company's bankruptcy that the problems with the Minit-Charter 12 were occurring in 1Q13 and 2Q13.  In addition, CW2, the former Director of Hardware Engineering who was responsible for the development of the Minit-Charger 12, stated that there were issues with the Minit-Charger 12 when prototype verification testing began in April 2013 and that, by May 2013, the June 2013 release deadline was pushed out.

137.   CW4 stated that the development of the Minit-Charger 12 was "obviously not on schedule" and explained that the charging cable was interfering with the battery management system because the high current and high voltage charging cable was installed next to the low voltage communication cable.  CW6 was told by a colleague in May or June 2013 that the Minit-Charger 12 did not work, that it could not be fixed and that one of the problems was the failure of the 12-volt transformers to work correctly.

138.   Even before the problems were discovered during prototype testing, Brar and Herrmann knew it was probable that the Minit-Charger 12 would not be released in 2013.  As CW2 explained, the previous development schedule that projected a release date in 2013 was "most likely not going to be completed" because it was "very risky" and depended on absolutely no mistakes being made.  In fact, CW2 and other engineers did not believe the deadline could be achieved.  CW2 also said that the risks were reported to management – including Brar and Herrmann – in weekly reports and meetings.

1          **3.**        **In May 2013, Brar and Herrmann Knew ECOtality Was**

2                    **Unable to Sell a Sufficient Number of EV Chargers to Support the Company's Operations and that the Company Was Not**

3                    **Making Progress Shifting Its Business from One Dependent on the EV Project to a Well Diversified Business**

4       139.     The information included in the OIG reports, the information provided by former

5  ECOtality employees and Brar's admissions in the declaration he filed in the Company's bankruptcy

6  show that Brar and Herrmann knew various adverse facts which contradicted their representations on

7  May 15, 2013 that: (a) the Company was "making progress in shifting [its] business from one

8  primarily dependent on the EV Project to a company with a diversified product and services

9  offering"; (b) "each of [ECOtality's] three complementary product and service offerings present

10  compelling growth opportunities"; (c) "[t]he EV Project has provided us with a solid foundation to

11  build upon"; (d) "[a]s the EV Project winds down, we have turned our attention to our next stage of

12  growth and are taking important steps to meeting our aggressive internal objectives to cultivate a

13  long-term, healthy and profitable business"; (e) "a clear, growing market opportunity exists";

14  (f) ECOtality had "demonstrated some solid progress with our recent [Blink] sales initiatives"; and

15  (g) "we are making progress on shifting our business from one with a significant concentration of

16  revenue in one project to a well diversified business."

17       140.     As alleged above, Brar and Herrmann knew the Company had reported millions of

18  dollars in operating losses and net losses in 2012 when 72% of its revenues were generated by

19  subsidized sales under the EV project.

20       141.     The information in the OIG reports shows that the demand for EVs and EV charging

21  stations was less than expected as utilization of EV chargers was very poor in six of the EV Project

22  regions. Further, the OIG reports show that Brar and Herrmann knew manufacturing and installation

23  costs had increased by as much as 200%, which would negatively impact the profitability of any

24  unsubsidized sales that could be made. And Brar and Herrmann knew the overheating of connector

25  plugs and the Company's failure to install EV charging stations on a timely basis – the OIG reported

26  the Company's installations were "drastically behind schedule" – would negatively impact sales.

27       142.     Brar admitted in the sworn declaration he filed in the Company's bankruptcy that, in

28  1Q13 and 2Q13, ECOtality failed to attain sales volumes of its EV chargers sufficient to support its

1    operations and that the connector plug that connected the EV charger to the EV was overheating and,

2    in certain rare cases, melting when the EV was charging.  He also admitted that the problems with

3    the Minit-Charter 12 were occurring in 1Q13 and 2Q13.

4         143.    Former ECOtality employees confirmed that the Company was unable to sell

5    sufficient numbers of EV chargers without government subsidies.  CW1 knew from the data in the

6    CRM system that sales in 2012 and 2013 were extremely short of internal Company forecasts and

7    that ECOtality was only selling a couple of commercial Blink chargers per week in 2013 before

8    CW1 resigned in July 2013.  CW5 stated that there were very few indirect sales in 2013 from the

9    numerous dealer relationships established by the Company and only 25-30 direct (non-dealer) sales

10   in 2013.

11        144.    Former employees also described product problems.  CW3 and CW6 said that the

12   overheating of EV charger plugs was occurring throughout 2013, and CW6 said there were hundreds

13   of overheating reports that CW6 and others investigated.  CW6 also said that the Company's Linux-

14   based Level 2 chargers had problems with file uploading and downloading and often suffered from

15   corrupted files, which required CW6 and others to make service calls and upgrade thousands of EV

16   chargers.

17        **E.    June 2013: Brar and Herrmann Announce that ECOtality Raised $8.2**
            **Million of Capital in a Private Placement and Make Additional False**
18          **and Misleading Statements**

19        145.    On June 13, 2013, ECOtality filed a Current Report on Form 8-K with the SEC

20   advising that on June 12, 2013, it entered into a Securities Purchase Agreement with a group of

21   investors who purchased 5.1 million shares of the Company's stock for $1.60 per share, raising $8.2

22   million.  The Securities Purchase Agreement included representations and warranties from the

23   Company that were materially false and misleading:

24        3.1: Representations and Warranties of the Company.  The Company hereby
          represents and warrants to each Investor that, as of the date hereof and as of the
25        Closing Date:

26                          *        *        *

27         (h)    SEC Reports; Financial Statements. Except as set forth on Schedule 3.1(h),
           the Company has filed all reports required to be filed by it with the Commission
28         under the Securities Act and the Exchange Act, including pursuant to Section 13(a)

or 15(d) thereof, for the twelve months preceding the date hereof (excluding disclosures of risks included in any forward-looking statement disclaimers or other statements that are similarly non-specific and are predictive and forward-looking in nature) (the foregoing materials being, collectively referred to herein as the "SEC Reports" and, together with the Schedules to this Agreement (if any), the "Disclosure Materials") on a timely basis or has timely filed a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, *the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading*. The financial statements of the Company included or incorporated by reference in the SEC Reports have been prepared from and are in accordance with the books and records of the Company and its Subsidiaries in all material respects, comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved, except as may be otherwise specified in such financial statements or the notes thereto, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, recurring, immaterial, year-end audit adjustments and the absence of footnotes therefrom. Except as set forth on <u>Schedule 3.1(h)</u>, neither the Company nor any of its Subsidiaries has any liabilities or obligations of any nature (absolute, accrued, contingent or otherwise) for which reasonable reserves have not been established in accordance with GAAP in the financial statements described above, except for liabilities that have arisen since December 31, 2009 in the ordinary and usual course of business and consistent with past practice and that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

(i) <u>Press Releases</u>. *The press releases disseminated by the Company during the twelve months preceding the date of this Agreement taken as a whole do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made and when made, not misleading.*

(j) <u>Material Changes</u>. Since the date of the latest audited financial statements included within the SEC Reports, except as specifically disclosed in <u>Schedule 3.1(j)</u> or the SEC Reports:

(i) *there has been no event, occurrence or development that has had or that would reasonably be expected to result in a Material Adverse Effect*;

\*       \*       \*

Except for the issuance of the Securities and the other Transactions contemplated by the Transaction Documents, *no event, liability or development has occurred or exists with respect to the Company or any of its Subsidiaries or their respective businesses, properties, operations or financial condition that, in each case, is required to be disclosed by the Company under applicable securities Laws*

*at the time this representation is made that has not been publicly disclosed*. Except as disclosed on Schedule 3.1(j), the Company does not have pending before the Commission any request for confidential treatment of information.

\* \* \*

(z)     Government Bids and Contracts.

\* \* \*

(iii)     Except as set forth on Schedule 3.1(z)(iii), *with respect to each Government Contract, Government Bid and Government Assistance Agreement*: *(A) the Company has complied in all material respects with all applicable requirements, terms and conditions*; all invoices and claims for payment, reimbursement or adjustment and all representations and certifications were current, accurate and complete in all material respects as of their respective submission dates; (B) no written notice has been received by the Company alleging that the Company, or any director, officer or employee thereof, is or was in material, uncured breach or violation of any applicable Law, contractual, regulatory or administrative requirement; no written notice of termination, cure notice, or show-cause notice or written assertion that any invoice or claim for payment, reimbursement or adjustment was false or improper has been received by the Company; (C) all pricing discounts and rebates have been reported to and credited to Governmental Authorities in compliance with all applicable requirements in all material respects; *(D) there are no outstanding material claims or disputes between the Company and any Governmental Authority*; (E) neither the Company nor any Subsidiary has made any assignment of revenues or anticipated revenues; and (F) the Company has maintained systems of internal controls that are, and have been, in compliance with all requirements in all material respects including, without limitation, government cost accounting requirements.

146.     The representation and warranty that the Company's previous press releases and SEC reports did not contain any materially misleading statements or omissions was false because, as alleged above, the press releases and SEC reports issued on April 15, 2013 and May 15, 2013 contained numerous materially misleading statements and omissions.  For the same reasons, Brar and Herrmann knew that, contrary to the "Material Changes" representation and warranty, the securities laws did require the disclosure of the numerous undisclosed problems that caused their statements to be materially false and misleading.  And they knew that ECOtality had not complied with all applicable requirements, terms and conditions of government agreements because the Company was unable to complete the installation and data collection requirements of the EV Project.

147.     On June 19, 2013, ECOtality reported that the $8.2 million private placement had been completed, that the funds would "be used for general corporate and working capital purposes," and that ECOtality was *then "making good progress to advance [its] Blink Network and monetize*

1   *[its] EV solutions*," adding that "[t]his capital raise help[ed the Company] *continue [its] operational*

2   *momentum as [it] execute[d] on [its] strategic initiatives to expand [its] diversified business lines*

3   *and continue[d] to build [its] business*."

4       148.    Brar and Herrmann knew ECOtality was not "making good progress to advance [its]

5   Blink network and monetize [its] EV solutions."  In fact, in June 2013, ECOtality had submitted a

6   corrective action plan to the DOE – at the DOE's insistence – after the DOE concluded in May 2013

7   that the Company would not be able to meet the installation and data collection milestones.  Further,

8   the OIG found other problems that would prevent ECOtality from advancing and monetizing its EV

9   solutions, including very poor utilization of EV charging stations and substantial cost overruns.

10       149.    Brar and Herrmann also knew, as admitted by Brar in his declaration, that, in 1Q13

11   and 2Q13, ECOtality failed to attain sales volumes of its EV chargers sufficient to support its

12   operations and that the connector plug that connected the EV charger to the EV was overheating and,

13   in certain rare cases, melting when the EV was charging.  As CW1 explained, Brar and Herrmann

14   knew from the CRM system that sales in 2013 were extremely short of internal Company forecasts

15   and that ECOtality was only selling a couple of commercial Blink chargers per week in 2013.

16   **F.    July 2013: Defendants Issue an Inaccurate and Materially Misleading**
       **Registration Statement and Prospectus**

17

18       150.    On July 1, 2013, ECOtality filed a Form S-3 Registration Statement to register the 5.1

19   million shares sold to the group of investors on June 12, 2013.  The risk warnings in the 2012 Form

     10-K were incorporated by reference:

20

21           Investing in our common stock involves a high degree of risk.  ***Please review***
       ***the risks and uncertainties described under the heading "Risk Factors" discussed***

22   ***under the section entitled "Risk Factors" contained in our most recent Annual***
       ***Report on Form 10-K and in our most recent Quarterly Report on Form 10-Q, as***

23   ***well as any amendments thereto reflected in subsequent filings with the SEC,***
       ***which are incorporated by reference into this prospectus in their entirety***.  Before

24   making an investment decision, you should carefully consider these risks as well as
       other information included or incorporated by reference in this prospectus.  The risks

25   described in these documents are not the only ones we face.  Additional risks and
       uncertainties not presently known to us or that we currently deem immaterial may

26   also affect our business operations.  ***These risks could materially affect our***
       ***business, results of operations or financial condition and cause the value of our***

27   ***common stock to decline.  You could lose all or part of your investment***.  Please
       also read carefully the section below entitled "Cautionary Note Regarding Forward-

28   Looking Statements."

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC                                - 46

151.     The SEC declared the S-3 Registration Statement effective on July 9, 2013, and the Company filed a Prospectus on Form 424B3 on July 10, 2013 that also incorporated by reference the risk warnings in the 2012 Form 10-K:

> Investing in our common stock involves a high degree of risk. ***Please review the risks and uncertainties described under the heading "Risk Factors" discussed under the section entitled "Risk Factors" contained in our most recent Annual Report on Form 10-K and in our most recent Quarterly Report on Form 10-Q, as well as any amendments thereto reflected in subsequent filings with the SEC, which are incorporated by reference into this prospectus in their entirety.*** Before making an investment decision, you should carefully consider these risks as well as other information included or incorporated by reference in this prospectus. The risks described in these documents are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also affect our business operations. ***These risks could materially affect our business, results of operations or financial condition and cause the value of our common stock to decline. You could lose all or part of your investment***. Please also read carefully the section below entitled "Cautionary Note Regarding Forward-Looking Statements."

152.     As alleged above, the risk warnings included in the 2012 Form 10-K and incorporated by reference in the Registration Statement and Prospectus were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading and omitted to state material facts required to be stated therein. Indeed, before the offering, the DOE had concluded that ECOtality would not meet the requirements of the EV Project and informed the Company on June 14, 2013 that it needed to submit a corrective action plan. The corrective action plan was submitted in July 2013, which the DOE determined required significant modifications.

153.     In addition, as alleged above, ECOtality would not release the Minit-Charger 12 due to the problems and was not selling sufficient numbers of EV chargers without government subsidies to support the Company's operations.

## VII.     AUGUST 12, 2013: THE END OF THE CLASS PERIOD – ECOTALITY ANNOUNCES NUMEROUS PROBLEMS THAT CAUSE THE COMPANY'S STOCK PRICE TO DECLINE 79 PERCENT

154.     On August 6, 2013, ECOtality announced that its 2013 Annual Meeting of Stockholders, originally scheduled to be held on August 22, 2013, had been postponed to October 29, 2013. Defendants also advised that contrary to the May 3, 2013 Form 8-K, the annual financial data required to be disclosed prior to the 2013 Annual Meeting of Stockholders would not be made

available until September 2013. Defendants failed to disclose that they would be notifying the DOE the next day, August 7, 2013, that ECOtality was in financial distress and might not be able to meet its obligations under the EV Project. Even without the disclosure of this material adverse information, the reported delays caused the Company's stock price to decline 4.7%. Investors would learn a few days later the reasons for the delays.

155. On August 12, 2013, ECOtality filed a Form 8-K with the SEC in which it publicly disclosed for the first time that the Company had experienced certain material adverse developments that in the aggregate significantly impacted its ability to meet ECOtality's ongoing obligations and fund anticipated operating losses:

> Since the Company's capital raise described in the Current Report on Form 8-K filed on June 20, 2013, the Company has experienced certain material adverse developments that in the aggregate significantly impact its ability to meet its ongoing obligations and to fund anticipated operating losses. These developments include but are not limited to:
>
> (i) The Company's failure to attain sales volumes of its commercial Electric Vehicle Service Equipment ("EVSE") sufficient to support the Company's operations in the second half of 2013. As cash flows from the EV Project declined, it was essential that the Company transition from subsidized installations of EVSEs under the EV Project to regular commercial sales and installations. To this end, the Company reorganized its sales organization to support such efforts. In addition to selling its products directly through its sales force, the Company formed commercial relationships with independent dealers for the purpose of distribution of its EVSEs and related products in the first half of 2013 with the expectation of selling substantial volumes of EVSE products in the second half of 2013. At this time, neither the Company's direct sales force nor the independent dealers have generated sales volumes of its commercial EVSE products sufficient, in combination with other sources of revenue, to support the Company's operations in the second half of 2013.
>
> (ii) The Company's inability to release a scheduled new product offering in its Minit Charger industrial line. Our industrial product line expansion with the Minit Charger 12 product, which was scheduled to launch later this year, was critical to our growth. However, because the Minit Charger 12 product exhibited unacceptable performance shortfalls during prototype verification testing, such product will not be introduced in 2013. Accordingly, there will be no revenues from the product in 2013.
>
> (iii) The Company has been unable to obtain additional financing. As previously disclosed, net working capital is an important measure of our ability to finance our operations. As we focused on our business plan for strong growth of our commercial businesses we were cognizant that fully executing on our plan would require us to raise additional capital to supplement our cash flows from operations. Management actively pursued a number of options to secure additional capital. However, the Company learned on

August 8, 2013 that financing that was being pursued from an existing investor would not be forthcoming. The Company continues its efforts to obtain additional capital but there can be no assurances that such financing will occur on reasonable terms, or at all. Even if we are able to obtain additional financing, we cannot assure you that such financing will be in an amount sufficient to meet the Company's short or long term capital needs.

(iv)     The Company has been notified by the U.S. Department of Energy ("DOE") that the DOE is suspending payments to the Company in connection with the EV Project. In an abundance of caution on August 8, 2013, the Company notified the DOE that, even though the Company continues to aggressively pursue certain options for additional financing and is exploring other alternatives, in the event additional financing is not obtained, the Company may not be able to fulfill its operational obligations, including under the EV Project. In response, the DOE sent a letter to the Company stating that it is suspending all payments under the EV Project while it investigates the situation and determines whether the award should continue. This suspension has had a significant impact on receivables that were anticipated to be collected from the DOE, in addition to remaining amounts anticipated to be invoiced and collected under the EV Project.

(v)     In the August 8, 2013 letter, the DOE also notified the Company that the Company is not authorized to incur any new cost or obligation under the award and that the DOE would not reimburse the Company for such costs during the suspension. Further, the DOE instructed the Company to provide notices to its vendors and subcontractors of the suspension.

. . . [T]he Company also incurred significant expenses and liquidated damages in connection with the previously disclosed Department of Labor ("DOL") investigation of the Company under the Fair Labor Standards Act and the Davis-Bacon Act. The Company has agreed to pay certain employees and contractors identified by the Company and the DOL back wages and liquidated damages in an aggregate total amount of approximately $855,000 in consideration for a release of the Company by such employees and contractors of any and all liability with respect to any wage related matters. Accordingly, the Company revised its March 31, 2013 accrual of $597,000 to reflect the approximately $855,000 expected to be paid, in addition to approximately $89,000 in estimated payroll taxes, for a total accrual of $943,000 as of June 30, 2013, resulting in an additional approximately $346,000 charge to general and administrative expenses in the second quarter of 2013.

Further, the Company is facing some uncertainty regarding the resolution of a phenomenon occurring in some of the Company's previously installed EVSEs which causes overheating, and in certain rare cases melting, of the connector plug that connects the EVSE to the electric vehicle when charging. The Company, along with certain automotive original equipment manufacturers ("OEMs") and equipment suppliers, has been actively evaluating the issue in an attempt to determine the cause and to address the problem. Even though a root cause for the observed phenomenon is yet to be definitively verified, in the interim, on August 9, 2013, the Company commenced the reduction of the maximum power delivered by certain of the EVSEs, which reduction has been shown in limited laboratory test to reduce the temperature rise in the connector plug to acceptable levels. The Company continues to discuss with the parts supplier of the connector plug a plan of action which would require the parts supplier to pay to replace either all the connector plugs in its existing EVSE units or those connector plugs identified to be problematic. At this time, the Company cannot assure you that negotiations will result in the parts supplier

agreeing to incur the cost of such remediation. Accordingly, the Company may have to incur such costs and expenses in the future. In addition, some OEMs have notified the Company that they are considering communicating to their customers and other parties to advise them not to use the Company's EVSEs because of the connector plug issue if the Company does not replace all connector plugs on its approximately 12,000 existing EVSEs in the market. The Company believes such a communication may have a material adverse impact on the near term cash flow and prospects of the Company.

Although the Company is currently exploring options for a restructuring or sale of the entire business and/or assets of the Company, the Company may need to file a petition commencing a case under the United States Bankruptcy Code as part of any such process or otherwise in the very near future.

In connection with the events disclosed above, the Company's Board of Directors (the "Board") has retained FTI Consulting ("FTI"), as a restructuring advisor, reporting directly to the Board. FTI's primary responsibilities will be to (i) evaluate capital structure alternatives and identify additional sources of financing, (ii) execute profitability improvement alternatives, (iii) undertake cost cutting measures, (iv) develop and execute plans to improve liquidity against existing assets, (v) identify ongoing personnel requirements and appropriate retention or incentive plans, and (vi) facilitate the possible sale of the Company or its assets. FTI's engagement agreement is yet to be finalized.

156. As a result of disclosing the true condition of Company, ECOtality's stock price declined $1.15 per share, or 79.1%, from $1.46 on August 9, 2013 to $0.31 on August 12, 2013. By comparison, the S&P 500 declined 0.1%. The Company's stock price declined more than 87% from $2.40, the highest price the stock traded at during the Class Period. The decline in the stock price on August 12, 2013 erased more than $53 million of ECOtality's market capitalization.

## VIII.   LOSS CAUSATION

157. As detailed above, the false representations and omissions of material facts about the successful completion of the EV Project and the Company's ability to transition to commercial (*i.e.*, non-subsidized) sales caused ECOtality's stock to trade at artificially inflated prices and operated as a fraud and deceit on purchasers of the Company's securities. After closing at $0.96 on April 15, 2013, ECOtality's stock price traded between $1.27 and $2.40, reaching its Class Period high of $2.40 on May 14, 2013. When ECOtality revealed on August 12, 2013 the adverse facts concerning its inability to successfully complete the EV Project or to successfully transition to commercial sales of its products, ECOtality's stock price declined 85% from its $2.40 peak to $0.31 on August 12, 2013 as the artificial inflation was removed from the Company's stock price. Class members who

purchased ECOtality stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

158.    Defendants' false and misleading statements were made without any reasonable basis and caused ECOtality's common stock to trade at artificially inflated levels through the Class Period. As a direct result of defendants' disclosures set forth above, and a materialization of the undisclosed risk of investing in ECOtality, the price of ECOtality's common stock declined.  These drops removed the inflation from the price of ECOtality common stock, causing real economic loss to investors who had purchased ECOtality common stock during the Class Period.

159.    On April 15, 2013, Brar and Herrmann reported ECOtality's 4Q12 and FY12 results and falsely represented that ECOtality was successfully completing the EV Project and successfully transitioning the Company to selling its products and services without government subsidies.  In response, the Company's stock price increased $0.34, or 35.4%, from $0.96 on April 15, 2013 to $1.30 on April 16, 2013.  By comparison, the S&P 500 composite index (ticker "SPX") increased by only 1.4%.

160.    On May 14, 2013, the day before ECOtality reported its 1Q13 results, the Company's stock price increased 25% from $1.92 on May 13, 2013 to $2.40 on May 15, 2013 before closing at $2.05.  On May 15, 2013, Brar and Herrmann reported ECOtality's 1Q13 results and again made false statements that perpetuated the misleading impression that ECOtality was successfully completing the EV Project and successfully transitioning the Company to selling its products and services without government subsidies.  Although the Company's stock price declined from $1.99 on May 15, 2013 to $1.86 on May 16, 2013, the stock continued to trade at artificially inflated prices because Brar and Herrmann continued to conceal that: (a) ECOtality was not meeting the requirements of the EV Project; (b) ECOtality would not release the Minit-Charger 12 in 2013 due to performance problems exhibited during prototype verification testing; and (c) ECOtality was unable to make a sufficient number of unsubsidized sales of EV chargers to support the Company's operations.

161.    On August 12, 2013, before the opening of trading, ECOtality publicly revealed for the first time numerous problems with the business, including the inability to successfully complete

1   the EV Project, the inability to release the Minit-Charger 12 in 2013 and the failure to sell a

2   sufficient number of EV chargers to support the Company's operations in 2013. The Company also

3   reported that it had hired a "restructuring" adviser to evaluate options, including new financing, a

4   possible sale of the Company, or bankruptcy filing, which could be made "in the very near future."

5   As a result of disclosing the true condition of Company, ECOtality's stock price declined $1.15 per

6   share, or 79.1%, from $1.46 on August 9, 2013 to $0.31 on August 12, 2013. By comparison, the

7   S&P 500 declined 0.1%.

8       162.    The declines in ECOtality's stock price following the August 12, 2013 disclosure

9   compared to the changes in the S&P 500 index negates any inference that the losses suffered by class

10  members were caused by changed market or industry conditions or Company-specific facts unrelated

11  to the fraudulent conduct.

12  **IX.     CLASS ACTION ALLEGATIONS**

13      163.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

14  of Civil Procedure on behalf of all persons who purchased ECOtality common stock during the Class

15  Period and were damaged thereby (the "Class"). Excluded from the Class are defendants, directors

16  and officers of ECOtality and their families and affiliates.

17      164.    The members of the Class are so numerous that joinder of all members is

18  impracticable. During the Class Period, there were 25.63 million outstanding shares owned by

19  thousands of persons and institutions. Thus, the disposition of their claims in a class action will

20  provide substantial benefits to the parties and the Court.

21      165.    There is a well defined community of interest in the questions of law and fact

22  involved in this case. Questions of law and fact common to the members of the Class that

23  predominate over questions that may affect individual Class members include:

24          (a)    Whether the federal securities laws were violated by defendants;

25          (b)    Whether Brar and Herrmann engaged in a fraudulent scheme and omitted

26  and/or misrepresented material facts;

27

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC                                                          - 52 -

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Brar and Herrmann knew or recklessly disregarded that their statements were materially false and misleading;

(e)     Whether the price of ECOtality common stock was artificially inflated during the Class Period;

(f)     Whether the fraudulent scheme, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.*, damages; and

(g)     the extent of damages sustained by Class members and the appropriate measure of damages.

166.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class purchased ECOtality common stock during the Class Period and sustained damages as a result of defendants' wrongful conduct.  Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interest that conflict with those of the Class.

167.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results.  Class members have not indicated an interest in prosecuting separate actions as none have been filed.  The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable.  No difficulties are likely to be encountered in the management of this action as a class action.

168.    In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Although individual Class

1   members have suffered disparate damages, the fraudulent scheme and the misrepresentations and

2   omissions causing damages are common to all Class members. Further, there are no individual

3   issues of reliance that could make this action unsuited for treatment as a class action because all

4   Class members relied on the integrity of the market and are entitled to the fraud-on-the-market

5   presumption of reliance.

6         169.    The market for ECOtality's common stock was open, well developed and efficient at

7   all relevant times. ECOtality's stock met the requirements for listing, and was listed and actively

8   traded on the NASDAQ, a highly efficient and automated market. As a regulated issuer, ECOtality

9   filed periodic public reports with the SEC. ECOtality regularly communicated with public investors

10   via established market communication mechanisms, including through regular dissemination of press

11   releases on the national circuits of major newswire services and through other wide-ranging public

12   disclosures, such as communications with the financial press and other similar reporting services.

13         170.    As alleged above, the change in the price of ECOtality's stock – compared to the

14   changes in the S&P 500 – in response to the release of unexpected material positive and negative

15   information about the Company shows there was a cause-and-effect relationship between the public

16   release of the unexpected information about ECOtality and the price movement in the Company's

17   stock. The average weekly trading volume of ECOtality's stock during the Class Period was

18   approximately 4.24 million shares, or approximately 16.56% of the average total outstanding shares.

19   ECOtality was followed by analysts, who attended the Company's conference calls and issued

20   reports throughout the Class Period. The average market capitalization of ECOtality was $42

21   million. Institutional investors owned between 4.56 million and 8.33 million of ECOtality's shares

22   during the Class Period, or between 17.8% and 32.5% of the average total outstanding shares. The

23   "float" or shares not owned by insiders during the Class Period comprised 72% before May 22 and

24   65% on and thereafter. The Class Period bid/ask spread median was $0.0185.

25         171.    As a result of the foregoing, the market for ECOtality common stock promptly

26   digested current information regarding ECOtality from all publicly available sources and reflected

27   such information in the Company's stock price. Under these circumstances, all purchasers of

28   ECOtality common stock during the Class Period suffered similar injury through their purchases of

ECOtality common stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against the Officer Defendants**

172.    Plaintiffs incorporate ¶¶1-171 by reference.

173.    During the Class Period, the Officer Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

174.    The Officer Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of ECOtality securities during the Class Period.

175.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ECOtality securities.  Plaintiffs and the Class would not have purchased ECOtality securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Officer Defendants' misleading statements.

## COUNT II

**For Violations of §20(a) of the Exchange Act**
**Against the Officer Defendants**

176.    Plaintiffs incorporate ¶¶1-175 by reference.

177.    The Officer Defendants acted as controlling persons of ECOtality within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of ECOtality securities, the Officer Defendants had the power and authority to cause ECOtality to

engage in the wrongful conduct complained of herein. By reason of such conduct, the Officer Defendants are liable pursuant to §20(a) of the Exchange Act.

## COUNT III

### For Violations of §11 of the Securities Act
### Against All Defendants

178. Plaintiffs incorporate ¶¶1-3, 17-68 and 150-171 by reference.

179. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

180. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiffs do not allege that the Officer Defendants or the Director Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

181. The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading and omitted to state material facts required to be stated therein.

182. The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

183. Defendants are strictly liable to members of the Class who purchased shares pursuant and/or traceable to the Registration Statement for any misstatements and omissions contained therein.

184. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

185. By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

186. Plaintiffs Vale and Diamond acquired ECOtality shares in July 2013 that were traceable to the Registration Statement.

187.     Plaintiffs and the Class have sustained damages.  The value of ECOtality common stock has declined substantially subsequent to, and due to, defendants' violations.

188.     At the time of their purchases of ECOtality shares, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to August 12, 2013.  Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiffs filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiffs filed this complaint.

## COUNT IV

### For Violations of §15 of the Securities Act
### Against ECOtality, the Officer Defendants and the Director Defendants

189.     Plaintiffs incorporate ¶¶103, 17-68, 150-171 and 178-188 by reference.

190.     This Count is brought pursuant to §15 of the Securities Act against the Officer Defendants and the Director Defendants.

191.     Each of the Officer Defendants and Director Defendants was a control person of ECOtality by virtue of his or her position as a director and/or senior officer of ECOtality.  Each of the Officer Defendants and Director Defendants had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of ECOtality.

192.     Each of the Officer Defendants and Director Defendants was a culpable participant in the violations of §11 of the Securities Act alleged in the Count above based on his or her having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the offering to be successfully completed.

193.     Brar controlled Herrmann and ECOtality though his position of power and control as the Company's CEO, President and Director.  He had supervisory authority over other ECOtality executives, including Herrmann.  He also had the power to control ECOtality and exercised that power by signing the Registration Statement.

1       194.    Herrmann controlled ECOtality through her position of power and control as the

2  Company's CFO. She had supervisory authority over other ECOtality executives. She also had the

3  power to control ECOtality and exercised that power by signing the Registration Statement.

4       195.    The Director Defendants had the power to control and influence ECOtality, Brar,

5  Herrmann and Company executives through their powers set forth in the Company's Second

6  Amended and Restated Bylaws adopted on September 2, 2011. It is stated in the Second Amended

7  and Restated Bylaws that the business and affairs of ECOtality shall be managed and that all

8  corporate powers shall be exercised by or under the direction of the Board of Directors. The

9  Amended and Restated Bylaws also give the Board the power to appoint, remove and designate the

10  authority of the Company's officers. The Director Defendants exercised their power by appointing

11  officers and signing the Registration Statement.

12                         **PRAYER FOR RELIEF**

13       WHEREFORE, plaintiffs pray for relief and judgment, as follows:

14       A.    Determining that this action is a proper class action, designating plaintiffs as Lead

15  Plaintiffs and certifying plaintiffs as Class representatives under Rule 23 of the Federal Rules of

16  Civil Procedure and plaintiffs' counsel as Lead Counsel;

17       B.    Awarding compensatory damages in favor of plaintiffs and the other Class members

18  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

19  wrongdoing, in an amount to be proven at trial, including interest thereon;

20       C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this

21  action, including counsel fees and expert fees;

22       D.    Awarding rescission or a rescissory measure of damages; and

23       E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the

24  Court.

25

26

27

28

1                                  **JURY DEMAND**

2        Plaintiffs demand a trial by jury.

3 DATED: January 31, 2014           ROBBINS GELLER RUDMAN
                                                     & DOWD LLP

4                                     CHRISTOPHER P. SEEFER
                                    KENNETH J. BLACK

5

6

7                                         s/ Christopher P. Seefer
                                 CHRISTOPHER P. SEEFER

8                                     Post Montgomery Center
                                    One Montgomery Street, Suite 1800

9                                     San Francisco, CA 94104
                                    Telephone: 415/288-4545

10                                     415/288-4534 (fax)

11                                     Lead Counsel for Plaintiffs

12                                     ZELDES HAEGGQUIST & ECK, LLP
                                    AMBER L. ECK

13                                     625 Broadway, Suite 1000
                                    San Diego, CA 92101

14                                     Telephone: 619/342-8000
                                    619/342-7878 (fax)

15

16                                     Additional Counsel for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:13-cv-03791-SC                                                      - 59 -

1
<u>CERTIFICATE OF SERVICE</u>

2   I hereby certify that on January 31, 2014, I authorized the electronic filing of the foregoing

3 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4 the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5 caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7   I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct. Executed on January 31, 2014.

9
        <u> s/ Christopher P. Seefer     </u>

10
        CHRISTOPHER P. SEEFER

11
        ROBBINS GELLER RUDMAN
         & DOWD LLP

12
        Post Montgomery Center
        One Montgomery Street, Suite 1800

13
        San Francisco, CA 94104
        Telephone: 415/288-4545

14
        415/288-4534 (fax)
        E-mail: chriss@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

**LOWENSTEIN SANDLER LLP**
MICHAEL J. MCGAUGHEY (198617)
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: 415-288-4545
Fax: 415-288-4534
mmcgaughey@lowenstein.com

Counsel for Plaintiffs Special Situations
     Fund III QP, L.P., Special Situations
     Cayman Fund, L.P., and Wolverine
     Flagship Fund Trading Limited

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPECIAL SITUATIONS FUND III QP, L.P., SPECIAL SITUATIONS CAYMAN FUND, L.P., AND WOLVERINE FLAGSHIP FUND TRADING LIMITED, <br><br> Plaintiffs <br><br> vs. <br><br> H. RAVI BRAR, SUSIE HERRMANN and MURRAY JONES, <br><br> Defendants. | File No. _____-cv-_____ <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR</u> <br> <u>JURY TRIAL</u> |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................1

II.    JURISDICTION AND VENUE .........................................4

III.   INTRADISTRICT ASSIGNMENT ...................................4

IV.   PARTIES ............................................................................4

V.     THE $8.2 MILLION PIPE DEAL .....................................5

      A.    The PIPE Investors Insisted on Certain Material Representations in the SPA Given the Risk Factors Facing the Company that It Had Disclosed Prior to the PIPE Deal .................................6

      B.    The Company's Representations in the SPA (Falsely) Assured The PIPE Investors That None of the Company's Risk Factors Had Already Materialized .....................................8

      C.    The Representations And Warranties Were False When Made ..................9

VI.   THE OIG AUDITS DEMONSTRATE THAT THE DOE WAS CONCERNED ABOUT ECOTALITY'S ABILITY TO COMPLETE THE EV PROJECT AND THAT IT COMMUNICATED THOSE CONCERNS TO ECOTALITY PRIOR TO THE CLOSING OF THE PIPE DEAL .........................12

      A.    If ECOtality Had Informed The PIPE Investors About The Pending DOE Investigation -- As It Was Obligated To Do Under The SPA -- The PIPE Investors Would Not Have Agreed To The PIPE Deal ..........13

      B.    ECOtality Led The PIPE Investors To Believe That The Financing Raised From The PIPE Deal Would Provide Sufficient Working Capital To Complete The EV Project ......................14

      C.    The Company Submitted Its Corrective Action Plan, Which The DOE Refused To Approve .........................16

      D.    Defendants Made Their Misrepresentations and Omissions with Scienter ........................................17

VII.  DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS DIRECTLY CAUSED THE PIPE INVESTORS' LOSS .........................18

VIII. LEGAL CLAIMS ............................................................21

      FIRST CAUSE OF ACTION

          For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against Brar......................21

      SECOND CAUSE OF ACTION

          For Violations of §20(a) of the Exchange Act Against Brar, Herrmann and Jones ....................24

THIRD CAUSE OF ACTION

      For Violations of §§ 25401 and 25501 of the
California Corporations Code Against Brar ......................25

FOURTH CAUSE OF ACTION

      For Violations of § 25504 of the California
Corporations Code Against Brar, Herrmann and
Jones.................................................................................28

## I. INTRODUCTION

1. This is a securities fraud action by Special Situations Fund III QP, L.P. ("SSF III QP"), Special Situations Cayman Fund, L.P. ("SSF Cayman", and together with SSF III QP, "SSF"), and Wolverine Flagship Fund Trading Limited ("Wolverine", and together with SSF, the "PIPE Investors")*,* three owners of the common stock of ECOtality, Inc. ("ECOtality" or the "Company") that purchased their shares of ECOtality stock pursuant to a Securities Purchase Agreement, dated June 12, 2013 (the "SPA"). The SPA was the vehicle by which SSF and Wolverine entered into a so-called PIPE deal with ECOtality (the "PIPE Deal"), by which a private investment in public equity -- or "PIPE" -- was made.

2. The PIPE Investors hereby assert claims against H. Ravi Brar ("Brar"), ECOtality's former Chief Executive Officer ("CEO"), Susie Herrmann ("Herrmann"), ECOtality's former Chief Financial Officer ("CFO"), and Murray Jones ("Jones"), ECOtality's former Chief Operating Officer ("COO"), under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

3. ECOtality, designed, manufactured, and sold electric vehicle ("EV") charging systems. The Company manufactured and sold four types of EV chargers, including: (a) a Level 2 wall-mount unit, referred to as the Blink Level 2 Residential Charger; (b) a commercial stand-alone Level 2 charger, known as the Blink Level 2 Pedestal Charger; (c) the Blink DC Fast Charger; and (d) the Minit-Charger, a line of advanced fast-charge systems for industrial applications, including material handling and airport ground support equipment.

4. ECOtality derived nearly all of its revenues from the U.S. Department of Energy ("DOE") for its participation in the DOE's Vehicle Technologies Program. In 2009, ECOtality had been awarded a cost-share grant of $100.2 million from the DOE (the "DOE Grant" or "DOE Contract") to lead, support and manage a substantial deployment of EVs and charging infrastructure in major metropolitan areas throughout the United States (the "EV Project"). In essence, the EV Project required ECOtality to deploy EV chargers and analyze EV charger usage data. The EV Project was modified in 2012 and required ECOtality to deploy 13,200 EV chargers by September 2013 and to complete data collection and analysis by

December 31, 2013.  As of January 1, 2013, pursuant to the terms of the DOE Grant, the deadline for ECOtality to complete commercial installations for the EV Project was September 2013.

5.      The PIPE Investors made their purchase of ECOtality stock at a critical point in time for the Company.  Because ECOtality was nearly entirely dependent upon the DOE for its revenues, any risk to the viability of the DOE's funding grant could be devastating to the Company.  Indeed, the Company even represented as much in its public filings preceding the PIPE Deal, when it warned investors that among its risk factors, the Company was at risk of losing its DOE grant and was subject to periodic compliance audits by the DOE pursuant to such grant.  Similarly, the Company had disclosed in its public filings preceding the PIPE Deal that in order to execute its overall business strategy, it may require additional working capital, which may not be available on terms favorable to the Company or at all.

6.      As a result of such known risks facing the Company, the PIPE Investors required and specifically relied upon certain crucial representations set forth in the SPA by which the Company addressed these risks and assured the PIPE Investors that they had not yet materialized and were not imminently likely to occur in the near future.  Thus, ECOtality represented, among other things, that with respect to each of its Government Contracts, including the DOE Contract: (a) the Company had not received any cure notice; (b) there were no outstanding material claims or disputes between the Company and any governmental authority; (c) the Company had not been under investigation or audit by any governmental authority; (d) the Company had not been requested to provide information under threat of legal or administrative penalty; and (e) the Company had not made any disclosure to a governmental authority concerning any alleged non-compliance.

7.      These key representations were instrumental in inducing the PIPE Investors into entering into the PIPE Deal and purchasing $6.4 million of ECOtality common stock (in total, the PIPE Deal raised over $8 million for the Company).  However, as of the time these representations were made, they were flatly contracted by the reality that (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes

between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made disclosures to a governmental authority, the DOE, concerning its alleged non-compliance.

8.      Indeed, Defendants were specifically aware that these representations were false when made:  among other communications, at a June 9, 2013 meeting with the DOE -- three days before the SPA was signed -- the Company advised the DOE that it may no longer be able to meet the September 30, 2013 milestone for completion of charging installations in accordance with the EV Project plan as approved by the DOE, which milestone the DOE deemed to be "significant."  In addition, by a June 14, 2013 cure notice, the DOE advised ECOtality of its finding that ECOtality would be unable to complete the installation and data collection requirements of the EV Project and demanded that ECOtality submit a corrective action plan.  In that cure notice, the DOE warned that ECOtality's failure to provide the requested information and take corrective action could lead to imposition of sanctions, including suspension or termination for non-compliance as provide by federal regulation. Incredibly, just four days later, in connection with the June 18, 2013 closing of the PIPE Deal, ECOtality made to the PIPE Investors the representations set forth above without any indication that the cure notice had been received, that ECOtality had already made disclosures to the DOE with respect to its alleged non-compliance as recently as June 9, 2013, or that ECOtality was required to provide the DOE with the information it had requested under threat of legal or administrative penalty.

9.      In response to the June 14, 2013 cure notice, ECOtality submitted to the DOE a July 9, 2013 reply setting forth a proposed corrective action plan, which the DOE did not approve and required to be significantly modified. Before the modifications were made, however, the Company informed the DOE on August 7, 2013 that it might not be able to meet its obligations under the EV Project. The DOE suspended payments to ECOtality, and on August 12, 2013, ECOtality publicly disclosed its problems with the EV Project, among other things.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -3-

10.     Indeed, on August 12, 2013 ECOtality publicly revealed for the first time numerous problems with the business, including the inability to successfully complete the EV Project and the DOE's suspension of all payments to the Company.  The Company further disclosed that these problems "significantly impact[ed] its ability to meet its ongoing obligations and to fund anticipated operating losses" and that ECOtality might file for bankruptcy in "the very near future."

11.     In response to this unexpected news, ECOtality's stock price dropped 79% to a closing price of $0.31 per share on August 12, 2013, dropping drastically from the $2.04 trading price on June 12, 2013, when the PIPE Investors first contracted to purchase ECOtality common stock under the SPA.  On September 16, 2013, ECOtality and its subsidiaries each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Arizona.

## II.     JURISDICTION AND VENUE

12.     Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered in this District and the alleged misconduct was transacted in and emanated from this District.

## III.     INTRADISTRICT ASSIGNMENT

14.     Pursuant to Civil L.R. 3-2(c), assignment to the San Francisco Division is proper because a substantial part of the events or omissions giving rise to the claims herein occurred in San Francisco.

## IV.     PARTIES

15.     Plaintiff Special Situations Fund III QP, L.P. is a limited partnership organized under the laws of Delaware.  It acquired 1,875,000 unregistered shares of ECOtality common stock in the PIPE Deal for a purchase price of $3 million.

16.     Plaintiff Special Situations Cayman Fund, L.P. is a limited partnership organized under the laws of Delaware. It acquired 625,000 unregistered shares of ECOtality common stock in the PIPE Deal for a purchase price of $1 million.

17.     Plaintiff Wolverine Flagship Fund Trading Limited is a Cayman Islands exempted company. It acquired 1,250,000 unregistered shares of ECOtality common stock in the PIPE Deal for a purchase price of $2 million. Wolverine also purchased 278,845 shares of ECOtality common stock on June 21, 2013 for $446,152.

18.     Defendant H. Ravi Brar was, at all relevant times, ECOtality's Chief Executive Officer ("CEO"), President and a director. Defendant Brar joined the Company as Chief Financial Officer ("CFO") in November 2010 and was named CEO, President and a director in September 2012. As detailed herein, Brar executed the SPA and is responsible for the misrepresentations and omissions in connection therewith.

19.     Defendant Susie Herrmann was ECOtality's CFO at all times relevant to this complaint. Until September 2012, when she was named CFO, Defendant Herrmann served as the Company's Vice President of Corporate Finance and had been with the Company since February 2008. As detailed herein, Herrmann was directly involved in, or responsible for, the misrepresentations and omissions in connection with the SPA.

20.     Defendant Murray Jones was ECOtality's COO at all times relevant to this complaint. Defendant Jones was intimately involved in communications with the PIPE Investors and participated in in-person meetings and site visits with the PIPE Investors. As detailed herein, Jones was directly involved in, or responsible for, the misrepresentations and omissions in connection with the SPA.

## V.     THE $8.2 MILLION PIPE DEAL

21.     Pursuant to the June 12, 2013 SPA, the PIPE Investors provided ECOtality with $6 million in working capital to fund the EV Project, in exchange for receiving common stock in the Company. In total, the private placement transaction raised $8.2 million for the Company.

### A. The PIPE Investors Insisted on Certain Material Representations in the SPA Given the Risk Factors Facing the Company that It Had Disclosed Prior to the PIPE Deal

22.     The SPA contained a series of critical representations and warranties on which the PIPE Investors relied in committing their $6.4 million investment to the Company.  Indeed, as of the time they made their investment, the PIPE Investors were focused on several material risk factors and other concerns that the Company itself had previously brought to investors' attention by their prior public filings.  Thus, in its Form 10-K Annual Report, dated April 15, 2013, for year ended December 31, 2012 (the "2012 Annual Report"), the Company identified several risk factors that it faced, several of which focused specifically on the fact that the Company was nearly entirely dependent on the grants from the DOE to support its business plan.  In particular, the Company identified the following risk factors:

> A large percentage of our revenues depend on the progress of our activities under grants from the DOE. . . .The [DOE] contract is expected to result in up to $100.2 million in revenue to us, which we expect to represent a substantial portion of our revenues while it is in effect.  As a condition of the DOE Contract, we are required to meet certain obligations, including, but not limited to, producing and delivering products, services and reports on a timely basis in accordance with required standards.

2012 Annual Report, Item 1A., Risk Factors.

23.     Likewise, the Company further warned that it was obligated to satisfactorily comply with periodic compliance audits as an important condition to its grants from the DOE:

> In addition, we are subject to periodic compliance audits in connection with grants from the DOE.  If we are unable to properly perform our obligations under those agreements, or if any compliance audits result in material deficiencies, material adjustments to the previously submitted claims and/or to the amounts recognized as revenue in our financial statements could occur, which would have a material adverse effect on our business, financial condition and results of operations.

2012 Annual Report, Item 1A., Risk Factors.

24.     As an additional risk factor, the Company warned investors in April, 2013 that "ECOtality North America may not continue to receive DOE funding or any other

governmental funding, which currently comprises a large portion of our consolidated revenue." The Company amplified this risk factor as follows:

> We expect to derive a substantial majority of our revenue during 2013 from DOE-related activity, including the DOE Contract. . . .If any of our current projects with the DOE are cut or cancelled, or future projects are reduced from those currently planned, our business, financial condition and results of operations could be materially and adversely affected.

2012 Annual Report, Item 1A., Risk Factors.

25.     Another risk factor that the Company identified in its 2012 Annual Report arose from the fact that it might have required additional working capital to execute its business strategy, and that working capital might not be available on terms favorable to it or at all:

> We have an ambitious business plan for strong growth of our commercial businesses which will require us to raise additional financing to supplement our cash flows from operations to fully execute. . . .There can be no assurance that if we were to need additional funds to meet obligations we have incurred, or may incur in the future, that additional financing arrangements would be available in amounts or on terms acceptable to us, if at all. Furthermore, if adequate additional funds are not available, we may be required to delay, reduce the scope of, or eliminate material parts of the implementation of our business strategy.

2012 Annual Report, Item 1A., Risk Factors.

26.     The Company further identified as a risk factor the fact that "[p]roduct development and commercialization milestones may not be met." *Id.*

27.     Accordingly, it is precisely because the Company had set forth this litany of risk factors related to its near-total dependency on the DOE Grant and its critical need to satisfactorily complete the DOE's compliance audits -- coupled with the possible unavailability of additional needed working capital -- that the PIPE Investors relied so heavily on the critical representations set forth in the SPA that were designed to address these risks head on and thereby induce the PIPE Investors to invest their $6.4 million in ECOtality without fear that any of these identified risks had already materialized.  Otherwise, at the very least, if the Company was in fact in possession of any information that would threaten the DOE Grant or

otherwise call into question the Company's financial ability to complete the EV Project, the Company was required to disclose that information to allow the PIPE Investors to perform the requisite due diligence to determine just what disclosures the Company had made to the DOE about its alleged non-compliance, what any DOE investigation was about, and whether a risk to the completion of the EV Project had already materialized.

**B.** **The Company's Representations in the SPA (Falsely) Assured The PIPE Investors That None of the Company's Risk Factors Had Already Materialized**

28. Given the known risk factors that the Company itself had identified to the market in its 2012 Annual Report, among other sources, the representations that the Company made on June 12, 2013 in the SPA to dispel any concern that these risk factors had actually materialized were of vital importance to the PIPE Investors in making their investment.

29. Perhaps the single most important set of representations in the SPA -- which was flatly contradicted by actual events then known to the Company but concealed from the PIPE Investors -- was that with respect to all of its Government Contracts (as defined in the SPA), among which was the DOE Contract, (i) there were no pending investigations or audits; (ii) the Company had not been requested to provide information under threat of penalty; and (iii) the Company had not made any disclosure to a governmental authority with respect to any alleged non-compliance.

30. Thus, in the June 12, 2013 SPA, the Company made the following representations and warranties, among others, as follows:

- "With respect to each Government Contract . . . the Company has complied with all applicable requirements, terms and conditions" (SPA Section 3.1(z)(iii)(A));

- "With respect to each Government Contract . . . no written notice has been received by the Company alleging that the Company . . . is or was in material, uncured … violation of any applicable . . . contractual, regulatory or administrative requirement" (SPA Section 3.1(z)(iii)(B));

- "With respect to each Government Contract . . . no cure notice . . . has been received by the Company" (SPA Section 3.1(z)(iii)(B));

- "With respect to each Government Contract . . . there are no outstanding material claims or disputes between the Company and any governmental authority" (SPA Section 3.1(z)(iii)(D));

- "The Company . . . and to the knowledge of the Company . . . [and its] directors, officers, employees, agents or consultants, have not during the past three (3) years . . . with respect to any Government Contract . . . [1] been under investigation or audit by any Governmental Authority . . . [2] been requested to provide information . . . under threat of . . . legal or administrative penalty or . . . [3] made any disclosure to a Governmental Authority with respect to any alleged…noncompliance" (SPA Section 3.1(z)(iv)(C-E)).

31.    In addition, it is expressly provided in the SPA that each of the representations and warranties in Section 3.1(z)(iv) of the SPA was made after consultation with ECOtality's directors and officers, among others.

**C.    The Representations And Warranties Were False When Made**

32.    In the period preceding the execution of the SPA on June 12, 2013, the Company and the DOE had numerous conference calls and at least one in-person meeting -- all of which were unbeknownst to the PIPE Investors -- to discuss, among other things, the Company's expectation for meeting the remaining milestones under the DOE Contract.  In those conference calls and meetings, ECOtality made disclosures to the DOE indicating that ECOtality was no longer certain that it could meet the September 2013 deadline for completing the installation and data collection requirements of the EV Project.  Thus, during a June 9, 2013 meeting with the DOE -- to which the PIPE Investors were not privy and three days before the SPA was signed -- ECOtality provided information to the DOE indicating that ECOtality "may no longer be able to meet the September 30, 2013 milestone for completion of charging station installations in accordance with the approved project plan," which milestone the DOE deemed to be "significant."

33.    In addition, on June 14, 2013 -- two days after the SPA was executed but prior to its closing on June 18, 2013 -- the DOE requested ECOtality to prepare and submit a Corrective Action Plan ("CAP") to cure its apparent non-compliance, which CAP needed to show an updated plan with both a "payment plan" and "monthly milestones" to achieve

installation of "all 5000 planned installations by September 30, 2013." In its June 14, 2013 communication the DOE also required a "certification of financial commitment for the remainder of the project." The DOE further informed ECOtality that "[f]ailure to provide and take corrective action could lead to imposition of remedies, including suspension or termination for non-compliance as outlined in 10 CFR 600.352." This information was not disclosed to the PIPE Investors prior to closing on the SPA.

34. On June 18, 2013, the PIPE Deal closed. The SPA specifically provided that all representations and warranties therein were valid as of the Closing Date (June 18) as well as of the time of contracting (June 12). SPA, Section 3.1. Moreover, the Company had provided the PIPE Investors with a June 12, 2013 Disclosure Schedule to supplement and update the representations and warranties made in the SPA, pursuant to which the Company did not provide any additional information in the Disclosure Schedule or at the time of closing to amend or update the contractual representations and warranties set forth above in any way. On the contrary, the Disclosure Schedule for Section 3.1(z)(iv) expressly provided "None," affirmatively indicating that the Company did not have any additional disclosures to declare.

35. Accordingly, four days after the DOE sent its June 14, 2013 notice, the Company reaffirmed the SPA's representations and warranties that no cure notice had been received by the Company; that there were no outstanding material claims or disputes between the Company and any governmental authority; that there was no investigation or audit by any Governmental Authority; that the Company had not been requested to provide information under threat of legal or administrative penalty; and that the Company had not made any disclosures to a governmental entity with respect to any alleged non-compliance. This is so despite the indisputable fact that there was indeed a cure notice that was received by the Company; there was in fact an outstanding material claim or dispute between the Company and any governmental authority; there was in fact an investigation or audit being conducted by a Governmental Authority; the Company had in fact been requested to provide information under threat of legal or administrative penalty in response thereto; and, perhaps most

egregiously, the Company had indeed made disclosures to a governmental entity with respect to its alleged non-compliance with the DOE Contract.

36. Pursuant to the final representation in this set, at an even more basic level, the rationale behind this representation was that the PIPE Investors were entitled to know whether the Company had made any disclosures to the DOE even with respect to any *alleged* non-compliance in connection with the EV Project -- precisely as the Company did during its June 9, 2013 meeting with the DOE and in contemporaneous conference calls -- if only to focus their due diligence on determining whether or not any such alleged non-compliance posed a threat to the very viability of their investment. Indeed, the SPA's representations cast a very wide net in determining what type of information should be provided to the PIPE Investors; the Company would not have admitted to any wrongdoing or otherwise somehow compromised itself simply by informing the PIPE Investors about the disclosures it made to the DOE concerning its possible non-compliance with the EV Project. Accordingly, the SPA called for the Company to identify disclosures it may have made about its **alleged** non-compliance, regardless of whether the Company may itself still have believed that it was possible to meet the existing September 2013 milestone. It was not left to the Company's discretion to pick and choose or characterize what types of disclosures it had made to the DOE about its compliance; the SPA contemplated that the Company would reveal to the PIPE Investors all such disclosures, including those concerning merely **alleged** non-compliance, and the PIPE Investors were thereby permitted an opportunity to review that information in order to make a fully informed decision about whether to invest in the Company or not. Instead, by covering up the existence of the disclosures it had made to the DOE concerning the September 2013 milestone and the subsequent cure letter it received from the DOE, the Company concealed a critical piece of information from the PIPE Investors to which they were plainly entitled, and deprived them of the ability to scrutinize the substance of that information prior to making their $6.4 million investment.

37. Furthermore, even apart from the above representations that no cure notice had been received and no information had been provided to a governmental authority concerning

ECOtality's alleged non-compliance, the SPA included additional representations that were false when made. Thus, for instance, the Company represented that since the time of its most recent SEC filing, "there has been no event, occurrence or development that has had or that would reasonably be expected to result in a Material Adverse Effect," SPA Section 3.1(j), even though ECOtality's disclosures to the DOE during the June 9, 2013 meeting concerning its alleged non-compliance as well as the DOE's June 14, 2013 cure notice -- which threatened the very continuation of the DOE Grant -- should readily have been expected to result in a material adverse effect within the meaning of the SPA.

38. Additionally, the Company expressly acknowledged by its "Disclosure" representation that each of the PIPE Investors would rely on the representations and covenants contained in the SPA in effecting their transaction to purchase common stock of the Company, and the Company confirmed that its representations were true in all material respects and did not omit to state any material fact necessary in order to make the statements made therein not misleading. Section 3.1(kk). This representation is patently false as the Company omitted to state anything about the material fact that ECOtality had provided disclosures to the DOE in various conference calls and during the June 9, 2013 meeting concerning its alleged non-compliance, or the material fact that the DOE had sent a cure notice and requested a corrective action plan and other information on threat of legal or administrative penalty. At a bare minimum, the Company owed it to the PIPE Investors to advise them of the disclosures it made to the DOE at the June 9, 2013 meeting and related conference calls, as well as the June 14, 2013 cure notice and the DOE's request for information, which are plainly material omissions given the Company's previously disclosed dependency on DOE grant funding and its being subject to periodic compliance audits by the DOE.

## VI. THE OIG AUDITS DEMONSTRATE THAT THE DOE WAS CONCERNED ABOUT ECOTALITY'S ABILITY TO COMPLETE THE EV PROJECT AND THAT IT COMMUNICATED THOSE CONCERNS TO ECOTALITY PRIOR TO THE CLOSING OF THE PIPE DEAL

39. Two reports issued by the DOE's OIG, Office of Audits and Inspections, dated July 25, 2013 and October 31, 2013, respectively, provide further insight into the nature of the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS            -12-

DOE's concern about ECOtality's ability to complete the EV Project and the timeline of events by which the DOE and ECOtality communicated about those concerns.

40.    According to the OIG's October 31, 2013 report, as of May 21, 2013, the DOE became aware that ECOtality would not meet its September 2013 milestone for completing charging station installations.

41.    In that same report, the OIG also referred to an internal memorandum discussing the need for a corrective action plan, in which memorandum "a [DOE] official noted that the necessary installation rate for completion was about one-half to one-seventh of what was needed for commercial EV chargers."

**A.    If ECOtality Had Informed The PIPE Investors About The Pending DOE Investigation -- As It Was Obligated To Do Under The SPA -- The PIPE Investors Would Not Have Agreed To The PIPE Deal**

42.    By its failure to inform the PIPE Investors about the disclosures it had made to the DOE concerning its alleged non-compliance and the pending DOE investigation, the Company induced those investors into buying ECOtality stock while concealing material information to which they were entitled. After all, the very rationale behind the representations and warranties was that the PIPE Investors were in critical need of any and all available information that could threaten the viability of the EV Project and the DOE Grant given the myriad foreseeable and known risks that the Company was dependent on the DOE Grant and was thinly capitalized. However, rather than make the requisite disclosures and provide the PIPE Investors the information to which they were clearly entitled, the Company lulled those investors into the false sense of security that the Company's stated risk factors had not yet materialized, when in fact they had.

43.    Indeed, the OIG itself concluded that the DOE should have disclosed to the OIG in the course of its audit of the EV Project and the DOE Grant that the DOE was in possession of information casting doubt on ECOtality's ability to complete the EV Project. Thus, the OIG's October 13, 2013 report found that the DOE had not fully disclosed known concerns regarding ECOtality's ability to meet its EV Project obligations to the OIG prior to completion of the OIG's previous audit. The OIG report further found that the failure of the DOE to report

to the OIG issues "that could have impacted project completion would have led us to perform additional audit procedures to evaluate ECOtality's ability to fulfill its obligations under the Recovery Act award."

44.    The OIG itself thus concluded that if it had been timely advised by the DOE of the factors apparently known to the DOE impeding ECOtality's project completion, as ECOtality had disclosed to the DOE in and around June 2013 (prior to the signing of the SPA), then the OIG would have undertaken more specific audit procedures to determine whether to recommend more immediate and drastic curative measures, such as the suspension or termination of the DOE Grant. In other words, the OIG appreciated the severity of the risk that ECOtality might not be able to complete the EV Project and considered any fact probative of that risk important enough that it took the DOE to task for failing to share the same information that ECOtality had provided to the DOE; namely, that ECOtality had made disclosures to the DOE concerning its alleged non-compliance and that a DOE investigation concerning such alleged non-compliance was pending.

**B.    ECOtality Led The PIPE Investors To Believe That The Financing Raised From The PIPE Deal Would Provide Sufficient Working Capital To Complete The EV Project**

45.    ECOtality specifically represented to the PIPE Investors that the financing raised by the PIPE Deal would provide it with sufficient funding to meet its capital requirements for completion of the EV Project. Thus, the SPA contained the following representation concerning "Solvency":

> upon consummation of the Transaction. . . the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, and projected capital requirements and capital availability thereof.

SPA Section 3.1(w).

46.    By this representation, ECOtality induced the PIPE Investors into believing that the PIPE Deal provided ECOtality with sufficient capital to carry on its business as now conducted and as proposed to be conducted. Likewise, the representation included the fact that

the PIPE Deal was sufficient to cover projected capital requirements as well. In all events, nothing in this representation suggested or implied that ECOtality needed further funding to assure its near-term survival or complete the EV Project.

47. Indeed, the PIPE Investors were aware that the Company intended to raise additional capital after the PIPE Deal was consummated; however, the PIPE Investors were not aware that any additional financing was necessary to sustain the Company's very existence immediately after the PIPE Deal closed, or even that additional funding was needed to complete the EV Project. Thus, ECOtality further represented in the Disclosure Schedule accompanying the SPA as follows:

> The Company intends to raise additional capital in the form of equity and/or debt (e.g. project financing) in order to fund operations and for the expansion of its network as required to fully execute its business plan.

SPA Disclosure Schedule, Schedule 3.1(w).

48. The PIPE Investors were thus aware that the Company intended to raise additional capital, but at no point were they informed or did they believe that the financing being provided to the company by virtue of the PIPE Deal would not be sufficient to allow the Company to complete the EV Project and otherwise achieve its then-current business plan.

49. ECOtality was similarly deceitful when it informed the DOE -- just as it had represented to the PIPE Investors -- that the PIPE Deal provided sufficient funding for ECOtality to complete the EV Project, even though ECOtality apparently believed at that time that it needed more money to complete that project. Thus, in response to the DOE's request for a certification of financial commitment as part of its June 14, 2013 curative notice, Brar sent the DOE a post-closing letter dated July 5, 2013 advising that ECOtality had "recently completed a private placement of common stock and warrants to certain institutional investors, which has established a $7.5 million reserve." The letter further advised that "[a] significant portion of the reserve will be used to fund eTec's operations, including any cost share obligations remaining under the EV Project." Brar's July 5, 2013 letter said nothing about having an immediate need for any further financing, stating simply (and cagily) that "to the

extent" any additional funding was needed in the future in excess of such reserve and other cash flow, ECOtality would address any such need through a combination of debt and/or additional equity issuance as appropriate. Just as ECOtality intended, the DOE interpreted this assertion to conclusively indicate that as a result of the PIPE Deal ECOtality now had sufficient funding to complete the EV Project (contrary to ECOtality's now-apparent but concealed belief that it in fact needed further funding beyond the PIPE Deal to do so).

50. Thus, the OIG's October 31, 2013 report found that the DOE had not believed that ECOtality's financial situation was dire prior to August 7, 2013 because ECOtality had not indicated prior to that time that the Company was in financial distress. On the contrary, according to the OIG's report, the DOE believed that ECOtality had been on sound financial footing because "ECOtality had recently asserted that it had received approximately $7.5 million in capital *that would have supported the completion of its obligations under the Recovery Act project*" (emphasis added).

51. Accordingly, ECOtality was very definitive in its communications to the DOE as well as the PIPE Investors that the PIPE Deal provided adequate financing to complete the EV Project and that no additional financing was needed beyond the PIPE Deal at the time that that transaction took place. These representations stand in stark contrast to the public statements ECOtality made just six weeks later, when ECOtality tellingly confessed in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," a fact never previously disclosed to the PIPE Investors at the time of their investment.

## C. The Company Submitted Its Corrective Action Plan, Which The DOE Refused To Approve

52. On July 9, 2013, ECOtality submitted to the DOE its corrective plan, which itself acknowledged that ECOtality could not meet the projected 1,000 commercial units that remained to be installed. As its certification of financial commitment, ECOtality represented that it "recently completed a private placement of common stock and warrants to institutional investors" and "has established a "$7.5 million reserve" to complete the project.

53.     Later during that same week of July 8, 3013, ECOtality and the DOE conducted a follow-up meeting concerning ECOtality's corrective action plan. At that meeting, the DOE indicated that it did not intend to approve the plan.  Indeed, according to the OIG's October 31, 2013 report, in September 2013, DOE officials commented to the OIG that they did not plan to approve the proposed corrective action plan from ECOtality as written, and that the plan would require significant modifications.

54.     On August 8, 2013, ECOtality reported to the DOE that it was in "financial distress and may not be able to meet its obligations under the Recovery Act award."  On August 9, 2013, the DOE suspended payments and informed ECOtality not to incur additional expenses.  On August 12, 2013, ECOtality announced that it was no longer able to meet its financial obligations, and on September 16, 2013, ECOtality filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code, rendering the PIPE Investors' common stock in ECOtality worthless.

55.     Also during this period of time, ECOtality had filed a registration statement on Form S-3 on July 1, 2013, which was declared effective by the SEC on July 9, 2013.  Pursuant to such declaration, the 5.1 million shares of ECOtality stock that had been sold in the PIPE Deal were registered for resale to the investing public.  However, on or about August 9, 2013, the Company sent a notice to SSF by fax advising that the recently filed registration statement was no longer effective and was not available for offers and sales of ECOtality common stock.

56.     Wolverine never even received that notice from the company (which ECOtality apparently purported to send by fax long after business hours to an incorrect telephone number), but ultimately learned about it because ECOtality's transfer agent refused to process any request for transfers of the stock or removal of restrictive legends from the stock certificates as a result of the Company's announcement.  Accordingly, neither SSF nor Wolverine sold any of their ECOtality stock pursuant to the registration statement

### D.     Defendants Made Their Misrepresentations and Omissions with Scienter

57.     Defendants made their false and misleading representations and warranties with scienter.  They participated in making the disclosures to the DOE, and/or were aware of such

disclosures being made, at the June 9, 2013 meeting with the DOE and in the contemporaneous conference calls with the DOE that occurred during that same period of time, all of which preceded the execution of the SPA on June 12, 2013. The SPA's representations and warranties were knowingly false when made and Defendants made such (mis)representations with scienter and an intention to deceive the PIPE Investors and induce them into purchasing ECOtality stock. Likewise, Defendants concealed the existence of the June 14, 2013 curative notice with scienter and deliberately failed to reveal that document to the PIPE Investors on or before the June 18, 2013 closing with an intention to deceptively cause the PIPE Investors to invest in the Company without knowing its true state of affairs.

58. Likewise, Defendants (falsely) represented to the PIPE Investors that the PIPE Deal would provide sufficient funding to complete the EV Project with the intent of inducing the PIPE Investors into signing the SPA and purchasing ECOtality stock notwithstanding the known falsity of that representation. Just as they told the DOE, ECOtality misled the PIPE Investors into believing that the $8.2 million raised from the PIPE Deal would provide a $7.5 reserve that would have supported completion of its obligations under the EV Project, when in fact ECOtality admitted in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," contrary to its prior disclosures to the PIPE Investors. Defendants thus made these financial misrepresentations to the PIPE Investors with scienter.

## VII. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS DIRECTLY CAUSED THE PIPE INVESTORS' LOSS

59. Contrary to ECOtality's representations to the PIPE Investors in the SPA, as of the time these representations were made they were false because (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made a disclosure to the DOE

concerning its alleged non-compliance in meeting the September 2013 milestone. Furthermore, ECOtality represented to the PIPE Investors in the SPA that as a result of the PIPE Deal it would have sufficient funding to complete the EV Project and that no further working capital was necessary to do so. This is consistent with ECOtality's representation to the DOE on July 5, 2013, after the PIPE Deal had closed, that it then had sufficient funding to complete the EV Project. These representations were also false when made, as exposed by ECOtality's own admission in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," a fact never previously disclosed to the PIPE Investors at the time of their investment.

60. It is the very same subject matter of these misrepresentations that caused the loss in value of the PIPE Investors' common stock of ECOtality. As the Company had previously apprised the financial markets, ECOtality was subject to the risks that it could lose the DOE funding on which it was so highly dependent, that it was subject to periodic compliance audits by the DOE in connection with such funding, and that the Company might require additional working capital to execute its overall business plan. It was precisely because these known and foreseeable risks were of concern to the PIPE Investors that they bargained for representations from the Company in the SPA expressly assuring the PIPE Investors that, among other things, the Company was in good standing with the DOE, it was not subject to an audit by -- or in receipt of a cure letter from -- the DOE, it had not made disclosures to the DOE with respect to any alleged non-compliance, and it did not require additional funding beyond the PIPE Deal to complete the EV Project and execute its then-current business plan.

61. The DOE itself believed that the PIPE Deal provided ECOtality with sufficient funding to complete the EV Project, as ECOtality represented to it in its July 5, 2013 financial commitment letter. Likewise, the October 31, 2013 OIG report confirmed that the DOE believed that the $7.5 million in capital that ECOtality received from the PIPE Deal would have supported completion of its obligations under the EV Project.

62. Indeed, the Company and Brar were motivated to make such misrepresentations and induce the PIPE Investors into contributing their $6 million in funding to the Company

precisely because the Company in turn needed to assure the DOE that it had sufficient funding to complete the EV Project. In order to provide the DOE with the financial commitment letter that the DOE required along with ECOtality's corrective action plan, ECOtality needed to induce the PIPE Investors to provide sufficient funding to complete the project and then inform the DOE that such funding had thus been made available to the Company. ECOtality was well aware that if it failed to assure the DOE that it had sufficient financing to complete the EV Project, the DOE would immediately suspend or terminate the DOE Grant; in fact, this is exactly what happened the very next month, in August 2013, when the Company informed the DOE that it lacked sufficient financing to complete the EV Project. Upon hearing that news, the DOE immediately suspended payments to ECOtality, a setback from which the PIPE Investors had (correctly) feared the Company could not recover.

63. Ultimately the very risks against which the PIPE Investors had tried to protect themselves materialized, contrary to the representations that ECOtality made to them in the SPA. Thus, the DOE was in fact concerned that ECOtality would not be able to complete the EV Project (although the Company omitted this fact); the DOE had in fact sent a cure notice to the Company (although the Company omitted this fact); the Company had in fact made disclosures to the DOE with respect to its alleged non-compliance (although the Company omitted this fact), and the Company was not in fact able to complete the EV Project with the funding provided by the PIPE Deal (although the Company misrepresented this fact). Ultimately, the risks underlying all of these (mis)representations and omissions materialized, and the DOE suspended payments to ECOtality under the DOE Grant in connection with the EV Project out of its concern that ECOtality lacked adequate financing to complete the EV Project, which concern only exacerbated the DOE's related concern arising as early as May 2013 that ECOtality was not likely to meet the September 2013 milestone and would not be able to complete the EV Project, as the DOE and ECOtality discussed at their June 9, 2013 meeting and during contemporaneous conference calls.

64. Accordingly, the DOE's twin concerns about the Company's ability to complete the EV Project and the Company's lack of adequate funding to do so -- which concerns were

so interrelated as to reflect two sides of the same coin -- were knowingly omitted from the disclosures provided to the PIPE Investors and were the selfsame factors that led to the DOE's suspension of funding under the DOE Grant and the ultimate bankruptcy of the Company and the loss of the PIPE Investors' stock value.

65. In addition, the curative disclosure that the Company made on August 12, 2013 revealed the Company's fraud and set in motion a chain of events that would soon eviscerate the PIPE Investors' entire investment in ECOtality stock. On that date, ECOtality publicly revealed for the first time in its Form 8-K its lack of available funding to complete the EV Project and the DOE's suspension of all payments to the Company. The Company also reported that these problems "significantly impact[ed] its ability to meet its ongoing obligations and to fund anticipated operating losses" and that ECOtality might file for bankruptcy in "the very near future." Tellingly, ECOtality admitted in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," a fact never previously disclosed to the PIPE Investors at the time of their investment. In response to this surprising admission, ECOtality's stock price took a 79% nose dive to just $0.31 per share on August 12, 2013, which price effectively dropped to zero when ECOtality proceeded with its inevitable bankruptcy filing on September 16, 2013. The PIPE Investors thus purchased their ECOtality stock under the SPA at an inflated price, and they would not have paid that price (and would not have entered into the transaction) if the truth about ECOtality had been disclosed to them.

## VIII. LEGAL CLAIMS

### FIRST CAUSE OF ACTION

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against Brar

66. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 65 as though fully set forth herein.

67.    In connection with the PIPE Deal, Brar disseminated or approved the false statements specified above, which he knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendant Brar knew, or was severely reckless in failing to know, of the material omissions from, and misrepresentations contained in, the statements as set forth above.

68.    Defendant Brar, with knowledge of or severely reckless disregard for the truth, disseminated or approved statements in the SPA referred to above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.    Defendant Brar, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on the PIPE Investors and concealed material adverse information regarding the fact that (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made any disclosure to a governmental authority concerning its alleged non-compliance.  Moreover, Brar concealed material adverse information regarding the fact that the PIPE Deal would not provide sufficient funding for the Company to complete the EV Project, despite having represented to the contrary in the SPA (consistent with the Company's representations to the DOE in that regard).

70.    By reason of the conduct alleged herein, Defendant Brar knowingly or recklessly, directly and indirectly, has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that he:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that

operated as a fraud or deceit upon the PIPE Investors in connection with their purchases of ECOtality securities.

71.     In reliance on the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above (including the materially false and misleading representations that (a) the Company had not received a cure notice; (b) there were no outstanding material claims or disputes between the Company and the DOE; (c) the Company was not under investigation or audit by the DOE; (d) the Company had not been requested to provide information under threat of legal or administrative penalty; (e) the Company had not made any disclosure to a governmental authority concerning its alleged non-compliance; and (f) that the PIPE Deal would provide sufficient funding for the Company to complete the EV Project), the PIPE Investors acquired ECOtality common stock under the SPA.

72.     Had Plaintiffs known of the materially adverse information not disclosed by Defendant Brar and known that he was concealing the existence of its disclosures to the DOE and its true financial picture, Plaintiffs would not have purchased ECOtality securities.

73.     Defendant Brar's failure to disclose this information lulled Plaintiffs into a false sense of security that the foreseeable risks facing the Company -- including the risks relating to the Company's near-total dependency on the DOE Grant for its funding; the Company's being subject to the DOE's periodic compliance audits; and the risk that the Company would not necessarily be able to obtain alternate financing on terms that were favorable or at all -- had not yet materialized and were not imminently likely to do so.  When these foreseeable risks materialized, ECOtality lost its DOE funding and filed for bankruptcy, wiping out Plaintiffs' investment.  Plaintiffs' damages were the direct and proximate result of Defendant Brar's unlawful conduct as alleged herein.

74.     By virtue of the foregoing, Defendant Brar violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013.  Plaintiffs have brought this claim within two years of discovery of the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -23-

violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely.

### SECOND CAUSE OF ACTION

**For Violations of §20(a) of the Exchange Act**
**Against Brar, Herrmann and Jones**

76.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 75 as though fully set forth herein.

77.     By reason of the wrongful conduct described herein, ECOtality committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.     Brar, Herrmann and Jones, by reason of their management positions, were controlling persons of the Company within the meaning of Section 20 of the Exchange Act. With respect to Brar, the control person claim in this second cause of action is pled in the alternative to the first cause of action asserted herein.

79.     Brar, Herrmann and Jones each had the power, influence and authority to cause, and did cause, directly or indirectly, others to engage in the wrongful conduct complained of herein, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading, as well as the withholding and omission of truthful statements from disclosures and representations made to Plaintiffs.   Brar -- who himself executed the SPA -- and Herrmann and Jones were provided with or had unlimited access to copies of the SPA and the Company's documents and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     The Defendants were culpable participants in ECOtality's violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged above.   Indeed, it is expressly provided in the SPA that each of the representations and warranties in Section 3.1(z)(iv) of the SPA -- *i.e.*, those representations and warranties concerning the viability of ECOtality's Government

Contracts and any disclosures that ECOtality may have made to a Governmental Authority with respect to any alleged non-compliance -- were made after consultation with ECOtality's directors and officers, among other agents. The SPA thus provides that those representations were made with respect to "the Company and its Subsidiaries (and, to the knowledge of the Company, their respective directors, officers, employees, agents or consultants)."

81. By reason of such wrongful conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

82. As a direct and proximate result of Defendants' wrongful conduct, the PIPE Investors suffered damages in connection with their purchases of the Company's securities in amounts to be proven at trial.

83. The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013. Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely.

### THIRD CAUSE OF ACTION

### For Violations of §§ 25401 and 25501 of the California Corporations Code Against Brar

84. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 83 as though fully set forth herein.

85. In connection with the PIPE Deal, Brar disseminated or approved the false statements specified above, which he knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendant Brar knew, or was severely reckless in failing to know, of the material omissions from, and misrepresentations contained in, the statements as set forth above.

86. Defendant Brar, with knowledge of or severely reckless disregard for the truth, disseminated or approved statements in the SPA referred to above, which were misleading in

that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     Defendant Brar, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on the PIPE Investors and concealed material adverse information regarding the fact that (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made any disclosure to a governmental authority concerning its alleged non-compliance.  Moreover, Defendant Brar concealed material adverse information regarding the fact that the PIPE Deal would not provide sufficient funding for the Company to complete the EV Project, despite having represented to the contrary in the SPA (consistent with the Company's representations to the DOE in that regard).

88.     By reason of the conduct alleged herein, Defendant Brar knowingly or recklessly, directly and indirectly, has violated Section 25401 of the California Corporations Code in that he:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the PIPE Investors in connection with their purchases of ECOtality securities.

89.     In reliance on the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above (including the materially false and misleading representations that (a) the Company had not received a cure notice; (b) there were no outstanding material claims or disputes between the Company and the DOE; (c) the Company was not under investigation or audit by the DOE; (d) the Company had not been requested to provide information under threat of legal or administrative penalty; (e) the

Company had not made any disclosure to a governmental authority concerning its alleged non-compliance; and (f) that the PIPE Deal would provide sufficient funding for the Company to complete the EV Project), the PIPE Investors acquired ECOtality common stock under the SPA.

90. Had Plaintiffs known of the materially adverse information not disclosed by Defendant Brar and known that Defendant Brar was concealing the existence of its disclosures to the DOE and its true financial picture, Plaintiffs would not have purchased ECOtality securities.

91. Defendant Brar's failure to disclose this information lulled Plaintiffs into a false sense of security that the foreseeable risks facing the Company -- including the risks relating to the Company's near-total dependency on the DOE Grant for its funding; the Company's being subject to the DOE's periodic compliance audits; and the risk that the Company would not necessarily be able to obtain alternate financing on terms that were favorable or at all -- had not yet materialized and were not imminently likely to do so. When these foreseeable risks materialized, ECOtality lost its DOE funding and filed for bankruptcy, wiping out Plaintiffs' investment. Plaintiffs' damages were the direct and proximate result of Defendants' unlawful conduct as alleged herein.

92. By virtue of the foregoing, Defendant Brar violated Section 25401 of the California Corporations Code, and Plaintiffs assert this claim against Brar pursuant to Section 25501 thereof.

93. The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013. Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely pursuant to Section 25506(b).

**FOURTH CAUSE OF ACTION**

**For Violations of § 25504 of the California
Corporations Code Against Brar, Herrmann and Jones**

94.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 93 as though fully set forth herein.

95.     By reason of the wrongful conduct described herein, ECOtality committed a primary violation of Sections 25401 and 25501 of the California Corporations Code.

96.     Brar, Herrmann and Jones, by virtue of their being principal executive officers or directors, were controlling persons of the Company within the meaning of Section 25504 of the California Corporations Code.  With respect to Brar, the control person claim in this forth cause of action is pled in the alternative to the third cause of action asserted herein.

97.     Brar, Herrmann and Jones each had the power, influence and authority to cause, and did cause, directly or indirectly, others to engage in the wrongful conduct complained of herein, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading, as well as the withholding and omission of truthful statements from disclosures and representations made to Plaintiffs.  Brar -- who himself executed the SPA -- and Herrmann and Jones were provided with or had unlimited access to copies of the SPA and the Company's documents and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     The Defendants were culpable participants in ECOtality's violations of Sections 25401 and 25501 of the California Corporations Code.  Indeed, it is expressly provided in the SPA that each of the representations and warranties in Section 3.1(z)(iv) of the SPA -- *i.e.*, those representations and warranties concerning the viability of ECOtality's Government Contracts and any disclosures that ECOtality may have made to a Governmental Authority with respect to any alleged non-compliance -- were made after consultation with ECOtality's directors and officers, among other agents.  The SPA thus provides that those representations

were made with respect to "the Company and its Subsidiaries (and, to the knowledge of the Company, their respective directors, officers, employees, agents or consultants)."

99.    By reason of such wrongful conduct, the Defendants are liable pursuant to Section 25504 of the California Corporations Code.

100.    As a direct and proximate result of Defendants' wrongful conduct, the PIPE Investors suffered damages in connection with their purchases of the Company's securities in amounts to be proven at trial.

101.    The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013.  Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely pursuant to Section 25506(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against Brar, Herrmann and Jones, jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.    Awarding rescission or a rescissory measure of damages; and

D.    Awarding such equitable, injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: October 23, 2014

                            /s/ Michael J. McGaughey
MICHAEL J. McGAUGHEY
LOWENSTEIN SANDLER LLP
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: 415-288-4545
Fax: 415-288-4534
E-mail: mmcgaughey@lowenstein.com
*Counsel for Plaintiffs Special Situations Fund III
QP, L.P., Special Situations Cayman Fund, L.P.,
and Wolverine Flagship Fund Trading Limited*

*Pro hac vice* application forthcoming:
STEVEN M. HECHT
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
Telephone: 646-414-6902
Fax: 973-597-2381
E-mail: shecht@lowenstein.com